**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. ________________ |
| v. | ) | |
| FRANKLIN COUNTY MUNICIPAL COURT; JESSICA D'VARGA, Administrative and Presiding Judge for Franklin County Municipal Court, in her official capacity; ENOCH WHITE, Director of Security, Franklin County Municipal Court, in his official capacity, | ) | |
| | ) | DECLARATION OF LUKE AFFHOLTER |
| Defendants. | ) | |

I, Luke Affholter, declare as follows:

1. I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as an Acting Assistant Field Office Director [(A)AFOD] with the Detroit Field Office, Columbus, Ohio Sub-Office, which is located in Westerville, Ohio and has operational oversight over Franklin

County, Ohio. I have held this position since December 15, 2025.

2. I have been employed by ICE since November 6, 2006. Since that time, I have held several positions with ICE: Immigration Enforcement Agent from 2006 to 2009, Deportation Officer from 2009 to 2019, and Supervisory Detention and Deportation Officer from 2019 to present. I am currently serving in the capacity of Acting Assistant Field Office Director. In my career with ICE, I have overseen various units as both a first-line supervisor and second-line supervisor, to include fugitive operations, the criminal alien program (CAP), custody management, non-detained case management, prosecutions, and the alternatives to detention program.

3. I also supervise ERO staff, review operational reports, and ensure compliance with DHS and ICE policies. I receive regular briefings and written updates from DHS and ICE personnel regarding enforcement activities, detainer issuance and processing, and cooperation with state and local law enforcement agencies.

4. The statements contained in this declaration are based upon my personal knowledge, reasonable inquiry, and information made available to me in the course of my official duties from information obtained from records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS.

5. I have personal knowledge of the matters set forth in this declaration based on my position as (A)AFOD. In this role, I am responsible for overseeing all aspects of ERO's immigration enforcement operations within the jurisdiction of the Columbus, Ohio Sub-Office which includes Franklin County, Ohio.

6. The purpose of this declaration is to inform this Court about conditions on the ground in Franklin County and the surrounding area and how Franklin County Rules have obstructed

and will continue to obstruct the enforcement of federal immigration law.

**BACKGROUND**

7. Responsibility for enforcing the federal immigration laws lies primarily with DHS and two of its components: ICE and Customs and Border Protection (CBP).

8. ICE is the largest investigative branch of DHS, enforcing numerous federal laws. ICE's mission is to protect the United States from cross-border crime and illegal immigration. ICE has three core operational directorates: Enforcement and Removal Operations (ERO), Homeland Security Investigations (HSI), and the Office of the Principal Legal Advisor (OPLA). ERO personnel include ICE deportation officers who are immigration officers under 8 U.S.C. § 1357 and possess limited delegated customs-officer authority under 19 U.S.C. § 1589a.

9. ERO's mission is to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, a federal misdemeanor, and those who illegally reenter the United States after having been removed, a federal felony—or otherwise undermine the integrity of federal immigration laws and border control efforts. ERO oversees programs and conducts operations to identify and apprehend removable aliens, to detain these individuals when necessary, and to remove illegal aliens from the United States. ERO prioritizes the apprehension, arrest, and removal of aliens who threaten the safety of our nation's communities and the integrity of U.S. immigration laws.

10. CAP focuses on identifying, arresting, and removing criminal aliens incarcerated in federal, state, county, or local detention facilities. CAP safely transfers these individuals into federal custody, reducing the risk to the public. Additionally, under The Laken Riley Act

of 2025, ICE is required to take into custody aliens who commit certain acts in the United States. *See* Laken Riley Act, Pub. L. No. 119-1, 139 Stat 3 (Jan. 29, 2025).

11. The Fugitive Operations Program (FOP) locates and arrests at-large aliens who are not in law enforcement custody and who pose a threat to national security or public safety, have entered the United States illegally, are subject to orders of removal, or undermine immigration laws and border control.

12. ERO traditionally partners with other law enforcement agencies to ensure community safety, enhancing its ability to arrest and remove criminal and fugitive aliens.

13. Transfers to ICE custody may occur when state, county, or local authorities honor ICE detainers, which are governed by 8 C.F.R. § 287.7 and ICE Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers* § 2.4 (Mar. 24, 2017).

14. A detainer is a notice from DHS to law enforcement agencies (LEA) stating ICE intends to take custody of an individual for immigration proceedings or removal, and it requests information such as the release dates and booking details. If a detainer is not honored, or an alien is released without ICE notification, CAP or FOP teams must then locate and arrest the alien in the community, which requires significantly more resources and creates avoidable potential safety risks to the aliens, ERO personnel, and the community at large. Jurisdictions that honor ICE detainers typically hold aliens for up to 48 hours after their detention ends and allow ICE officers access to secure jail areas to safely take custody of the alien(s).

15. ERO Operations within the Columbus, Ohio jurisdiction, covers the central 26 counties in the state of Ohio and is comprised of approximately 44 law enforcement officers.

## FRANKLIN COUNTY MUNICIPAL COURT

16. On March 11, 2026, the Franklin County Municipal court published proposed Rule 2.10 for public comment, with the comment period ending on April 8, 2026. Following a public-comment period that closed on April 8, 2026, the Franklin County Municipal court adopted Local Rule 2.10.

17. Rule 2.10 prohibits civil arrests, including civil immigration arrests, of individuals who are present in the courthouse for the purpose of attending a court proceeding or conducting other lawful court business.

18. Under Rule 2.10, the term "courthouse" includes any building or space used by the Franklin County Municipal court, as well as the curtilage of the building.

19. Based on my experience and responsibilities as the (A)AFOD for ERO in Franklin County, I recognize the critical importance of officer safety and operational effectiveness in determining when ICE officers must conduct law enforcement operations. In my professional opinion, enforcing restrictions on courthouse arrests against DHS negatively affects ERO's ability to fulfill its federal enforcement responsibilities safely and effectively in Franklin County.

## THE ABILITY TO ARREST ALIENS IN COURTHOUSES IS ESSENTIAL TO ENSURING OPERATIONAL EFFECTIVENESS AND OFFICER SAFETY

20. Access to courthouses is essential for operational purposes and is critical to the effective execution of ICE's immigration enforcement mission.

21. Conducting courthouse arrests offers significant operational advantages because the date and time of the individual's appearance is known in advance. This predictability allows

law enforcement to efficiently allocate resources, minimize surveillance efforts, and increase the likelihood of a safe and orderly apprehension in a secure environment.

22. Making arrests at or near a courthouse often reduces the risk of flight and increases safety for target alien(s), officers, and the public, since courthouses have established security protocols and controlled access. The individuals involved have already undergone security screening and have been checked for weapons.

23. ICE's current policy governing civil immigration enforcement actions in or near courthouses is the April 27, 2021, memorandum issued by former Acting ICE Director Tae Johnson and Acting CBP Commissioner Troy Miller, *Civil Immigration Enforcement Actions in or near Courthouses* ("Johnson Memo")[1], which was reinstated nationwide following vacatur of ICE's 2025 courthouse guidance.

24. Pursuant to the April 27, 2021 Johnson Memo, a civil immigration enforcement action may be taken in or near a courthouse if (1) it involves a national security threat, or (2) there is an imminent risk of death, violence, or physical harm to any person, or (3) it involves hot pursuit of an individual who poses a threat to public safety, or (4) there is an imminent risk of destruction of evidence material to a criminal case.[2] In the absence of hot pursuit, a civil immigration enforcement action also may be taken in or near a courthouse against an individual who poses a threat to public safety if: (1) it is necessary to take the action in or near the courthouse because a safe alternative location for such action does not exist or would be too difficult to achieve the enforcement action at such location, and (2) the action

---

[1] 11072.2 ICE Memorandum from Tae Johnson, ICE Acting Director and Troy Miller, CBP Acting Commissioner on *Civil Immigration Enforcement Actions in or near Courthouses* (April 27, 2021).

[2] *Id*. at 2.

has been approved in advance by a Field Office Director, Special Agent in Charge, or Port Director.[3]

25. Further, the Johnson Memo instructs that, to the fullest extent possible, civil immigration enforcement actions in courthouses should be conducted in non-public areas, outside public view, in collaboration with courthouse security personnel, using non-public entrances and exits, and at the conclusion of the judicial proceeding that brought the individual to the courthouse.[4]

26. From 2024 through February 2026, ICE officers in Columbus, OH conducted multiple significant arrests of aliens at the Franklin County Municipal courthouse and on its grounds, including civil immigration arrests and in some cases, criminal immigration arrests or transfers to criminal immigration proceedings. The following are representative examples and do not represent all arrests made during that period but highlight notable enforcement actions.

27. On July 16, 2024, ICE officers arrested Erick BACA Rueda, a 38-year-old citizen of Honduras, at the Franklin County Municipal court without incident. The BACA arrest involved both criminal and civil immigration authorities, including a criminal judicial warrant for 8 U.S.C. § 1326 and an administrative immigration warrant. BACA had been convicted of felony battery and was an aggravated felon per the definition in section 101(a)(43)(F) of the Immigration and Nationality Act as he was sentenced to at least one year in prison for this offense. BACA had also been removed from the United States as an aggravated felon in 2017 and had illegally re-entered. In addition to felony battery, BACA

[3] *Id*. at 2.
[4] *Id*. at 3.

also had criminal arrests for domestic violence, driving under the influence of liquor, and public order crimes. ICE had obtained a criminal arrest warrant for BACA for the federal offense of 8 USC 1326 (Re-Entry of Removed Alien) and had attempted to arrest him at-large in Columbus, OH for months prior without success. ICE officers discovered that BACA was scheduled for arraignment at the Franklin County Municipal court on the charge of domestic violence and planned the arrest for that day. ICE officers waited outside the courtroom and ensured that BACA completed his hearing (in which he pled guilty to criminal mischief) and encountered him once he had cleared the courtroom and was no longer needed by the court. ICE officers arrested BACA without incident in the courthouse and immediately transported him to his initial appearance at the U.S. District Court for the Southern District of Ohio to answer to the federal charges of illegal re-entry. On July 14, 2025, ICE successfully removed BACA to Honduras upon the completion of his federal sentence.

28. On December 11, 2024, ICE officers arrested Sergio GUTIERREZ Hernandez, a 34-year-old citizen of Mexico, pursuant to an administrative immigration warrant at the probation office located within Franklin County Municipal court property. The arrest was civil in nature and occurred without incident. On February 20, 2024, ICE officers encountered GUTIERREZ while detained at the Franklin County Jail and determined that he was present in the United States in violation of immigration law. ICE lodged an immigration detainer with the Franklin County Jail, however, the jail released GUTIERREZ to the street without notifying ICE and he became an at-large priority for enforcement. GUTIERREZ had been arrested by immigration authorities and removed from the United States on four prior occasions, had illegally re-entered without permission, and had been convicted of the

federal offense of 8 USC 1326 (Re-entry of Removed Alien). GUTIERREZ also had criminal arrests for domestic violence, assault, and aggravated menacing. ICE in Columbus, OH prosecuted GUTIERREZ for the federal criminal offense of 8 USC 1326 and he was turned over to the U.S. Marshals Service. ICE successfully removed GUTIERREZ to Mexico on November 5, 2025, after the completion of his federal sentence.

29. On April 10, 2025, ICE officers planned and received approval to arrest Jesus RIVAS Perez, a 31-year-old citizen of Venezuela, at the Franklin County Municipal court pursuant to an administrative immigration warrant. RIVAS did not appear at his scheduled court hearing. ICE officers later located and arrested RIVAS near his residence after he attempted to flee from officers by running out of the residence and jumping a fence. At the time, ICE records identified RIVAS as a suspect of association with Tren de Aragua (TdA), a transnational criminal organization. RIVAS had previously been arrested at the U.S./Mexico border, issued an expedited removal order, and released from custody. This case illustrates the operational importance of courthouse enforcement: when an individual does not appear or cannot be apprehended at a known, controlled location, ICE must expend additional resources to locate and arrest the individual in a less controlled environment. ICE successfully removed RIVAS to Venezuela on August 1, 2025.

30. On April 24, 2025, ICE officers arrested Octavio CORNEJO Zuniga, a 52-year-old citizen of Chile, at the Franklin County Municipal court without incident. CORNEJO had been arrested for theft in Columbus, OH and booked into the Franklin County Jail. Despite ICE issuing an immigration detainer to arrange arrest of CORNEJO in the secure setting of the jail, the Franklin County Jail released CORNEJO to the street without allowing ICE to

arrange transfer of custody. As he was a known criminal alien who was released on an active detainer, ICE officers tracked his case and successfully arrested CORNEJO after arraignment at the Franklin County Municipal Court. CORNEJO's criminal history includes arrests for theft, domestic violence, and driving while impaired. ICE successfully removed CORNEJO to Chile on June 19, 2025.

31. On April 30, 2025, ICE officers arrested Rafael RAMIREZ Ramos, a 46-year-old citizen of Guatemala, at the Franklin County Municipal court without incident. RAMIREZ had criminal convictions for felonious assault and criminal mischief, and had also been arrested for domestic violence, assault, and operating a motor vehicle intoxicated. RAMIREZ also had an active criminal warrant out of Pasco, Washington showing a propensity to actively avoid law enforcement. ICE successfully removed RAMIREZ to Guatemala on June 11, 2025.

32. On May 6, 2025, ICE officers arrested Juvenal LOPEZ Alvaro, a 35-year-old citizen of Mexico, as he was leaving the Franklin County Municipal court. ICE officers waited until his hearing concluded so as not to impede on the judicial operations of the court and encountered and arrested LOPEZ just prior to the exit of the court without incident. LOPEZ had been removed from the United States on two prior occasions and had an outstanding warrant of removal. LOPEZ had a conviction for the federal offense for violation of 8 USC 1326 and had been sentenced to 9 months incarceration. LOPEZ had recently been arrested for domestic violence, assault, and aggravated menacing and those charges were outstanding. LOPEZ had remained at large in Columbus, OH after his second illegal re-entry until his hearing at the Franklin County Municipal court was discovered by ICE. ICE successfully removed LOPEZ to Mexico on May 13, 2025.

33. On November 4, 2025, ICE officers arrested Victorino GONZALEZ Hernandez, a 42-year-old citizen of El Salvador, at the Franklin County Municipal court without incident or interruption of the court proceedings. GONZALEZ had an extensive and violent criminal history, including arrests for assault (on 7 occasions), domestic violence (on 3 occasions), aggravated menacing, violation of a protection order, driving under the influence of alcohol, disorderly conduct, malicious destruction of property, reckless endangerment, child abuse, intoxicated endangering, disturbing the peace, and obstruction. ICE successfully removed GONZALEZ to El Salvador on December 23, 2025.

34. On February 4, 2026, ICE officers arrested Omar SANCHEZ Mendoza, a 26-year-old citizen of Mexico, at the Franklin County Municipal court without incident. Officers identified SANCHEZ in the waiting area of the court, prior to his scheduled hearing. Officers maintained surveillance and allowed SANCHEZ to enter the courtroom and attend his scheduled hearing. After conclusion of the hearing, SANCHEZ exited the courtroom and officers encountered and arrested him as he was waiting for the elevator. SANCHEZ had been arrested for driving under the influence of liquor twice in the last 12 months and had been arrested by immigration authorities and voluntarily returned to Mexico on five separate occasions. ICE successfully arranged for SANCHEZ's departure from the United States on February 13, 2026.

35. Except where otherwise noted, the Franklin County Municipal court enforcement actions described above were civil immigration arrests conducted pursuant to administrative immigration warrants. Based on case notes and information from supervisors, Franklin County Municipal court security was notified in advance and coordinated with ICE in the cases for which information is available. To my knowledge, none of the arrests described

in this declaration occurred inside a courtroom, and there were no reported disruptions to court proceedings. ICE officers generally conducted these arrests after the individual's court business had concluded, when known, and in a manner intended to minimize confrontation and disruption to courthouse operations.

36. The individuals described above included aliens with arrests or convictions for serious offenses, including aggravated assault, felonious assault, felony battery, domestic violence, theft, and child abuse, as well as individuals with suspected gang affiliations or associations or other public-safety concerns. In my experience, these individuals presented public safety concerns relevant to the circumstances addressed in the Johnson Memo governing civil immigration enforcement actions in or near courthouses. Courthouse arrests of such individuals can reduce the risk of flight, reduce the likelihood that the individual will remain at large and potentially commit additional offenses, and protect the safety of officers, the public, bystanders, and the subjects of enforcement actions.

37. When conducting these operations in courthouses, ICE officers have consistently respected the integrity and decorum of judicial proceedings. ICE officers generally coordinate with courthouse security when practicable, avoid arrests inside courtrooms, and plan arrests to occur after hearings or other court business have concluded so as not to impede legal proceedings.

38. Since Rule 2.10 went into effect, ICE has not conducted civil immigration arrests at the Franklin County Municipal court because the Rule prohibits such arrests absent a judicial warrant. But for Rule 2.10, ICE would use the Franklin County Municipal court as a location for civil immigration enforcement action when authorized by federal law and consistent with the Johnson memorandum.

39. If ICE were permitted to conduct arrests within the Franklin County Municipal court, officers could safely apprehend targeted aliens in a controlled setting, minimizing risks to the community. The courthouse environment, with established security protocols, provides a predictable and secure location for enforcement actions.

40. Franklin County's restrictions significantly impede ICE's operational effectiveness by forcing officers to locate and apprehend aliens in less secure and unpredictable environments. This not only complicates enforcement efforts but also increases the potential for flight and confrontation.

41. These limitations further jeopardize public safety and national security, as aliens who may pose serious risks are more likely to remain at large. The inability to conduct courthouse arrests allows aliens to be released into the community, increasing the possibility of additional criminal activity and potential harm to Franklin County residents.

42. Additionally, permitting ICE to arrest aliens in courthouses is an efficient approach for federal, state and local law enforcement, as it conserves resources by allowing officers to apprehend aliens who present public safety concerns at a known location.

43. Nonetheless, the restriction imposed by the Franklin County Municipal court Rule 2.10 has required ICE to allocate additional resources to apprehend aliens at large. These at-large arrests occur in public spaces such as workplaces or homes, where the subject may be armed, violent, or otherwise dangerous. Officers are now conducting extended surveillance and field operations to locate and arrest individuals, as opposed to effectuating arrests at courthouses, which is a more efficient and secure setting.

44. As a result, officers must dedicate significantly more time and personnel to these operations, diverting resources from other enforcement priorities. For example,

operationally, two officers may be assigned to effectuate an arrest at a jail or courthouse, whereas four to six officers are typically required to make an at-large arrest in the field.

45. Moreover, extended surveillance operations require additional personnel, vehicles, equipment, and overtime compensation, increasing operational costs.

46. The unpredictability of locating subjects outside the courthouse can also lead to missed apprehensions, as individuals may change routines or actively evade detection.

47. In practice, Rule 2.10 limits where ICE officers can conduct civil immigration enforcement actions and hinders ICE's enforcement efforts. In Ohio, sanctuary policies -such as the refusal to honor ICE detainers and the release of criminal aliens without notifying ICE - require ICE to locate and apprehend these dangerous individuals at-large within the community. As a result, courthouses have become one of the few reliable locations where ICE officers can identify and safely take criminal aliens into custody.

48. At present, federal law enforcement officers are operating in an increasingly hostile environment, facing heightened threats, assaults, and incidents of online doxing that endanger both their safety and that of their families.

49. Because of Rule 2.10, when ICE cannot assume custody in a custodial setting and a courthouse arrest at the Franklin County Municipal court would otherwise be authorized and appropriate, officers must use less controlled environments, such as residences, workplaces, or public spaces, where the risk of confrontation, flight, or violence is higher. The dangers these at-large arrests pose to law enforcement are well documented: two Columbus ICE officers have been hospitalized due to violence encountered during at-large arrests within the past three months.

50. Arrests in public areas, such as neighborhoods, workplaces, or community spaces, increase the likelihood of bystanders being present and potentially placed in harm's way or unlawfully intervening in lawful enforcement actions.

51. For example, officers may encounter unknown individuals or bystanders who could interfere or escalate the situation. The lack of courthouse security screening means officers cannot be certain the subject is unarmed or not carrying contraband.

52. Conducting arrests in courthouses, rather than in public community settings, helps minimize unnecessary publicity and reduces the risk of exposure to these doxing threats to ICE officers. In 2026 alone, multiple ICE officers in the Columbus, Ohio Sub-Office have had pictures and videos taken during enforcement operations posted online, including comments that threatened violence.

53. In summary, courthouse arrests are important to ICE's operational effectiveness, officer safety and the protection of the community. Restrictions on such arrests require ICE officers to operate in less controlled environments, increasing risk to officers, the public, bystanders and the subjects of enforcement actions, while also increasing operational costs and resource demands.

54. Further, Rule 2.10 is not limited to preventing disruption inside courtrooms. It applies throughout Franklin County Municipal courthouse buildings, spaces, and curtilage, including after court proceedings have concluded. As a result, Rule 2.10 prevents ICE officers from conducting lawful civil immigration arrests at the Franklin County Municipal court even when the individual has completed court business and the arrest can be conducted discreetly, in coordination with courthouse security, and without disrupting court operations.

55. In my experience, Rule 2.10 limits where ICE officers can safely and effectively conduct civil immigration enforcement actions in Franklin County and requires ICE to use less predictable locations.

56. The rise in officer injuries and threats, including doxing, underscores the dangers associated with at-large arrests. Allowing ICE to conduct civil immigration arrests at the Franklin County Municipal court when authorized by federal law and permitted by ICE policy would enhance public safety, improve operational efficiency, and better protect officers, the public, bystanders, and the subjects of enforcement actions.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my personal knowledge, reasonable inquiry, and information made available to me in the course of my official duties.

Executed on this 21st day of August 2026.

LUKE H AFFHOLTER

Digitally signed by LUKE H AFFHOLTER
Date: 2026.08.21 23:13:28 -04'00'

Luke Affholter
Acting Assistant Field Office Director
Immigration and Customs Enforcement
Enforcement and Removal Operations
Detroit Field Office
Columbus, Ohio Sub-Office