**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

THE UNITED STATES OF AMERICA,

Plaintiff,

v.

FRANKLIN COUNTY MUNICIPAL COURT; JESSICA D'VARGA, Administrative and Presiding Judge, Franklin County Municipal Court, in her official capacity; ENOCH WHITE, Director of Security, Franklin County Municipal Court, in his official capacity,

Defendants.

No. 2:26-cv-1025

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## INTRODUCTION

The Supremacy Clause does not permit a county court to set the terms on which federal officers enforce federal law. Yet Franklin County Municipal Court (FCMC) Local Rule 2.10 does just that. It forbids federal immigration officers from making civil arrests inside the courthouse or its curtilage unless they first obtain a judicial warrant—even when Congress has authorized the arrest on an administrative warrant or, in specified circumstances, without a warrant at all. *See* 8 U.S.C. §§ 1226(a), 1357(a)(2). By prohibiting federal agents from executing civil immigration arrests in and around the courthouse unless they obtain a judicial warrant, Rule 2.10 directly interferes with federal enforcement authority that Congress vested in the Executive Branch as part of Congress's comprehensive scheme enacted in the Immigration and Nationality Act (INA).

Rule 2.10 is invalid twice over. *First*, it directly regulates the United States. The Rule dictates when and how federal officers may perform a uniquely federal function: enforcing federal immigration law. The Ninth Circuit recently held that a state law that "aims to regulate the manner and conditions under which federal agents can enforce federal law" directly regulates federal operations reserved to the Federal Government and violates intergovernmental immunity. *United States v. California*, 173 F.4th 1060, 1067–68 (9th Cir. 2026). Rule 2.10 does the same thing.

*Second*, Rule 2.10 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012). The INA authorizes civil arrests anywhere so long as the statutory requirements are satisfied, not merely where a locality consents. Simply put, if Congress did not impose a courthouse-specific judicial-warrant requirement on federal officers, FCMC may not add one.

These constitutional violations inflict ongoing and irreparable sovereign harm. Rule 2.10 obstructs federal agents from carrying out congressionally authorized enforcement operations at a location Congress expressly contemplates—state courthouses—and forces officers to conduct arrests in less secure, less predictable environments. And while injuries to federal sovereignty

alone establish irreparable harm, the harm here is even greater. Being forced to conduct arrests in the community at large rather than within the safe confines of a courthouse endangers officers and the community, and requires more agency resources, time, and precautions. Conducting an arrest at or near a courthouse often reduces the risk of flight and safety risks to the public, law enforcement officers, and subjects themselves, in part because individuals are usually screened for weapons or other contraband before entering a courthouse.

Finally, the balance of equities and the public interest favor an injunction: there is a significant sovereign injury from local rules that seek to regulate the Federal Government, and there is significant public interest in protecting federal officers' safety, removing unlawful impediments to federal law enforcement operations, and permitting agents to uphold federal law.

In fact, on August 18, 2026, Franklin County notified the Department of Justice of its intent to continue enforcing the Rule against federal officials.[1] The United States therefore moves this Court for a preliminary injunction enjoining Defendants FCMC, its administrative and presiding judge, and its director of security (as well as their agents, assistants, successors, employees, and all persons acting in concert or cooperation with them, or at their direction, or under their control) from enforcing Rule 2.10 against the Federal Government. An injunction will restore the longstanding, uniform federal practice of conducting targeted, controlled courthouse arrests.

## BACKGROUND

### I. Governing Principles of Federal Law Enforcement

The President has a constitutional duty to "take Care that the laws be faithfully executed." U.S. Const. art. II, § 3. The authority to discharge that duty "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). Because "no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance."

[1] *Infra* note 5.

*Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020). In executing the laws, the Federal Government "can act only through [those] officers and agents," who must in turn "act within the States." *Davis*, 100 U.S. at 263. Accordingly, federal law enforcement activities necessarily take place within the States, including in Ohio. To ensure the proper and effective functioning of federal agencies, the head of each agency has the power to govern the agency's affairs and direct its agents' activities. *See, e.g.*, 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the Department of Justice in the Attorney General); 8 U.S.C. § 1103(a)(2) (authorizing the DHS Secretary to "control, direct[], and supervis[e]" all DHS employees).

Federal law enforcement agencies, including those within the Department of Homeland Security ("DHS"), are created by federal law. *See, e.g.*, 6 U.S.C. § 252 (U.S. Immigration and Customs Enforcement ("ICE")); 6 U.S.C. § 211 (U.S. Customs and Border Protection ("CBP")). All law enforcement agents within these agencies have the power to swear out and execute search warrants based upon probable cause. Fed. R. Crim.P. 41. Different law enforcement agencies within the Federal Government have different, but sometimes overlapping, authorities for the types of crimes and offenses they investigate and prosecute.

DHS and its component agencies ICE and CBP are primarily responsible for enforcing the nation's immigration laws. Those laws are primarily contained in the INA, and, pursuant to Congress's power to "establish a uniform Rule of Naturalization," U.S. Const., art. I, § 8, cl. 4, make up the framework for the "governance of immigration and alien status." *See Arizona*, 567 U.S. at 395. The INA gives the Executive Branch broad authority to inspect, investigate, arrest, detain, and remove aliens who are unlawfully in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225-29a, 1231.

Under the INA, "an alien may be arrested and detained" pending a removal proceeding based on "a warrant issued by the [Secretary of Homeland Security]." 8 U.S.C. § 1226(a).

Federal regulations implement that authority by providing for administrative warrants of arrest and identifying the immigration officials authorized to issue such warrants. *See* 8 C.F.R. §§ 236.1(b), 287.5(e)(2). These administrative immigration warrants are distinct from judicial warrants and are part of the civil immigration enforcement framework Congress established in the INA. ICE policy further reflects the role of administrative warrants in the federal immigration framework by requiring detainers to be accompanied by either a Form I-200, Warrant for Arrest of Alien, or a Form I-205, Warrant of Removal/Deportation. U.S. ICE, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers* § 2.4. Federal immigration agents also may arrest an alien "without [a] warrant" if the agent "has reason to believe that the alien" is unlawfully present in the United States and "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2).

One INA provision expressly contemplates that immigration enforcement actions may take place at courthouses. If an "enforcement action leading to a removal proceeding was taken against an alien" at certain locations—including a "courthouse" if the alien is appearing in connection with certain proceedings—the document initiating the removal proceeding must include a statement of compliance with certain confidentiality requirements. *Id.* § 1229(e)(1), (2)(B). To be sure, Section 1229(e) does not independently confer arrest authority. But it confirms that Congress addressed courthouse enforcement actions in the INA and imposed specific procedural safeguards in certain circumstances rather than adopting a categorical courthouse ban or judicial-warrant requirement. In other words, Congress knew that courthouse enforcement actions occurred and chose to impose certain conditions on them. But it did not impose a judicial-warrant requirement for these actions, even though it could have. *Cf.* 18 U.S.C. § 2703(a) (requiring the government to obtain a search warrant when collecting certain electronic communications).

Consistent with these statutory authorities, for more than a decade—and across presidential administrations—ICE has directed its agents to exercise their civil arrest authority to arrest aliens in and around courthouses. For instance, in 2014, ICE issued guidance authorizing

agents to take enforcement actions "at or near courthouses" against certain high-priority aliens, including aliens with criminal convictions, aliens who have participated in gang activity, and aliens who are national security threats. Memorandum from Philip T. Miller, Assistant Dir. for Field Operations, U.S. ICE, Enforcement Actions at or Near Courthouses (Mar. 19, 2014).

ICE's current courthouse-specific guidance is the April 27, 2021, memorandum issued by Acting ICE Director Tae Johnson and Acting CBP Commissioner Troy Miller, *Civil Immigration Enforcement Actions in or Near Courthouses* ("2021 ICE Guidance" or "Johnson Memo"), https://perma.cc/BJS5-9DY3, which has been reinstated following the vacatur of ICE's 2025 courthouse guidance. The Johnson Memo permits civil immigration enforcement actions in or near courthouses in specified circumstances, including where the action involves a national-security threat, an imminent risk of death, violence, or physical harm to any person, hot pursuit of an individual who poses a threat to public safety, or an imminent risk of destruction of evidence material to a criminal case. *Id*. In the absence of hot pursuit, it also permits such action against an individual who poses a threat to public safety if a safe alternative location does not exist or would be too difficult to achieve, and the action has been approved in advance by the appropriate senior official. *Id.* "To the fullest extent possible, an enforcement action in the courthouse will be taken in a nonpublic area of the courthouse, outside of public view, be conducted in collaboration with courthouse security personnel, utilize the courthouse's non-public entrances and exits, and be conducted at the conclusion of the judicial proceeding that brought the individual to the courthouse." *Id*.

ICE agents have adhered to these directives. Enforcement actions in or near courthouses generally take place in non-public areas of the courthouse, are conducted with the collaboration of court security staff, and often use the court building's non-public entrances and exits.

Affholter Decl. ¶ 37.[2] And ICE officers generally plan arrests to occur after hearings have concluded, so as not to impede legal proceedings. *Id.*

From 2024 through early 2026, ICE officers assigned to the Columbus, Ohio Sub-Office conducted multiple immigration enforcement actions at or near FCMC, including civil immigration arrests. Affholter Decl. ¶26, ¶¶ 27–34.

## II. The Challenged Local Rule

After a public campaign in Franklin County seeking to prevent ICE arrests at the courthouse,[3] FCMC adopted Rule 2.10 on or about April 20, 2026. Rule 2.10(B)(1) provides that "[n]o individual shall be subject to a civil arrest while present in the courthouse for the purpose of attending a court proceeding or conducting other lawful court business." Rule 2.10 defines "Courthouse" to mean "any building or space used by Franklin County Municipal Court along with the curtilage of the building." *Id.* As noted above, Rule 2.10 does not apply to arrests carried out pursuant to a judicial warrant issued by a judge. *Id.* (B)(2). Rule 2.10(A) also includes a Statement of Purpose:

> The administration of justice by the judicial branch of the government cannot be impeded by the other branches of the government in the exercise of their respective powers.
>
> Courts possess all powers necessary to secure and safeguard the free and untrammeled exercise of their judicial functions and cannot be directed, controlled, or impeded therein by other branches of the government.

Finally, the Statement of Purpose concludes with "[n]othing in this rule shall be construed so as to violate any provision of the Supremacy Clause of the United States Constitution or any federal immigration law." *Id.* (A).[4]Although the Rule's statement of purpose disclaims any intent to violate the Supremacy Clause or federal immigration law, *id*. (A), that disclaimer cannot

---

[2] Luke Affholter is an Acting Assistant Field Office Director [(A)AFOD] in DHS with the Detroit Field Office, Columbus, Ohio Sub-Office, which is in Westerville, Ohio and has operational oversight over Franklin County, Ohio. His declaration is attached as Exhibit A.

[3] *WOSU News Staff*, *Campaign Pushes Franklin County Municipal Judges to Change Rules to Limit ICE in Courthouse*, WOSU (Feb. 13. 2026), https://www.wosu.org/politics-government/2026-02-13/campaign-pushes-franklin-county-municipal-judges-to-change-rules-to-limit-ice-in-courthouse.

[4] A copy of Rule. 2.10 is attached to the Complaint as Exhibit B.

override the Rule's operative command. Indeed, the operative provision contains no federal-officer exception and exempts only arrests carried out pursuant to a judicial warrant issued by a judge. Since the Rule took effect, ICE has not conducted civil immigration arrests at FCMC. Affholter Decl. ¶ 38.

## III. Department of Justice Demand Letter

On August 6, the United States Department of Justice sent Defendants a letter seeking "assurances that this unconstitutional local rule will not be enforced against federal officers by no later than August 21, 2026."[5]

On August 18, 2026, Defendants affirmed their intent to continue to frustrate federal immigration law, responding that "the Judges believe that Local Rule 2.10 is an appropriate and necessary measure for meeting its obligation to individuals accessing the courts."[6]

## LEGAL STANDARDS

A preliminary injunction may be granted if the plaintiff establishes (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008); *see also Thompson v. DeWine,* 976 F.3d 610, 615 (6th Cir. 2020); *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997). Where, as here, the Federal Government is a party to the suit, the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In general, where the United States has demonstrated a likelihood of success on the merits of a Supremacy Clause claim, the other factors also favor a preliminary injunction. *See*, *e.g.*, *Obama for Am. v. Husted,* 697 F.3d 423, 436 (6th Cir. 2012) ("When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor.") (internal quotation marks omitted)) *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

---

[5] A copy of the Department of Justice letter is attached to the Complaint as Exhibit C.
[6] A copy of Defendants' letter is attached to the Complaint as Exhibit D.

"A preliminary injunction 'maintain[s] the status quo pending determination of an action on its merits.'" *Burniac v. Wells Fargo Bank, N.A.*, 810 F.3d 429, 435 (6th Cir. 2016) (quoting *Blaylock v. Cheker Oil Co.,* 547 F.2d 962, 965 (6th Cir.1976)). The status quo is "the last peaceable uncontested status that existed before the dispute arose." *Montgomery v. Carr*, 848 F.Supp. 770, 779 (S.D. Ohio 1993) (internal quotation marks omitted).

**ARGUMENT**

## I. The United States Has Standing to Enjoin Rule 2.10

Article III standing requires a plaintiff to demonstrate a concrete injury that is fairly traceable to the defendant's conduct and judicially redressable. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Christian Healthcare Ctrs. v. Nessel*, 117 F.4th 826, 842 (6th Cir. 2024). The United States easily satisfies these requirements for several reasons.

First, the United States has sovereign authority to manage federal law enforcement activities—including those pertaining to immigration—and, under the Supremacy Clause, need not cede that authority to FCMC by complying with its purported requirements for federal law enforcement officers. *See, e.g., Arizona v. Biden*, 40 F.4th 375, 386-87 (6th Cir. 2022) ("The key sovereign with authority. . .with respect to immigration is the National Government, not the States*."); United States v. Miami University*, 91 F.Supp.2d 1132, 1146 n.12 (S.D. Ohio 2000) (explaining how the government "may decide to litigate simply in order to assure the proper implementation of one of the government's policies and programs, to prevent the violation of constitutional rights, or to protect its sovereign interest"). Indeed, the very fact that a municipal court is attempting to regulate the conduct of the Federal Government inflicts a "sovereign injury" on the United States. *See California*, 173 F.4th at 10699 ("[I]rreparable harm necessarily results from allowing California to enforce a law invalid under the doctrine of intergovernmental immunity."); *cf. Arizona v. Yellen*, 34 F.4th 841, 851–53 (9th Cir. 2022); *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000).

Second, Rule 2.10 imposes concrete, operational harms. It forces federal agents to conduct at-large arrests without courthouse screening, heightens risks of confrontation, and

compels DHS to divert substantial resources to lengthy surveillance operations. When officers must make an arrest away from the courthouse, they lose the benefit of the security screening that courthouse entrants have already undergone. Affholter Decl. ¶ 51. Forcing officers to locate and apprehend individuals in less secure and unpredictable environments not only complicates enforcement efforts but also increases the potential for flight and confrontation, endangering officers and the community. *Id.* ¶¶ 40–46. And officers are now conducting extended surveillance and field operations to locate and arrest individuals, which requires far more time and personnel. *Id.* ¶ 41. *See United States of America v. State of Illinois, et al*, No. 25-CV-02220-DWD, 2026 WL 2428274, at *6 (S.D. Ill. Aug. 19, 2026) (finding the United States has standing to challenge Illinois's Court Access, Safety, and Participation Act barring civil arrests on courthouse grounds, in part, because it "has the effect of interfering and impeding federal immigration investigation, operation and enforcement").

These restrictions impose a serious and concrete injury that the Federal Government is entitled to redress through this challenge. This injury is traceable to the conduct of Defendants. FCMC promulgates local rules governing conduct at its courthouse and did so here by adopting Rule 2.10. This Court has authority to enjoin defendants from enforcing Rule 2.10, and a favorable ruling would redress these harms.

## II. The United States Is Likely to Succeed on the Merits of its Claims

The United States is likely to succeed on the merits because Rule 2.10 violates the Supremacy Clause twice over, by (i) unlawfully regulating the Federal Government, and (ii) standing as an unlawful obstacle to the execution of the INA. In constitutional cases, success on the merits is "typically dispositive" because "when constitutional rights are threatened or impaired, irreparable injury is presumed," and "no cognizable harm results from stopping" the conduct, so it is "always in the public interest to prevent" constitutional violations. *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631 (6th Cir. 2025) (quoting *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (citation modified)).

### A. Rule 2.10 Impermissibly Regulates the Federal Government

Under the Supremacy Clause, States have "no power" to "in any manner control[] the operations of" the Federal Government. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819); *see Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."). The intergovernmental immunity doctrine encapsulates this principle. A state or local law violates intergovernmental immunity if it "regulates the United States directly," *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion), "unless Congress provides 'clear and unambiguous' authorization for such regulation," *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 175 (1988) (citation omitted); *United States v. Town of Windsor*, 765 F.2d 16, 18 (2d Cir. 1985) ("Absent congressional consent, direct state regulation of the activities of the Government is barred by the Supremacy Clause."). And "[a] state regulation can violate the Supremacy Clause either by directly regulating the federal government or by conflicting with an affirmative command of Congress." *Adkisson v. Jacobs Eng'g Grp.*, Inc., 36 F.4th 686, 697 (6th Cir. 2022) (citing *McCulloch*, 17 U.S. (4 Wheat.) at 426). "A state law regulates the United States directly when it 'places [either] a prohibition' or mandate on the federal government."*' CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 321 (3d Cir. 2025) (citation omitted). To that end, "intergovernmental immunity . . . forbids States from regulating the federal government *qua* government and from controlling federal governmental functions in *any* manner and to *any* degree." *California*, 173 F.4th at 1068) (emphasis added). Accordingly, any state law or local rule that conflicts with federal law is "without effect." *King v. Ford Motor Co.*, 209 F.3d 886, 891 (6th Cir. 2000) (quoting "*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516 (1992)".[7]

Indeed, several cases show the kinds of state or local laws that unlawfully regulate the Federal Government's operations. *See Johnson v. Maryland*, 254 U.S. 51, 57 (1920) (holding a

---

[7] It is "axiomatic" that the constitutionality of local ordinances or rules like the one at issue here are "analyzed in the same way as that of statewide laws." *United Auto., Aerospace & Agric. Implement Workers of Am. Loc. 3047 v. Hardin County, Kentucky*, 842 F.3d 407, 418 (6th Cir. 2016).

state could not require a Post Office employee to obtain a driver's license from the state, explaining that the state may not "require[] qualifications in addition to those that the [federal] Government has pronounced sufficient"); *Hancock v. Train*, 426 U.S. 167, 179–80 (1976) (concluding that a state could not forbid federal facilities from operating without a state pollution permit, as such a requirement improperly "place[d] a prohibition on the Federal Government") (quotation marks omitted); *CoreCivic, Inc.*, 145 F.4th at 325 (invalidating a New Jersey law based on intergovernmental immunity principles because the law "prevent[ed] the federal government from choosing how and through whom it will carry out a core federal function" relating to immigration detention).

Likewise, Rule 2.10 regulates the United States directly. Its command is categorical: "[n]o individual shall be subject to a civil arrest" while at the courthouse for a proceeding or other lawful court business. Rule 2.10(B)(1). And its reach is broad. The "courthouse" includes every building or space FCMC uses, plus the surrounding curtilage. *Id*. The Rule thus goes well beyond courtroom management. It controls whether federal officers may exercise federal arrest authority throughout the courthouse and its grounds.

The contrast with the Federal Government's 2021 policy is telling. That policy recognized that courthouse arrests could affect access to justice and sharply limited when they could occur. But it preserved arrests involving national-security threats, imminent risks of death or violence, hot pursuit of public-safety threats, and imminent risks that evidence would be destroyed. It also permitted an arrest of a public-safety threat when no safe alternative location existed, and a designated federal supervisor approved the operation. Memorandum from Tae D. Johnson, Acting Dir., ICE, & Troy A. Miller, Acting Comm'r, CBP, Civil Immigration Enforcement Actions in or Near Courthouses (Apr. 27, 2021). But Rule 2.10 goes further. It eliminates each exception unless officers first obtain a judicial warrant. An imminent threat, hot pursuit, or risk that evidence will disappear is not enough. Nor is a federal supervisor's determination that an arrest is necessary and no safe alternative exists. In other words, FCMC has replaced the Federal Government's enforcement judgment with its own.

The record confirms the Rule's direct effect. Before its adoption, ICE generally planned arrests for after court proceedings and, when available, used nonpublic areas and entrances in coordination with court security. Affholter Decl. ¶ 37. By late 2025, ICE had arrested at least twelve individuals at FCMC. Many had prior arrests or lengthy criminal records, and the arrests were largely completed without incident. *Id*. ¶¶ 26–34. Since Rule 2.10 took effect, ICE has made no civil immigration arrests there. *Id*. ¶ 38. To be sure, FCMC may *generally* control its employees and access to nonpublic spaces. *See* 2021 ICE Guidance ("*To the fullest extent possible*, an enforcement action in the courthouse will be taken in a nonpublic area of the courthouse . . . .") (emphasis added). But it may not decide when federal officers may enforce federal law.[8] Because Rule 2.10 does exactly that, it violates intergovernmental immunity.

At bottom, Rule 2.10 interferes with and impairs "the federal function" of civil immigration enforcement in and around the FCMC courthouse. *United States v. Fresno Cnty.*, 429 U.S. 452, 463 n.11, 464 (1977). Accordingly, the Rule constitutes unconstitutional direct regulation. *See Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state.").

**B. Rule 2.10 Is Preempted by the INA**

In addition to barring state laws that regulate the Federal Government, the Supremacy Clause preempts state and local laws that "conflict with" federal law. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Such a conflict exists when a state or local law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (quotation marks omitted). "What is a sufficient obstacle" to establish conflict preemption "is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. If a state or local law "frustrate[s]" the "operation" of federal law, the law "must yield to

---

[8] To be clear, the United States does not seek to compel FCMC personnel to assist immigration enforcement or to perform federal functions. Rather, it seeks only to prevent Defendants from enforcing a local rule that prohibits federal officers from conducting civil immigration arrests authorized by federal law and permitted by ICE policy.

due regulation of Congress within the sphere of its delegated power." *Id.* (quotation marks omitted).

The federal scheme at issue here is Congress's "extensive and complex" framework governing aliens' entry, apprehension, detention, and removal. *Arizona,* 567 U.S. at 395. Namely, Congress has "instruct[ed] when it is appropriate to arrest an alien during the removal process." *Id.* at 407. Section 1226 of the INA authorizes federal agents to "arrest[] and detain[]" an alien pending a removability determination if the agent has obtained an administrative warrant issued by federal immigration officials. 8 U.S.C. § 1226(a). And Section 1357 authorizes federal agents to make arrests without any warrant if there is reason to believe the alien is unlawfully present in the United States, and the alien "is likely to escape before a warrant can be obtained." *Id.* § 1357(a)(2). Indeed, the INA imposes mandatory-detention obligations for certain categories of aliens, including certain criminal aliens, within the statutory immigration framework. *See, e.g.*, *id.* §§ 1226(c), 1231(a) (2).

None of these provisions places any geographic limitations on where federal agents may exercise their arrest authorities. On their face*,* they authorize civil arrests anywhere so long as the statutory requirements are satisfied, and courts "may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020).

In fact, another INA provision expressly contemplates that immigration enforcement actions may take place at state courthouses. Section 1229(e) specifies that, where an "enforcement action leading to a removal proceeding was taken against an alien at any of" enumerated locations, the document served on an alien to initiate removal proceedings must indicate compliance with certain confidentiality requirements. 8 U.S.C. § 1229(e)(1). One enumerated location is "[a]t a courthouse" if the alien is appearing in connection with certain, primarily state-law proceedings, such as child-custody or domestic-violence cases. *Id.* § 1229(e)(2)(B), This provision would make little sense if the arrest authorities of Sections 1226(a) and 1357(a) (2) do not permit enforcement actions at state courthouses in the first place.

Relatedly, the provisions at issue here contrast with a neighboring provision that does limit the areas where federal officials can exercise their authorities. Section 1357(a)(3) authorizes federal agents to access private lands—"but not dwellings"—within a certain distance from the border for the purpose of preventing aliens from illegally entering the United States. 8 U.S.C. § 1357(a)(3). As noted above, no similar geographic limitation restricts the exercise of the authorities at issue here at courthouses.

Instead, the Rule prohibits civil arrests of persons in or around the courthouse unless the arrest is supported by a judicial warrant or order. In other words, the Rule superimposes on the Federal Government a judicial warrant requirement even where the INA would require only an administrative warrant—or no warrant at all. By interfering with Congress's judgment about the requirements for federal immigration agents to arrest aliens during the removal process, Rule 2.10 "creates an obstacle to the full purposes and objectives of Congress" and "is preempted by federal law." *Arizona*, 567 U.S. at 410. As the Supreme Court has recognized, "the removal process is entrusted to the discretion of the Federal Government." *Id.* at 409. That principle cannot be reconciled with FCMC's effort to impose constraints on federal immigration agents' arrest authority that Congress chose not to impose in the INA. Because FCMC Local Rule 2.10 conflicts with the federal framework, it is preempted.

## III. The United States Suffers Irreparable Harm Absent Preliminary Relief

The United States will continue to suffer irreparable harm so long as FCMC is permitted to enforce Rule 2.10. Irreparable harm necessarily results from the enforcement of a state or local law that violates the Supremacy Clause. *See New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 366–67 (1989) (noting that irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of . . . the express constitutional prescription of the Supremacy Clause" (citation omitted));*California*, 173 F.4th at 10699 (finding irreparable harm based on a Supremacy Clause violation); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (same), *aff'd in part, rev'd in part and remanded*,

567 U.S. 387 (2012). The automatic nature of the irreparable injury stems both from the constitutional violation and the attendant sovereign injuries. *California*, 173 F.4th at 10699.

Even if more were needed, Rule 2.10 poses several additional irreparable harms, including endangering federal law enforcement officers and the community. Being forced to conduct arrests in the community at large, rather than within the safe confines of a courthouse, requires more agency resources, time, and precautions. Because of this Rule, when ICE cannot assume custody in a custodial setting and a courthouse arrest at FCMC would otherwise be authorized and appropriate, officers must use less controlled environments, such as residences, workplaces, or public spaces, where the risk of confrontation, flight, or violence is higher. Affholter Decl. ¶ 47. The dangers these at-large arrests pose to law enforcement are well documented. In fact, two Columbus ICE officers have been hospitalized due to violence encountered during at-large arrests within the past three months. *Id.*

Moreover, arrests in public areas, such as neighborhoods, workplaces, or community spaces, increase the likelihood of bystanders being present and potentially placed in harm's way or unlawfully interfering with lawful enforcement actions. *Id.* ¶ 50. And the unpredictability of locating subjects outside the courthouse can also lead to missed apprehensions, as individuals may change routines or actively evade detection. *Id.* ¶ 46. Rule 2.10's restrictions also require ICE to allocate additional resources to apprehend aliens at large. *Id.* ¶ 43. Officers are now conducting extended surveillance and field operations to locate and arrest individuals, which require additional personnel, vehicles, equipment, and overtime compensation, thereby increasing operational costs. *Id*. For example, operationally, two officers may be assigned to effectuate an arrest at a jail or courthouse, whereas four to six officers are typically required to make an at-large arrest in the field. *Id.* ¶ 44.

By contrast, conducting courthouse arrests offers significant operational advantages because the date and time of the individual's appearance are known in advance. *Id.* ¶ 21. This predictability allows law enforcement to efficiently allocate resources, minimize surveillance efforts, and increase the likelihood of a safe and orderly apprehension in a secure environment.

*Id.* In addition, federal law enforcement officers are operating in an increasingly hostile environment, facing heightened threats, assaults, and incidents of online doxing that endanger both their safety and that of their families. *Id.* ¶ 48. Conducting arrests in courthouses, rather than in public community settings, helps minimize unnecessary publicity and reduces the risk of exposure to these doxing threats to federal officers. *Id.* ¶ 52. In 2026 alone, multiple ICE officers in the Columbus, Ohio sub-office have had pictures and videos taken during enforcement operations posted online, accompanied by comments that threatened violence. *Id.*

Finally, allowing a municipal court to dictate federal officer conduct introduces a cumulative effect that would fragment federal operations across jurisdictions nationwide. Indeed, if Rule 2.10 were allowed to stand, there would be nothing to stop other municipal courts and governments from imposing further unconstitutional restraints on the Federal Government. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (allowing a state to act unconstitutionally "would allow other States to do the same"). This could in turn create a "patchwork" system of laws or local rules, *id.*, under which federal agents would be subject to different regulations in each municipal court or local government, significantly undermining the Federal Government's ability to uniformly enforce federal law.

Put simply, restrictions on courthouse arrests at FCMC have forced ICE to operate in less controlled environments, increasing risk to officers, the public and bystanders while also driving up operational costs and resource demands. Affholter Decl. ¶ 56. Rule 2.10 renders federal immigration officers unable to carry out their congressionally mandated duties in accordance with the policies and procedures promulgated by Congress and DHS. These various independent and irreparable harms call out for redress.

## IV. The Balance of Hardships and the Public Interest Weigh in the United States' Favor

Where, as here, the Federal Government is a party, the balance-of-hardships and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Those merged factors favor the United States here.

As an initial matter, granting a preliminary injunction here would be in the public's interest because "the public is certainly interested in the prevention of enforcement" of ordinances or local rules that "may be unconstitutional." *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987); *see also California*, 173 F.4th at 10699 (stating that a violation of the Supremacy Clause necessarily means that "both the public interest and balance of the equities tip 'decisively in . . . favor' of a preliminary injunction"); *Dahl v. Bd. of Trs. of W. Michigan Univ.*, 15 F.4th 728, 736 (6th Cir. 2021) ("Proper application of the Constitution" "serves the public interest . . . as it is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks omitted)).

At bottom, there is no public interest in a local rule violating the Supremacy Clause by directly regulating federal law enforcement. There is, however, significant public interest in protecting federal officers' safety and removing unlawful impediments to federal law enforcement operations. The Sixth Circuit has also recognized that "prevent[ing] immigration fraud" is a "legitimate federal interest." *Bangura v. Hansen*, 434 F.3d 487, 495 (6th Cir. 2006). By contrast, FCMC "has no legitimate interest in enforcing laws which frustrate" federal immigration law. *L.P. Acquisition Co. v. Tyson*, 772 F.2d 201, 209 (6th Cir. 1985).

The effect of FCMC's Rule 2.10 is to hinder federal agents from conducting crucial law enforcement operations. Such obstructionism is not in the public interest. Rather, the public has a strong interest in preserving constitutional order and effective federal law enforcement, including, for example, the apprehension of dangerous aliens. Indeed, the limitations imposed by Rule 2.10 further jeopardize public safety and national security, as individuals who may pose serious risks are more likely to remain at large. Affholter Decl. ¶ 41. The inability to conduct courthouse arrests allows criminal aliens to be released into the community, increasing the possibility of additional criminal activity and potential harm to Franklin County residents. *Id.* In short, the County's residents benefit from federal law enforcement presence and operations that otherwise would be curtailed by enforcement of Rule 2.10. And it is not in the public interest to

require federal officers to comply with varying state and local standards for when and where they can carry out federal policy designed to comply with federal law.

Finally, preliminarily enjoining Rule 2.10 will not cause greater harm to Defendants because "there is no valid state interest in enforcing unconstitutional laws." *Brown v. Yost*, 133 F.4th 725, 738 (6th Cir. 2025). Federal officers and agencies have faced substantial operational disruption due to Rule 2.10, while an injunction would merely preserve the status quo at FCMC—allowing the Federal Government to carry out its sovereign, duly authorized functions. While FCMC may disagree with the United States' priorities, it has no legitimate interest in interfering with the enforcement of federal law or putting federal officers at risk. Thus, not only does the balance of equities support a preliminary injunction, but the public interest would be served by the issuance of such an injunction. *See Mayo*, 319 U.S. at 445 ("No other adjustment of competing enactments or legal principles is possible.").

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court preliminarily enjoin Defendants, as well as their officers, agents, servants, employees and attorneys, and all those working in concert or participation with them, from enforcing Rule 2.10 as to federal agencies and officers.

DATED: August 25, 2026

STANLEY E. WOODWARD, JR.
Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANNA EDWARDS
Counsel to the Associate Attorney General

CHARLES E.T. ROBERTS
Senior Counsel to the Assistant Attorney General
Civil Division

JACQUELINE COLEMAN SNEAD
Deputy Director

*/s/ Garrett Greene*
GARRETT GREENE
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, D.C. 20044-0386
(202) 549-9429
garrett.greene@usdoj.gov

*Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on August 25, 2026, and that all parties will be served with the Original Complaint and the Motion for Preliminary Injunction via certified mail and process server.

*/s/ Garrett Greene*
GARRETT GREENE