**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JESSICA D'VARGA, Administrative and Presiding Judge, Franklin County Municipal Court, in her official capacity,<br><br>Defendant. | No. 2:26-cv-1025<br><br>Judge Edmund A. Sargus<br><br>Magistrate Judge Kimberly Jolson<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

Plaintiff has filed a motion for a preliminary injunction. For the following reasons, Plaintiff's motion should be denied.

Respectfully submitted,

**CITY OF COLUMBUS, DEPARTMENT OF LAW**
**ZACH KLEIN, CITY ATTORNEY**

/s/ Richard N. Coglianese
Richard N. Coglianese* (0066830)
*Lead Counsel
Aaron D. Epstein (0063286)
Sheena D. Roseberg (0088137)
Assistant City Attorneys
City of Columbus
77 N. Front Street, Columbus, Ohio 43215
(614) 645-7385
(614) 645-6949 (fax)
RNCoglianese@columbus.gov
ADEpstein@columbus.gov
SDRosenberg@columbus.gov
*Counsel for Defendants*

**TABLE OF CONTENTS**

Introduction ....................1

Background ....................3

I. Ohio Law Has Barred Civil Courthouse Arrests for Over Two-Hundred Years ....................3

II. ICE's Changing Civil Courthouse Arrest Policies ....................3

III. The Arrests at FCMC ....................5

IV. The Adoption of Local Rule 2.10 ....................7

V. The Vacatur of ICE's 2025 Civil Courthouse Arrest Policies and This Lawsuit ....................8

Legal Standard ....................9

Argument ....................9

I. The United States Lacks Standing ....................9

A. The United States' Disagreement with a Local Rule Is Not an Injury-in-Fact ....................10

B. The United States Identifies No Arrest LR 2.10 Has Prevented or Will Prevent ....................12

C. Ohio Law Independently Bars the Same Civil Arrests Barred by LR 2.10 ....................14

II. The United States Is Not Likely To Succeed on the Merits of Its Claims ....................15

A. The INA Does Not Preempt LR 2.10 ....................15

i. LR 2.10 Does Not Conflict with the INA ....................15

ii. The INA Did Not Displace the Common Law Prohibition Against Civil Courthouse Arrests ....................20

B. LR 2.10 Does Not Directly Regulate the Federal Government ....................24

C. The Tenth Amendment Forbids the Relief the United States Seeks ....................28

III. The Remaining Preliminary Injunction Factors Foreclose Relief ....................31

A. The United States Has Not Identified an Immediate, Irreparable Harm ....................31

i. The Alleged Sovereign Injury Does Not Qualify as Irreparable Harm ....31

ii. The Alleged Operational Harms Are Hypothetical and Not Irreparable ....33

B. The Balance of Equities and Public Interest Tip Decisively in FCMC's Favor ....34

Conclusion ....36

# TABLE OF AUTHORITIES

**Cases**

*Adderley v. Florida*,
385 U.S. 39 (1966) .......... 16, 26

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) .......... 10

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 17, 28

*Arizona v. Yellen*,
34 F.4th 841 (9th Cir. 2022) .......... 11

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320, 324–27 (2015) .......... 32, 33

*Atl. Coast Line R. Co. v. Brotherhood of Locomotive Eng'rs*,
398 U.S. 281 (1970) .......... 16

*Block v. Canepa,*
175 F.4th 642 (6th Cir. 2026) .......... 14

*Brown v. Yost*,
133 F.4th 725 (6th Cir. 2025) .......... 34

*California v. Texas*,
593 U.S. 659 (2021) .......... 10, 14

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011) .......... 16

*City of Akron v. Mingo*,
160 N.E.2d 225 (Ohio 1959) .......... 14, 23

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018) .......... 18

*Cnty. of Ocean v. Grewal*,
475 F. Supp. 3d 355 (D.N.J. 2020) .......... 18

*CoreCivic, Inc. v. Gov. of N.J.*,
145 F.4th 315 (3d Cir. 2025) .......... 27

*Counts v. Gen. Motors, LLC*,
139 F.4th 576 (6th Cir. 2025) ........ 16

*Cox v. Louisiana*,
379 U.S. 559 (1965) ........ 1

*D.T. v. Sumner Cnty. Schs.*,
942 F.3d 324 (6th Cir. 2019) ........ *passim*

*Dahl v. Bd. of Trs. of W. Michigan Univ.*,
15 F.4th 728 (6th Cir. 2021) ........ 34

*DeCanas v. Bica*,
424 U.S. 351 (1976) ........ 17

*Doe v. U.S. Immigr. & Customs Enf't*,
490 F. Supp. 3d 672 (S.D.N.Y. 2020) ........ *passim*

*Elrod v. Burns*,
427 U.S. 347 (1976) ........ 32

*Ex Parte Helsby* (1832) 1 Deac. & Ch. 16, 22 ........ 23

*Ex Parte Russell* (1812) 19 Ves. Jun. 163, 166 (C. Sumner ed., 1845) ........ 23

*Fenner v. Gen. Motors, LLC*,
113 F.4th 585 (6th Cir. 2024) ........ 16

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ........ 1, 15, 17

*Hamama v. Adducci*,
946 F.3d 875 (6th Cir. 2020) ........ 24

*Hastings v. City of Columbus*,
42 Ohio St. 585 (Ohio 1885) ........ 22

*Johnson v. Maryland*,
254 U.S. 51 (1920) ........ 27

*Kansas v. Garcia*,
589 U.S. 191 (2020) ........ 16

*Kanuszewski v. Mich. Dep't of Health & Human Servs.*,
927 F.3d 396 (6th Cir. 2019) ........ 12

*Kentucky v. Biden*,
23 F.4th 585 (6th Cir. 2022) .......... 33

*Kerwin v. Trinity Health Grand Haven Hosp.*,
174 F.4th 942 (6th Cir. 2026) .......... 33

*Lamb v. Schmitt*,
285 U.S. 222 (1932) .......... 21, 22, 24

*Lindsey v. Whitmer*,
124 F.4th 408 (6th Cir. 2024) .......... 10

*Lomax v. Ortiz-Marquez*,
140 S. Ct. 1721 (2020) .......... 17

*Long v. Ansell*,
293 U.S. 76 (1934) .......... 24

*McHenry Cnty. v. Raoul*,
44 F.4th 581 (7th Cir. 2022) .......... *passim*

*Mich. Corr. Org. v. Mich. Dep't of Corr.*,
774 F.3d 89 (6th Cir. 2014). .......... 32

*Moorman v. Doe*,
No. 3:26-CV-327, 2026 WL 2620501 (S.D. Ohio Sept. 4, 2026) .......... 30

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) .......... 1, 28, 31

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 14

*NetChoice, LLC v. Fitch*,
145 S. Ct. 2658 (2025) .......... 39

*New Orleans Public Serv., Inc. v. Council of City of New Orleans*,
491 U.S. 350 (1989) .......... 34

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995) .......... 16

*New York v. U.S. Immigr. & Customs Enf't,*
466 F. Supp. 3d 439 (S.D.N.Y. 2020) .......... 7, 19, 23

*New York v. U.S. Immigr. & Customs Enf't*,
431 F. Supp. 3d 377 (S.D.N.Y. 2019)........................................................................ 20, 21, 23

*North Dakota v. United States*,
495 U.S. 423 (1990)..................................................................................................... 15, 19, 25

*Obama for Am. v. Husted*,
697 F.3d 423 (6th Cir. 2012) ............................................................................................... 9, 32

*Pablo Sequen v. Albarran*,
835 F. Supp. 3d 1061 (N.D. Cal. June 23, 2026)...................................................................... 8

*Parsons v. U.S. Dep't of Justice*,
801 F.3d 701 (6th Cir. 2015) ................................................................................................... 9

*Pasquantino v. United States*,
544 U.S. 349 (2005)............................................................................................................... 20

*PCC Airfoils, LLC v. Daugherty*,
176 F.4th 509 (6th Cir. 2026) ................................................................................................. 9

*Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*,
822 F.2d 1390 (6th Cir. 1987) ............................................................................................... 34

*Saginaw Cnty. v. STAT Emerg. Med. Servs.*,
946 F.3d 951 (6th Cir. 2020) ................................................................................................. 10

*Sheppard v. Maxwell*,
384 U.S. 333 (1966)............................................................................................................... 25

*Smith v. FirstEnergy Corp.*,
518 F. Supp. 3d 1118 (S.D. Ohio 2021) ................................................................................... 9

*Stewart v. Ramsay*,
242 U.S. 128 (1916)......................................................................................................... 21, 22

*United States v. Arizona*,
641 F.3d 339 (9th Cir. 2011) ................................................................................................. 32

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026) .............................................................................................. 12

*United States v. California*,
314 F. Supp. 3d 1077 (E.D. Cal. 2018)............................................................................ 2, 15, 26

*United States v. California*,
824 F. Supp. 3d 1079 (C.D. Cal. 2026) .......... 11

*United States v. City of Bos.*,
833 F. Supp. 3d 30 (D. Mass. 2026) .......... *passim*

*United States v. City of Los Angeles*,
No. CV 25-5917 FMO (AYPx), 2026 WL 1790971 (C.D. Cal. June 20, 2026) .......... 2

*United States v. City of Newark*,
No. 25CV5081 (EP) (AME), 2026 WL 1816022, at *1, *2 (D.N.J. June 24, 2026) .......... 15

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019) .......... 27

*United States v. Cnty. of Washtenaw*,
No. 26-11166, 2026 WL 2453724 (E.D. Mich. Aug. 21, 2026) .......... *passim*

*United States v. Colorado*,
831 F. Supp. 3d 1108 (D. Colo. 2026) .......... 2, 31

*United States v. Hawaii*,
830 F. Supp. 3d 1028 (D. Haw. 2026) .......... 11

*United States v. Illinois*,
796 F. Supp. 3d 494 (N.D. Ill. 2025) .......... 2, 18, 31

*United States v. Miami Univ.*,
91 F. Supp. 2d 1132 (S.D. Ohio 2000) .......... 11

*United States v. Michigan*,
817 F. Supp. 3d 630 (W.D. Mich. 2026) .......... 11

*United States v. Minnesota*,
No. 25-CV-3798 (ECT/JFD), 2026 WL 2085701 (D. Minn. July 20, 2026) .......... 2

*United States v. New Jersey*,
No. 20-1364 (FLW) (TJB), 2021 WL 252270 (D.N.J. Jan. 26, 2021) .......... 6

*United States v. New Jersey*,
No. CV 26-1770 (GC) (JTQ), 2026 WL 2621025 (D.N.J. Sept. 4, 2026) .......... *passim*

*United States v. New York*,
810 F. Supp. 3d 329 (N.D.N.Y. 2025) .......... *passim*

*United States v. New York*,
814 F. Supp. 3d 266 (N.D.N.Y. 2025) ..... 2

*United States v. Rochester*,
No. 25-CV-6226-FPG, 2026 WL 2581845 (W.D.N.Y. Sept. 1, 2026) ..... 2

*United States v. Texas*,
507 U.S. 529 (1993) ..... 20, 23

*United States v. West Virginia*,
295 U.S. 463 (1935) ..... 10

*Va. Uranium, Inc. v. Warren*,
587 U.S. 761 (2019 ..... 16

*Velazquez-Hernandez v. U.S. Immigr. & Customs Enf't*,
500 F. Supp. 3d 1132 (S.D. Cal. 2020) ..... 17, 20, 23

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
529 U.S. 765, 771 (2000) ..... 11

*Washington v. U.S. Dep't of Homeland Sec.*,
614 F. Supp. 3d 863 (W.D. Wash. 2020) ..... 23

*Wimbush v. Wyeth*,
619 F.3d 632 (6th Cir. 2010) ..... 16

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7, 24 (2008) ..... 9, 34

*Wyeth v. Levine*,
555 U.S. 555 (2009) ..... 16, 17

*Zumsteg v. Am. Food Club, Inc.*,
143 N.E.2d 701 (Ohio 1957) ..... *passim*

**Constitutions**

U.S. Const. amend. X ..... 28

Ohio Const. art. IV, 5(B) ..... 7

## Statutes and Session Laws

Violence Against Women and Department of Justice Reauthorization Act, P.L. No. 109–162, 119 Stat. 2960 (2006) ... 19

8 U.S.C. § 1101 *et seq.* ... 17, 18, 19

Act of Dec. 6, 1799, §§ 3–4, *reprinted in* The Laws of the Northwest Territory, 1788-1800, at 444-45 (Theodore Calvin Pease ed., 1925) ... 3

Act of Feb. 14, 1805, §§ 3–4, 3 Ohio Laws 181 (1805) ... 3

Act of Feb. 24, 1831, §§ 5–6, 29 Ohio Laws 341–42 (1831) ... 3

H. B. No. 649, 122nd Gen. Assemb. (Ohio 1999) ... 22

Ohio Legislature, Senate Bill 172, Summary ... 14

Ohio Rev. Code § 2331.11 ... 3, 14, 22

Ohio Rev. Code § 2331.12 ... *passim*

Ohio Rev. Code § 2331.13 ... 23

Ohio Rev. Code § 1901.01 ... 5

Ohio Rev. Code § 1901.02 ... 5

Ohio Rev. Code § 1901.18 ... 5

Ohio Rev. Code § 1901.20 ... 5

## Other Authorities

3 William Blackstone, Commentaries on the Laws of England 289 (1768) ... 21

Christopher Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 Yale L.J. Forum 410 (2017) ... 21

Emily E. Wendel, Ohio Leg. Serv'c Comm'n, *Bill Analysis: S.B. 172* (May 6, 2025)) ... 14

## ***Introduction***

Two founding principles are at issue in this lawsuit. First, under our federalist system, the powers of the federal government "are few and defined," while the powers reserved to the states "are numerous and indefinite," and "extend to all the objects which . . . concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." *Gregory v. Ashcroft*, 501 U.S. 452, 457–58 (1991) (quoting The Federalist No. 45, at 292–93 (Clinton Rossiter ed., 1961)). "[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018). Second, "[s]ince we are committed to a government of laws and not of men, it is of the utmost importance that the administration of justice be absolutely fair and orderly"; thus, "the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy." *Cox v. Louisiana*, 379 U.S. 559, 562 (1965). Both principles are under attack here.

Through its lawsuit, the United States seeks to dictate how the judges of the Franklin County Municipal Court ("FCMC") may administer justice in their courthouse. Following numerous disruptive civil immigration arrests that unsettled court attendees and court officers alike, the judges of FCMC adopted Local Rule 2.10 ("LR 2.10"), a narrow prohibition on civil arrests at FCMC that ensures the continued functioning and availability of the local justice system to the Columbus, Ohio community. The United States now seeks to preliminarily enjoin that modest rule—which mirrors the long-standing common law and state statutory prohibitions on civil courthouse arrests—on the far-reaching proposition that the Supremacy Clause empowers it to quash any state or local law that even incidentally affects immigration enforcement. That theory

has been rejected by courts across the country,[1] and the United States' claims are likely to fail here as well, for several reasons.

First, the United States has not alleged facts sufficient to establish that it has suffered an injury-in-fact or that its alleged injury is redressable by this Court, defeating standing. Second, although the Immigration and Nationality Act ("INA") permits civil arrests, it nowhere grants federal officers an unqualified right to conduct those arrests in state and local courthouses. Absent a clear statement of congressional intent to permit such arrests, the INA does not preempt LR 2.10 or abrogate the long-standing common law prohibition on such arrests. Third, LR 2.10 protects FCMC's proceedings and the property and personnel under its control; it does not directly regulate the United States, which remains free to enforce immigration law as it sees fit outside of FCMC's property. Fourth, the Tenth Amendment bars the United States' claims, which are nothing more than an attempt to use FCMC property and personnel to carry out a federal regulatory program. Because the United States is thus unlikely to succeed on the merits of its claims, and because the

[1] Notably, the United States did not address any of this precedent in its pleadings or brief. *See United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018), *aff'd in relevant part*, 921 F.3d 865 (9th Cir. 2019); *United States v. New Jersey*, No. 20-1364 (FLW) (TJB), 2021 WL 252270 (D.N.J. Jan. 26, 2021); *United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025), *appeal docketed*, No. 25-2904 (7th Cir. Oct. 27, 2025); *United States v. New York*, 810 F. Supp. 3d 329 (N.D.N.Y. 2025), *appeal docketed*, No. 26-104 (2d Cir. Jan. 16, 2026); *United States v. New York*, 814 F. Supp. 3d 266 (N.D.N.Y. 2025), *appeal docketed*, No. 26-104 (2d Cir. Jan. 16, 2026); *United States v. Colorado*, 831 F. Supp. 3d 1108 (D. Colo. 2026), *appeal docketed*, No. 26-1214 (10th Cir. June 2, 2026); *United States v. City of Bos.*, 833 F. Supp. 3d 30 (D. Mass. 2026), *appeal docketed*, No. 26-1852 (1st Cir. July 29, 2026); *United States v. City of Los Angeles*, No. CV 25-5917 FMO (AYPx), 2026 WL 1790971 (C.D. Cal. June 20, 2026); *United States v. Minnesota*, No. 25-CV-3798 (ECT/JFD), 2026 WL 2085701 (D. Minn. July 20, 2026), *appeal docketed,* No. 26-3798 (8th Cir. Sept. 21, 2026); *United States v. Cnty. of Washtenaw*, No. 26-11166, 2026 WL 2453724 (E.D. Mich. Aug. 21, 2026); *United States v. City of Rochester*, No. 25-CV-6226-FPG, 2026 WL 2581845 (W.D.N.Y. Sept. 1, 2026); *United States v. New Jersey*, No. CV 26-1770 (GC) (JTQ), 2026 WL 2621025 (D.N.J. Sept. 4, 2026).

remaining preliminary injunction factors cut decisively against the issuance of preliminary relief, the United States' motion should be denied.

## ***Background***

### *I. Ohio Law Has Barred Civil Courthouse Arrests for Over Two Hundred Years*

For centuries, the common law has acknowledged that civil courthouse arrests threaten "the uninterrupted administration of the judicial process" and has recognized a privilege against them. *See, e.g.*, *Zumsteg v. Am. Food Club, Inc.*, 143 N.E.2d 701, 703 (Ohio 1957). Ohio law has codified a privilege against these arrests as well, and for nearly as long. That codification traces back to 1799, several years before Ohio achieved statehood. *See* Ex. A (Act of Dec. 6, 1799, §§ 3–4, *reprinted in* The Laws of the Northwest Territory, 1788–1800, at 444–45 (Theodore Calvin Pease ed., 1925)). The new Ohio state legislature recodified the privilege in 1805, and then again in 1831. *See* Ex. B (Act of Feb. 14, 1805, §§ 3–4, 3 Ohio Laws 181 (1805)); Ex. C (Act of Feb. 24, 1831, §§ 5–6, 29 Ohio Laws 341–42 (1831)). Since 1953, the privilege has been codified in materially similar terms in the Ohio Revised Code, which privileges against civil arrest "[a]ttorneys," "plaintiffs, defendants, jurors," "witnesses," and court staff, among others, "while going to, attending, or returning from court," Ohio Rev. Code § 2331.11(A)(4), as well as any person "in any court of justice, during the sitting of such court," *id.* § 2331.12.

### *II. ICE's Changing Civil Courthouse Arrest Policies*

Despite these long-standing prohibitions, in recent years, U.S. Immigration and Customs Enforcement ("ICE") began permitting its officers to conduct civil arrests at courthouses, first as a rarity and then seemingly without limit. In 2021, ICE issued a memorandum permitting civil immigration arrests "in or near" courthouses, but only in five circumstances: if (1) the arrest "involves a national security threat," (2) "there is an imminent risk of death, violence, or physical

harm to any person," (3) the arrest "involves hot pursuit of an individual who poses a threat to public safety," (4) "there is an imminent risk of destruction of evidence material to a criminal case," or (5) in the absence of hot pursuit, the arrestee "poses a threat to public safety," "it is necessary to take the action in or near the courthouse because a safe alternative location for such action does not exist or would be too difficult to" carry out elsewhere, and "the action has been approved in advance by" supervisors. *See* Ex. D (Mem. from Tae Johnson, Acting Dir., U.S. ICE, on "Civil Immigration Enforcement Actions in or near Courthouses" (Apr. 27, 2021)) at 2. ICE adopted these limits because, in its own words, "civil immigration enforcement actions in or near a courthouse may chill individuals' access to courthouses and, as a result, impair the fair administration of justice," and the limits were intended to prevent "unnecessarily imping[ing] upon the core principle of preserving access to justice." *Id.* at 1.

In January 2025, ICE removed those limits. *See* Ex. E (Mem. from Caleb Vitello, Acting ICE Dir., on "Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses" (Jan. 21, 2025)). Although the new policy specified that, "[g]enerally," civil courthouse arrests would focus on "targeted aliens"—including groups as broad as "[a]liens who have been ordered removed from the United States but have failed to depart; and/or [a]liens who have re-entered the country illegally after being removed"—the policy also stated that civil arrests could be executed against "[o]ther aliens encountered during a civil immigration enforcement action in or near a courthouse, such as family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding." *Id.* at 2. While the policy encouraged officers to conduct arrests "discreetly to minimize their impact on court proceedings," it dropped any recognition of the threat that civil courthouse arrests pose to the fair administration of justice. *Id.* And, although the policy initially prohibited officers from conducting arrests that violated state or local law, *id.*,

ICE omitted even that restriction when it made the policy permanent in May 2025, *see* Ex. F (Mem. from Todd M. Lyons, Acting ICE Dir., on "Civil Immigration Enforcement Actions In or Near Courthouses" (May 27, 2025)) at 2.

### *III. The Arrests at FCMC*

The Franklin County Municipal Court ("FCMC") bore the brunt of these changes. Located in downtown Columbus, FCMC is "the busiest and largest" municipal court in Ohio, with jurisdiction over misdemeanor criminal cases, traffic cases, and small-dollar civil actions, as well as evictions, environmental criminal and civil matters, and initial arraignments and preliminary hearings for felonies. *See* Ex. G (FCMC 2025 Annual Report) at 5; Ohio Rev. Code §§ 1901.01(A), 1901.02(A)(5)–(B), 1901.18, 1901.20. The court consists of fifteen elected judges and roughly ten magistrate judges, who oversee the more than 150,000 cases the court handles annually. *See* Ex. G at 5. FCMC is in the same building complex as the neighboring Franklin County Court of Common Pleas, which has jurisdiction over criminal felony cases and civil actions with an amount in controversy over $15,000. *See* Decl. of Mitchell Williams ("Williams Decl.") ¶ 11.

Beginning in early 2025, there was a marked increase in civil immigration enforcement at FCMC. *See* Decl. of Melanie Tobias-Hunter ("Tobias-Hunter Decl.") ¶¶ 23–24; Williams Decl. ¶ 7. That rapid change in enforcement activity rattled court officers, parties to cases, victims, witnesses, and the Columbus community. For example, the Criminal Division of the Columbus City Attorney's Office prosecutes criminal cases at FCMC, ranging from traffic infractions to more serious crimes, such as stalking and domestic violence. Tobias-Hunter Decl. ¶ 8. In 2025, the Criminal Division prosecuted approximately 5,000 domestic violence and stalking cases, and it collected approximately 2,000 reports from crime victims through its Intake unit. *Id.* ¶¶ 16, 18. Many of those victims have limited or no English proficiency. *Id.* ¶ 10. In 2025, as enforcement

activity at FCMC increased, victims became distrustful of the Criminal Division, and began withholding critical information, such as contact information, on the mistaken assumption that the office was an extension of ICE. *Id.* ¶¶ 26–27; Decl. of Steve Dunbar ("Dunbar Decl.") ¶ 18. That growing distrust has made it more difficult for the office to obtain victim and witness testimony, and to successfully prosecute cases. Tobias-Hunter Decl. ¶¶ 26–27. In addition, defendants, terrified of immigration enforcement, have fled the courthouse, impeding prosecutions. *Id.* ¶ 30. Criminal Division staff have been shaken, afraid that if ICE perceives any slight, staff members could be criminally prosecuted. *Id.* ¶¶ 33–35. The 2025 enforcement change, in short, caused "a sense of panic on a daily basis" at FCMC—all at a cost to Columbus public safety. *Id.* ¶ 32.

The Franklin County Public Defender's Office endured similar tumult as ICE enforcement at FCMC increased. *See* Williams Decl. ¶¶ 7–8. Numerous civil arrests at FCMC alarmed the office: For example, in June 2025, Leonardo Fausto, an asylum seeker who was in the country legally, was arrested by ICE in an FCMC hallway after pleading guilty to a speeding violation. *See id.* ¶ 12. Fausto's arrest left his wife "desperate" and "alone" as the sole present parent to their three children. *See id.* Shortly after, teenager Mainor Anariva-Bueso was arrested in the FCMC lobby on the day of his traffic court arraignment. *Id.* ¶ 13. ICE also arrested a client of the office as he entered FCMC for his jury trial; the client was never returned for court proceedings, and the case remains open with a warrant issued for his failure to appear. *Id.* ¶ 15. This and other ICE activity at FCMC impacted the office's work: defendants were reluctant to attend scheduled court dates and hearings, confidential client communications at FCMC were placed at risk, and the office's staff hesitated to work in courtrooms when ICE agents were nearby, fearing possible violence and coercion. *Id.* ¶¶ 14, 17–19. These threats to the office's work prompted the public defenders' union to voice its outrage over the "environment of fear and intimidation" ICE had

created at FCMC. *Id.* ¶ 16. And it prompted the Public Defender himself to press FCMC for change: specifically, to adopt a ban on warrantless civil arrests at FCMC similar to the ban adopted by the adjacent Court of Common Pleas in February 2025. *See id.* ¶ 10.

There were other incidents at FCMC. The United States notes that it arrested Victorino Gonzalez Hernandez at FCMC on "November 4, 2025" "without . . . interruption of the court proceedings." ECF No. 1-3 ("Affholter Decl.") ¶ 33. Victorino Gonzalez Hernandez was scheduled to appear on November 4, 2025 for a bond revocation hearing arising out of domestic violence charges. He did not appear in court at the date and time of his hearing, forcing the court to issue a warrant. *See* Ex. H (Gonzlez Municipal Court Docket Case No 2024 CRB 011463). ICE took Mr. Gonzalez into custody on November 4, 2025 [Affholt Dec. ¶ 33], which explains his nonappearance.

Private attorneys have had similar experiences as a result of ICE's activity at FCMC: victims are less willing to cooperate with law enforcement, and clients are unwilling or hesitant to appear to press their cases, with one attorney authorized to enter pleas in absentia by more than sixty clients despite many having meritorious defenses. *See* ECF No. 1 ("Compl.") at 8 n.2; Decl. of Bertha Duran ("Duran Decl.") ¶¶ 6–12.[2]

### *IV. The Adoption of Local Rule 2.10*

In response to this turmoil, in March 2026, the FCMC judges exercised their rulemaking authority under the Ohio Constitution to propose LR 2.10. *See* Ohio Const. art. IV, § 5(B); Compl.

[2] The harm inflicted by civil courthouse arrests on the administration of justice has been well documented beyond this record. *See, e.g.*, *New York v. U.S. Immigr. & Customs Enf't,* 466 F. Supp. 3d 439, 443 (S.D.N.Y. 2020), *vacated and remanded on other grounds*, No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023).

¶ 44.[3] Public comment closed on the rule on April 8, 2026, and the rule went into effect shortly thereafter. Compl. ¶ 44. LR 2.10 provides that "[n]o individual shall be subject to a civil arrest while present in the courthouse for the purpose of attending a court proceeding or conducting other lawful court business." ECF No. 1-4. The rule defines "courthouse" to include "any building or space used by [FCMC]" and "the curtilage of the building," and excludes arrests conducted with a judicial warrant. *Id.* The rule disclaims any conflict with federal law, and roots its purpose in "[t]he administration of justice" and the principle that courts "cannot be directed, controlled, or impeded" in "the free and untrammeled exercise of their judicial functions." *Id.* (quoting *State ex rel. Johnston v. Taulbee*, 66 Ohio St. 2d 417, 421 (1981)).

### *V. The Vacatur of ICE's 2025 Civil Courthouse Arrest Policies and This Lawsuit*

In June 2026, a federal district court vacated ICE's 2025 courthouse arrest policies as arbitrary and capricious under the Administrative Procedure Act. *Pablo Sequen v. Albarran*, 835 F. Supp. 3d 1061, 1115 (N.D. Cal. June 23, 2026), *appeal docketed,* No. 26-4310 (9th Cir. July 7, 2026). Among other defects, the court noted that the policies "entirely fail to address the chilling effect of courthouse arrests." *Id.* As a result, the far-more-restrictive 2021 policy now governs ICE's civil arrests at courthouses. *See* Compl. ¶ 56; Affholter Decl. ¶ 23. Months later, the United States sent a letter to FCMC, asserting the sweeping position that the Supremacy Clause prohibits LR 2.10's regulation of FCMC property and personnel. ECF No. 1-5. FCMC promptly responded that, given the court's "critical obligation to ensure that all individuals—particularly witnesses and

[3] *See also* Ohio Sup. R. 1.0 (noting the "purpose" of the Ohio Rules of Superintendence of Courts as: "The foundation of our government rests upon the confidence of the people in the ability of their courts to achieve liberty and justice for all under the law. The fair, impartial, and speedy resolution of cases without unnecessary delay maintains this confidence, safeguards the rights of litigants to the just processing of their causes, and earns the trust of the public."); *id.* 3.0–3.01 (governing local courts' rulemaking).

victims of crime—can safely and reliably access the court without fear or interference," LR 2.10 "is an appropriate and necessary measure for meeting [the] obligation to individuals accessing the courts." ECF No. 1-6. Then, approximately four months after LR 2.10 took effect, the United States filed this suit and sought preliminarily relief. *See* ECF No. 2-1 ("PI [4]."). [5]

## ***Legal Standard***

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Courts consider four factors in weighing the need for relief: "(1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326 (6th Cir. 2019). Likelihood of success on the merits is often "the determinative factor" in a suit asserting a constitutional violation, *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012), but the irreparable-harm factor is also "indispensable," *D.T.*, 942 F.3d at 327. To obtain relief, a plaintiff must make "a clear showing" of entitlement. *PCC Airfoils, LLC v. Daugherty*, 176 F.4th 509, 513 (6th Cir. 2026) (quoting *Winter*, 555 U.S. at 23–24).

## ***Argument***

### ***I. The United States Lacks Standing***

[5] The United States appended a declaration to its complaint; FCMC has assumed the declaration is part of the complaint. FCMC has also appended exhibits to this brief that are referenced in the complaint and/or matters of public record. *See Smith v. FirstEnergy Corp.*, 518 F. Supp. 3d 1118, 1124 (S.D. Ohio 2021) (courts may consider "documents and exhibits incorporated in, referenced by, and attached to the complaint" and "matters of public record or for which judicial notice is appropriate").

The United States bears the burden of showing an injury-in-fact that is traceable to LR 2.10 and redressable by an injunction. *See Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 710 (6th Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The United States has not carried that burden here. The United States asserts that the mere existence of LR 2.10 is an affront to its sovereignty sufficient to establish standing, but it cites no case law supporting that novel claim. The United States also complains of hypothetical ill effects of LR 2.10, without citing any actual or imminent injury to its enforcement activity. And the United States cannot establish redressability, because state law poses an independent, unchallenged barrier to relief here.

### *A. The United States' Disagreement with a Local Rule Is Not an Injury-in-Fact*

The United States first contends that LR 2.10's mere alleged non-compliance with federal law inflicts a "sovereign injury" on it sufficient to establish standing. Compl. ¶¶ 66–69; PI Br. at 9. But that is not the law. There must be an "actual or threatened interference with the authority of the United States" and not a mere "difference of opinion" to support standing. *United States v. West Virginia*, 295 U.S. 463, 473 (1935); *see, e.g.*, *California v. Texas*, 593 U.S. 659, 670 (2021) ("[O]ur cases have consistently spoken of the need to assert an injury that is the result of a statute's actual or threatened *enforcement*[.]"); *Lujan*, 504 U.S. at 560 (requiring an "invasion of a legally protected interest" to allege an injury-in-fact). The Sixth Circuit thus applies these "foundational standing requirements" to private and public litigants alike. *Arizona v. Biden*, 40 F.4th 375, 385 (6th Cir. 2022); *see also Saginaw Cnty. v. STAT Emerg. Med. Servs.*, 946 F.3d 951, 957 (6th Cir. 2020) ("A government still must show that it suffers an 'actual or imminent' invasion of a judicially cognizable interest," that is, "some tangible interference with its authority to regulate or enforce its laws." (quoting *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007))); *Lindsey v. Whitmer*,

124 F.4th 408, 415 (6th Cir. 2024) ("[T]he Supremacy Clause doesn't establish standing."), *cert. denied*, 145 S. Ct. 2704 (2025).

Rightly so. On the United States' theory, it could sue over any state or local law it disliked, simply by conjuring an alleged conflict with federal law. *See United States v. City of Bos.*, 833 F. Supp. 3d 30, 45 (D. Mass. 2026) (noting the "sweeping" implications of this "essentially limitless view of sovereign injury," which would reach a "nonbinding city-council resolution" that "pronounc[ed] . . . a position contrary to federal policy"). "The potential for abuse of the federal courts for political purposes is manifest." *United States v. California*, 824 F. Supp. 3d 1079, 1085 (C.D. Cal. 2026). For these reasons, courts have repeatedly rejected this theory of standing. *See, e.g.*, *City of Bos.*, 833 F. Supp. 3d at 45 (rejecting similar claim and noting "no on-point authority" for the United States' position); *California*, 824 F. Supp. 3d at 1083 ("Plaintiff presents no binding authority holding that the mere *existence* of a preempted state law creates a sovereign injury to the federal government."); *United States v. Hawaii*, 830 F. Supp. 3d 1028, 1040 (D. Haw. 2026) (finding no standing, despite alleged injury to United States' "sovereignty," because "[t]he Complaint does not describe any concrete injury"); *United States v. Michigan*, 817 F. Supp. 3d 630, 645 (W.D. Mich. 2026) (similar).

The United States has not cited any case law warranting a departure from that binding precedent; instead, the cases the United States relies on either involve allegations of concrete, actual injury or do not concern standing at all. *See United States v. Miami Univ.*, 91 F. Supp. 2d 1132, 1142–46 & n.12 (S.D. Ohio 2000) (rejecting argument that, because a lawsuit by the United States also benefited private individuals, that third-party benefit deprived the United States of standing, and finding that the United States suffered a concrete harm when a federal funding recipient violated "the contractual and statutory provisions" that conditioned disbursement of the

funds); *Arizona v. Yellen*, 34 F.4th 841, 851–53 (9th Cir. 2022) (finding that Arizona had alleged "concrete and particularized harms to its ability to exercise its sovereign prerogatives," a necessary prerequisite to standing given that "federal courts are without jurisdiction to adjudicate abstract questions of political power, of sovereignty" (citations omitted)); *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (noting, in a False Claims Act case, that the injury asserted included "the proprietary injury resulting from the alleged fraud" against the federal government, and that sovereign injury "suffices to support a *criminal* lawsuit by the Government" (emphasis added)); *United States v. California*, 173 F.4th 1060, 1067–68 (9th Cir. 2026) (addressing the preliminary injunction factors, not standing). In short, the United States cannot rely on this theory to assert an injury-in-fact.

### ***B. The United States Identifies No Arrest LR 2.10 Has Prevented or Will Prevent***

The United States next attempts to assert a "concrete, operational harm[]" by arguing that at-large arrests cost more and carry more risk than arrests at FCMC. *See* PI Br. at 9. But to assert an injury sufficient to warrant forward-looking relief, "a plaintiff must show actual present harm or a significant possibility of future harm." *Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 405–06 (6th Cir. 2019). "Allegations of *possible* future injury are not sufficient," and "a highly attenuated chain of possibilities does not satisfy the requirement that threatened injury must be certainly impending." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up)). The United States cannot meet this standard, because it has not pled facts sufficient to support the necessary, antecedent finding to its alleged harm: that ICE *actually would make arrests* at FCMC but for LR 2.10. That failure matters here, given the vanishingly rare circumstances in which the United States is allowed to conduct civil arrests at FCMC under its own policy.

Specifically, for LR 2.10 to have any impact on ICE's enforcement activity, all of the following would have to be true: ICE would have to learn that an immigrant was present at FCMC who posed "a national security threat"; "an imminent risk of death, violence, or physical harm"; "an imminent risk of destruction of evidence"; "a threat to public safety" with hot pursuit; or "a threat to public safety" without hot pursuit, where no other arrest location would suffice. *See* Ex. D at 2. Then, ICE would have to determine that it should conduct the arrest inside of FCMC, as opposed to "near" FCMC—an option available under ICE's current policy and not in tension with LR 2.10—or countless other locations in the Columbus metropolitan region. Then, ICE would have to determine that it would not seek a judicial warrant to conduct the arrest—given that LR 2.10 carves out such arrests.

The United States has not established that this chain of events is anything more than "possible." First, there is no allegation—anywhere in the pleadings—that LR 2.10 has inflicted actual harm on the United States. That is, the United States nowhere alleges that it would have conducted a specific civil arrest at FCMC but for LR 2.10. And the pleadings make clear that there is no imminent injury. The United States describes only eight arrests at FCMC since 2014. *See* Affholter Decl. ¶¶ 26–34. Six of those arrests occurred under the now-vacated 2025 policies, and the United States does not claim that those arrests would have been permitted under the now-effective 2021 policy. *See id.* ¶ 36 (alleging, far short of that mark, that the 2025 arrests "presented public safety concerns relevant to the circumstances addressed in the" 2021 policy). Of the two arrests that occurred under the 2021 policy, one involved a judicial warrant and thus would have been allowed under LR 2.10. *See id.* ¶ 27. And the United States offers no facts about the last arrest

to suggest it satisfied the 2021 policy.[6] *See id.* ¶ 28. In short, the United States has not identified a single arrest, past or impending, that LR 2.10 stands in the way of, and that shortcoming is enough to end its suit.

### *C. Ohio Law Independently Bars the Same Civil Arrests Barred by LR 2.10*

Even if the United States had an injury, this Court could not redress it. Redressability cannot be established where, "notwithstanding any action a court might take, . . . an unchallenged, overlapping law regulating the same conduct would remain in place and inflict the same alleged injury." *Block v. Canepa,* 175 F.4th 642, 652 (6th Cir. 2026) (cleaned up); *see also Murthy v. Missouri*, 603 U.S. 43, 73 (2024) (citing *California v. Texas*, 593 U.S. at 671). That is the case here, because Ohio law imposes an unchallenged bar coextensive with LR 2.10. The United States seeks an injunction allowing it to civilly arrest individuals at FCMC, because "the date and time of the individual's appearance is known in advance." Affholter Decl. ¶ 21; *see also* Compl. ¶ 78; PI Br. at 16. But the only individuals whose appearance date and time are known in advance are the "plaintiffs, defendants, jurors, and witnesses" who are privileged from civil arrest "while going to, attending, or returning from court." *See* Ohio Rev. Code § 2331.11(A)(4); *see also City of Akron v. Mingo*, 160 N.E.2d 225, 230–31 (Ohio 1959) (holding that the privilege in § 2331.11 and related provisions is limited to civil arrests). In addition, Ohio law prevents civil arrest of any person "in any court of justice, during the sitting of such court." *See* Ohio Rev. Code § 2331.12.[7]

---

[6] The United States also pleads no facts supporting that this arrest could not have occurred "near" FCMC, in harmony with ICE's policy and LR 2.10, or that ICE could not have obtained a judicial warrant for this arrest, given the arrestee's acknowledged violation of federal law. *See id.* ¶ 27.

[7] Although § 2331.12 has been little analyzed or applied, the Ohio Legislative Service Commission recently relied on it in a bill analysis to state that "Ohio law prohibits a civil arrest from being carried out . . . [against a]ny other person attending a court session." *See* Ex. I (Emily E. Wendel, Ohio Legis. Serv'c Comm'n, *Bill Analysis: S.B. 172* (May 6, 2025)) at 3, *available at* legislature.ohio.gov/download?key=25636 (last visited Sept. 24, 2026). Of note, the bill addressed in that analysis, S.B. 172, sought to abrogate any privilege against arrest for immigration arrests,

Both of these Ohio laws prevent the same arrests LR 2.10 reaches, but the United States does not challenge either provision. Enjoining LR 2.10 would thus change nothing. *See City of Bos.*, 833 F. Supp. 3d at 44–45 (finding no redressability where the court could not relieve the United States' alleged injury due to unchallenged state law); *United States v. City of Newark*, No. 25CV5081 (EP) (AME), 2026 WL 1816022, at *1, *2 (D.N.J. June 24, 2026) (same).

## ***II. The United States Is Not Likely to Succeed on the Merits of Its Claims***

### ***A. The INA Does Not Preempt LR 2.10***[8]

As to the merits, the United States asserts that the INA conflicts with and thus preempts LR 2.10, *see* PI Br. at 13–15, but that argument fails for the simple reason that the United States has not identified a conflict. Instead, as numerous courts have found, the INA does not require states and localities to assist with immigration enforcement, much less to open their courthouse doors to the disruption immigration enforcement entails. *See, e.g.*, *United States v. New York*, 810 F. Supp. 3d 329, 346–48 (N.D.N.Y. 2025); *United States v. Cnty. of Washtenaw*, No. 26-11166, 2026 WL 2453724, at *2–3, *19–21 (E.D. Mich. Aug. 21, 2026); *United States v. New Jersey*, No. CV 26-1770 (GC) (JTQ), 2026 WL 2621025, at *11 (D.N.J. Sept. 4, 2026). Moreover, the INA cannot conflict with LR 2.10, because the INA did not displace the common law prohibition on civil courthouse arrests that LR 2.10 implements. For those reasons, the United States is unlikely to succeed on the merits of this claim.

#### ***i. LR 2.10 Does Not Conflict with the INA***

---

but it was not passed into law. *See* Ex. J (Ohio Legislature, Senate Bill 172, Summary), *available at* legislature.ohio.gov/legislation/136/sb172 (last visited Sept. 24, 2026).

[8] Because Congress holds "the primary role . . . in resolving conflicts between the National and State Governments," this brief addresses the preemption claim first. *See North Dakota v. United States*, 495 U.S. 423, 435 (1990); *see also California*, 314 F. Supp. 3d at 1110 (questioning whether intergovernmental immunity applies to a state law "restrict[ing] assistance with some federal endeavors" where that law was not preempted, given the directive in *North Dakota*).

Preemption is "an extraordinary power in a federalist system," and courts "must assume [that] Congress does not exercise [it] lightly." *Gregory*, 501 U.S. at 460. As a result, when "Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear." *Id.* Thus, to establish preemption, "[i]nvoking some brooding federal interest" is insufficient. *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality opinion). Litigants must "point specifically to a constitutional text or a federal statute that does the displacing or conflicts with state law." *Id.*; *see also, e.g.*, *Kansas v. Garcia*, 589 U.S. 191, 212 (2020) ("[T]he possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption."). Conflict preemption, in particular, "does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 607 (2011). Instead, the conflict preemption inquiry "should be narrow and precise," *Wimbush v. Wyeth*, 619 F.3d 632, 643 (6th Cir. 2010), and grounded in "the federal statute's text," *Counts v. Gen. Motors, LLC*, 139 F.4th 576, 581 (6th Cir. 2025). Further, a law that "merely . . . inconveniences the federal government" is not preempted; "[t]he repugnance between the laws must be so direct and positive that the two acts cannot be reconciled or consistently stand together." *Cnty. of Washtenaw*, 2026 WL 2453724, at *6 (cleaned up).

That presumption against preemption is strongest in cases "where federal law is said to bar state action in fields of traditional state regulation." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654–55 (1995); *accord Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 594 (6th Cir. 2024). That presumption applies here, given the core state powers—control of state courts and state property—at issue. *See, e.g.*, *Atl. Coast Line R. Co. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 285 (1970) (federalism reserved to the states

the power of the "maintenance of state judicial systems"); *Adderley v. Florida*, 385 U.S. 39, 47 (1966) (a state retains the "power to preserve the property under its control for the use to which it is lawfully dedicated"); *New York*, 810 F. Supp. 3d at 341 (applying the presumption in a similar case); *New Jersey*, 2026 WL 2621025, at *7 (same). In such cases, a challenged law survives "unless [preemption] was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *see also Gregory*, 501 U.S. at 460 (same).[9]

The INA does not come close to meeting that standard here. The INA permits federal officers to make arrests pursuant to administrative warrants, *see* PI Br. at 4–5 (citing 8 U.S.C. §§ 1226(a), 1357(a)), and its regulations govern how those warrants may issue, *see id.* (citing 8 C.F.R. §§ 236.1(b), 287.5(e)(2)). But none of those provisions say a word about *where* civil arrests may occur. That silence is decisive. *See New York*, 810 F. Supp. 3d at 346; *New Jersey*, 2026 WL 2621025, at *10; *Doe v. U.S. Immigr. & Customs Enf't*, 490 F. Supp. 3d 672, 692 (S.D.N.Y. 2020); *Velazquez-Hernandez v. U.S. Immigr. & Customs Enf't*, 500 F. Supp. 3d 1132, 1143 (S.D. Cal. 2020). Because the INA does not indicate any congressional intent to compel states and localities to accept warrantless civil arrests in their courthouses, the INA and LR 2.10 can "be reconciled," *see Cnty. of Washtenaw*, 2026 WL 2453724, at *6—by federal officers conducting civil arrests in

---

[9] One court declined to apply this presumption in a similar case "because immigration is an area traditionally regulated by the federal government." *See Cnty. of Washtenaw*, 2026 WL 2453724, at *7 (citation omitted). But that case is distinguishable insofar as the court did not address the acknowledged reservation of power to the states to manage their own courts. Further, the court erred in this narrow respect, given that the more robust presumption applies whenever a challenged law concerns "the historic police powers of the States," even if the law touches on a federal field like immigration. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 400 (2012) (recognizing presumption in a case concerning a state law related to immigration); *DeCanas v. Bica*, 424 U.S. 351, 357–58 (1976) (applying presumption to reject preemption challenge to state law related to immigration). In any event, the preemption claim fails even without this added presumption.

any number of locations outside of FCMC, or arrests with judicial warrants inside FCMC—defeating the preemption claim.[10]

That conclusion is borne out by each of the INA provisions the United States relies on here. *See* Compl. ¶¶ 29, 33, 35, 37, 53, 61 (citing 8 U.S.C. §§ 1182, 1225–1229a, 1231, 1357). To begin, all of these provisions impose obligations on the *United States*; none impose obligations on states and localities. Thus, the INA creates a purely voluntary regime for state and local cooperation with federal immigration enforcement; as a result, these provisions cannot be relied on as a basis for requiring FCMC to tolerate civil arrests. *See California*, 921 F.3d at 886 (finding no conflict preemption of state judicial warrant requirement because "neither an administrative warrant issued by federal authorities nor any other provision of law identified by the United States *compels* any action by a state or local official" and "refusing to help is not the same as impeding"); *McHenry Cnty. v. Raoul*, 44 F.4th 581, 592 (7th Cir. 2022) (finding no conflict preemption of a state ban on the use of local detention facilities for immigration enforcement because "[i]t would make no sense to hold that a federal statute premised on State cooperation preempts a State law withholding that cooperation").[11] Further, the United States primarily relies on these provisions to assert that it

[10] Given this silence, the United States' citation to *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721 (2020), does it no favors. *See* PI Br. at 14. In *Lomax*, the Court held that the Prison Litigation Reform Act's "three-strikes provision" reaches all dismissals for failure to state a claim, and not just dismissals with prejudice, because the Act's express language refers to "dismissals" and not "dismissals with prejudice." *Id.* at 1725. Thus, the Court held, its inquiry "beg[an], and pretty much end[ed], with the text of [the Act]." *Id.* There is no such "text" here; *Lomax* is inapposite.

[11] *See also, e.g.*, *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Federal law does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement."); *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 381–82 (D.N.J. 2020) ("There is no indication that Congress, in enacting the INA, sought to usurp" local "decision[s] not to cooperate with the enforcement of federal immigration law."); *Illinois*, 796 F. Supp. 3d at 530 n.18 ("The United States repeatedly conflates the INA's 'codification of comity,' with a *requirement* that States facilitate federal immigration enforcement. This is incorrect. Comity by definition is not a legal requirement." (citations omitted)); *New Jersey*, 2026 WL 2621025, at *8–10 (similar, as to many INA provisions relied on here).

retains broad authority over immigration enforcement. *See* PI Br. at 4. But no one is contesting that. What is contested is whether the United States can rely on that "brooding federal interest" to compel FCMC to permit civil arrests. Under the "high threshold" for finding conflict preemption, it cannot. *See New Jersey*, 2026 WL 2621025, at *11.

Further, the United States misconstrues the import of 8 U.S.C. § 1357(a)(3). *See* PI Br. at 15. That provision—which permits federal officers to conduct warrantless searches of private land and conveyances in certain defined locations near the United States border—proves only that Congress knows how to speak when it intends to grant federal officers access for warrantless civil enforcement; it did not so speak as to courthouses. Section 1357(a)(3) thus undermines the United States' cause. *See, e.g.*, *New York*, 810 F. Supp. 3d at 346 (finding that "Congress' use of explicit language authorizing ICE activity on otherwise protected private property in certain locations shows that it knows how to speak clearly when it intends to displace conflicting protections" and rejecting a preemption challenge to a state civil courthouse arrest ban on that ground and others); *Cnty. of Washtenaw*, 2026 WL 2453724, at *19 (similar, given the court's finding that the INA "does not state or imply a federal officer's unfettered right to warrantless entry onto property in the nation's interior"); *New Jersey*, 2026 WL 2621025, at *10 (similar, and finding that the INA's "lack of reference to state-owned property is therefore telling").

The United States' reliance on 8 U.S.C. § 1229(e) is also misplaced. *See* PI Br. at 15. That section—adopted as part of the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109–162, 119 Stat. 2960 (2006)—seeks to protect crime victims who are subject to an "enforcement action leading to a removal proceeding" in sensitive locations, such as courthouses, by requiring immigration officers not to use information from the

victim's abuser to support removal. *See, e.g.*, *New York*, 466 F. Supp. 3d at 446. By its plain terms, this section focuses "not on the location where civil immigration enforcement is permitted, but on limiting the use of information against noncitizen victims." *New York*, 810 F. Supp. 3d at 347. Given that focus—which is irrelevant here—this section, at most, recognizes that immigration enforcement arrests *may* occur at courthouses, perhaps because federal officers are empowered to conduct *criminal* arrests at courthouses, or because certain states and localities may choose to permit courthouse arrests, or because non-immigration enforcement actions at courthouses could one day lead to removal proceedings. *See, e.g.*, *New York v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 393 (S.D.N.Y. 2019). But that jumble of possibilities does not evince an intent, much less a "clear and manifest" one, to *require* states and localities to permit warrantless civil arrests in their courthouses, *see, e.g.*, *New York*, 810 F. Supp. 3d at 347; *New Jersey*, 2026 WL 2621025, at *11, particularly given that this section is meant to *protect* victims at courthouses, not to further expose them to removal, *see, e.g.*, *Doe*, 490 F. Supp. 3d at 693; *New York*, 431 F. Supp. 3d at 393; *Velazquez-Hernandez*, 500 F. Supp. 3d at 1144. Further, this 2006 amendment to the INA sheds no light on what Congress might have intended when it initially passed the INA in 1952. *See, e.g.*, *New York*, 810 F. Supp. 3d at 347 (collecting cases).

In short, the United States points to no INA provision requiring states and localities to accept civil arrests in their courthouses, and the preemption claim fails on that ground alone.

#### *ii. The INA Did Not Displace the Common Law Prohibition Against Civil Courthouse Arrests*

Independently, the INA cannot conflict with LR 2.10, because the INA left intact the long-standing common law prohibition against civil courthouse arrests that LR 2.10 effectuates. "[S]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles[.]" *United States v. Texas*, 507 U.S. 529, 534

(1993) (cleaned up). Thus, "to abrogate a common-law principle, the federal statute at issue must 'speak directly' to the question addressed by the common law" given that, in such a circumstance, "Congress does not write upon a clean slate." *Id.*; *see also Pasquantino v. United States*, 544 U.S. 349, 359–60, 368–72 (2005) (holding that Congress must clearly state its intent to abrogate the common law). The INA does not meet that standard here.

The common law privilege against civil courthouse arrests is "of ancient origin" and traces back "as early as Henry VI," *Zumsteg*, 143 N.E.2d at 703 (quoting *Brooks v. Delaware*, 79 A. 790, 794 (Del. 1911)). Its derivation in American law is rooted in Blackstone's Commentaries on the Laws of England, "on which early [United States] courts heavily relied in incorporating English common law into the laws of the several states and the United States." *New York*, 431 F. Supp. 3d at 388. Blackstone described the privilege as follows: "'Suitors, witnesses, and other persons, necessarily attending any courts of record upon business, are not to be arrested during their actual attendance, which includes their necessary coming and returning. And no arrest can be made . . . in any place where the king's justices are actually sitting.'" *Id.* (quoting 3 William Blackstone, Commentaries on the Laws of England 289 (1768)); *see* Christopher Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 Yale L.J. Forum 410, 423–31 (2017) (assessing English and American case law concerning the privilege and identifying "two strands," the first of which "protects persons coming to and from the courts, while the second protects the place of a court and its environs").

The federal common law embraced this tradition, with the Supreme Court observing that "[c]ourts of justice ought everywhere to be open, accessible, free from interruption, and to cast a perfect protection around every man who necessarily approaches them" as well as "all such persons as are necessary to manifest his rights." *Stewart v. Ramsay*, 242 U.S. 128, 129–30 (1916) (citation

omitted and collecting cases). Federal common law thus privileged "witnesses, suitors, and their attorneys, while in attendance in connection with the conduct of one suit" from civil arrest and service of process in unrelated civil suits. *Lamb v. Schmitt*, 285 U.S. 222, 225 (1932); *see Stewart*, 242 U.S. at 130. Because this rule was "founded in the necessities of the judicial administration," courts observed that it "is the privilege of the court, rather than of the defendant." *Stewart*, 242 U.S. at 130; *see Lamb*, 285 U.S. at 225 (collecting cases).

"The state courts, with few exceptions, have followed this rule." *Stewart*, 242 U.S. at 130 (collecting cases). Ohio is no exception. In fact, as noted above, the privilege was first adopted in the laws of the Northwest Territory in 1799, several years before Ohio achieved statehood in 1803. *See* Ex. A; *Hastings v. City of Columbus*, 42 Ohio St. 585, 590–91 (1885) (tracing the privilege against arrest in Ohio law for specified parties "attending court" and any person "in any court of justice, during the sitting of the court" back to 1799). The Ohio state legislature then recodified the privilege in 1805 and again in 1831. *See* Exs. B, C. And the privilege continued in effect thereafter: the Ohio General Assembly recodified the privilege in 1953 at its current location in the Ohio Revised Code, *see* Ohio Rev. Code §§ 2331.11–12; and in 1999, the General Assembly modernized § 2331.11, while leaving § 2331.12 intact. *See* Ex. K (H. B. No. 649, 122nd Gen. Assemb. (Ohio 1999) at 33–34). The privilege broadly protects from civil arrest "[a]ttorneys, bailiffs, clerks of courts, sheriffs, coroners, constables, plaintiffs, defendants, jurors, and witnesses, and other officers or employees of the court, while going to, attending, or returning from court," Ohio Rev. Code § 2331.11(A)(4), as well as any person "in any court of justice, during the sitting of such court," *id.* § 2331.12. The rationale for the privilege, like its federal counterpart, "arises out of the authority and dignity of the court, it is founded on the necessities of judicial administration, it has for its primal object the protection of the court and not the immunity of the

person, and is extended or withheld only as judicial necessities require." *Zumsteg*, 143 N.E.2d at 703 (quoting *Brooks*, 79 A. at 794).

Further, the privilege binds the sovereign as well as private litigants. Ohio law carves out from the privilege arrests for "treason, felony, or breach of the peace"—that is, criminal offenses. Ohio Rev. Code § 2331.13; *Mingo*, 160 N.E.2d at 230–31. Those are offenses the sovereign prosecutes, and there would be no reason to exclude those offenses from the privilege if it did not otherwise run against the state. Additionally, there is precedent in English common law, the source of the privilege, applying it to sovereign arrests. *See New York*, 810 F. Supp. 3d at 344 n.6; *see also* Ex. L (*Ex Parte Russell* (1812) 19 Ves. Jun. 163, 166 (C. Sumner ed., 1845) (applying privilege because "the general principle of law extends to the Crown as well as a subject"; therefore, arrestee "cannot be arrested by the Crown any more than by a subject")); *Ex.* M (*Ex Parte Helsby* (1832) 1 Deac. & Ch. 16, 22 (applying privilege against civil arrest "command[ed] to the sheriff by the king")). And that is consistent with the purpose of the privilege. A rule that "has for its primal object the protection of the court and not the immunity of the person," *Zumsteg*, 143 N.E.2d at 703, is agnostic as to whether the party threatening the administration of justice is a government official or a civilian; an arrest by either threatens the court's sanctity, *see, e.g.*, *Velazquez-Hernandez*, 500 F. Supp. 3d at 1145.

Numerous courts have held that the INA, which does not speak "directly" to the subject, did not displace this long-standing privilege. *See, e.g.*, *New York*, 810 F. Supp. 3d at 345–48; *New York*, 431 F. Supp. 3d at 392–93; *New York*, 466 F. Supp. 3d at 445; *Doe*, 490 F. Supp. 3d at 692; *Velazquez-Hernandez*, 500 F. Supp. 3d at 1143–44; *Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 879 n.21 (W.D. Wash. 2020); *see also Texas*, 507 U.S. at 535 (congressional silence on a common law subject "falls far short of an expression of legislative intent to supplant

the existing common law in that area").[12] The same conclusion is warranted here. When it enacted the INA, Congress legislated against a settled backdrop of federal and state common and statutory law barring civil courthouse arrests, and it said nothing. *See, e.g.*, *Lamb*, 285 U.S. at 225 (describing the privilege twenty years before the INA's enactment); *Long v. Ansell*, 293 U.S. 76, 83 (1934) (similar, just eighteen years before the INA's enactment).

The question here is whether Congress spoke with sufficient clarity to displace this long-standing privilege. It did not. And because LR 2.10 merely effectuates that privilege at FCMC, the preemption claim is unlikely to succeed for that independent reason.[13]

### *B. LR 2.10 Does Not Directly Regulate the Federal Government*

[12] Other courts have reached a contrary conclusion, but their holdings are distinguishable. For example, in *Ryan v. United States Immigration and Customs Enforcement*, the court declined to find a common law privilege against civil courthouse arrests for immigration offenses, but cabined its ruling to federal common law, due to a "gap in the record" on the relevant state common law, 974 F.3d 9, 29–31 (1st Cir. 2020)—that gap is not present here, and Ohio law supports application of the privilege in these circumstances. The *Ryan* court also was not presented with and did not address authority supporting the application of the privilege to sovereign arrests, *id.* at 24–26—again, unlike the record here. Further, while the *Ryan* court noted the lack of case law applying the privilege to immigration arrests, it did not address the obvious explanation for that absence: that civil immigration arrests at courthouses were nearly non-existent prior to recent years. *See New York*, 810 F. Supp. 3d at 344 & n.5–6; *Doe*, 490 F. Supp. 3d at 692 & n.3. A more recent case, *United States v. Illinois*, No. 25-CV-02220-DWD, 2026 WL 2428274 (S.D. Ill. Aug. 19, 2026), is likewise distinguishable. There, the court rejected Illinois's argument that a state law—which prohibited civil arrests up to 1,000 feet from a courthouse; created a strict-liability damages regime allowing recovery of punitive damages; and barred any actions against Illinois courts and personnel enforcing the law—merely codified the common law privilege, given the significant differences between the common law and the state law. *Id.* at *6. Those concerns are absent here.

[13] Were there any doubt as to this outcome, the constitutional avoidance doctrine would compel a finding that the INA does not require civil courthouse arrests, given the serious constitutional implications of a contrary finding. *See Hamama v. Adducci*, 946 F.3d 875, 880 (6th Cir. 2020); *infra* Part II.C (discussing implications of the United States' claims under the Tenth Amendment).

The United States' intergovernmental immunity claim fares no better. The United States asserts that LR 2.10 violates this doctrine by directly regulating the federal government.[14] PI Br. at 11–13. But that claim stretches the doctrine beyond recognition. While courts once readily struck down state and local laws that made it "more costly for the [Federal] Government to do its business," as the United States asks the Court to do here, the Supreme Court long ago "decisively rejected the argument that any state regulation which indirectly regulates the Federal Government's activity is unconstitutional." *North Dakota*, 495 U.S. at 434. Instead, the Supreme Court has "adopted a functional approach to claims of governmental immunity, accommodating of the full range of each sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the National and State Governments." *Id.* at 435. Under that approach, a law violates the doctrine only if it "regulates the United States directly," "[w]hatever burdens [the law] impose[s] on the Federal Government." *Id.* In other words, a state or local law that "does not seek to control federal employees but, at most, only incidentally affect[s] their duties" is permissible. *Cnty. of Washtenaw*, 2026 WL 2453724, at *8 (quoting *Texas v. United States Dep't of Homeland Sec.*, 123 F.4th 186, 205 (5th Cir. 2024)); *McHenry Cnty.*, 44 F.4th at 593 (rejecting direct regulation claim where a "consequence" of the challenged law would be that the federal government could not use state property for immigration enforcement, because the law directly regulated only "State and local entities" and "not the federal government").

LR 2.10 is an inward-facing policy that governs the use of FCMC personnel and property. The rule expressly disclaims any effort to regulate the United States, *see* ECF No. 1-4, and does not "directly" require anything of federal officers. Instead, the rule seeks to protect the local

---

[14] This doctrine also bars discrimination against the United States, *see United States v. Washington*, 596 U.S. 832, 838 (2022), but the United States has not brought a discrimination claim here.

administration of justice, *see id.*, a power that is reserved to the states and thus "accommodat[ed]" by this doctrine.[15] *See North Dakota*, 495 U.S. at 435. To the extent LR 2.10 impacts federal operations at all, it does so only by withdrawing use of FCMC property and personnel from immigration enforcement—a decision the INA leaves to states and localities to make. Localities simply "do not directly regulate the federal government by withholding assistance they are not required to provide." *Cnty. of Washtenaw*, 2026 WL 2453724, at *20; *see also New Jersey*, 2026 WL 2621025, at *13 (finding no impermissible regulation where a judicial warrant requirement did "not conflict with any federal statutory duties"); *California*, 314 F. Supp. 3d at 1110 (expressing reluctance to apply this doctrine to a state's "decision to restrict assistance with some federal endeavors" given the court's finding that there was no preemption under the INA).

Any burden on the United States is also modest. Under LR 2.10, federal officers remain free to conduct civil arrests in innumerable other locations in Columbus, including the streets, sidewalks, bus stops, and parking lots surrounding FCMC—that is, "near" FCMC, as contemplated by ICE's current policy. *See* Compl. ¶ 56. Also, where an arrest inside FCMC is preferable, federal officers may obtain a judicial warrant—an option that will almost invariably be available for anyone subject to arrest under ICE's restrictive current policy. That at-most-incidental burden—a byproduct of FCMC's regulation of its own personnel and property—does not direct regulation make. Courts have rejected materially similar claims for those reasons. *See, e.g.*, *Cnty. of Washtenaw*, 2026 WL 2453724, at *20; *New Jersey*, 2026 WL 2621025, at *13; *supra* n.1.

---

[15] The United States' effort to limit the interest here to "courtroom management" should be rejected out of hand. *See* PI Br. at 12; Affholter Decl. ¶ 54. That unsupported assertion is contrary to caselaw, *see, e.g.*, *Sheppard v. Maxwell*, 384 U.S. 333, 358 (1966) ("[C]ourtroom and courthouse premises are subject to the control of the court."), as well as the commonsense observation that what happens inside a courthouse may be as relevant to the administration of justice as what happens inside a courtroom. *See generally* Tobias-Hunter Decl.; Williams Decl.

Finally, to the extent LR 2.10 impacts the United States, it does so only as an exercise of FCMC's authority over courthouse property, given that FCMC, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *See Adderley*, 385 U.S. at 47; *see also, e.g.*, *New York*, 810 F. Supp. 3d at 352–53; *Cnty. of Washtenaw*, 2026 WL 2453724, at *8, *21–22; *New Jersey*, 2026 WL 2621025, at *12; *Texas*, 123 F.4th at 205 (declining to apply intergovernmental immunity principles to state conduct where the state sought only to "preserve its own property"). This distinction has been recognized in other contexts as well. *See, e.g.*, *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019) (upholding the government's ban on firearms on U.S. Capitol grounds because "the government—like private property owners—has the power to regulate conduct on its property" and collecting cases), *abrogated on other grounds by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

The cases cited by the United States do not support a contrary finding. Each concerns an effort to "control" the United States by directly regulating federal employees and contractors, and none concern the core state powers or proprietary interests at issue here. *See, e.g.*, *Johnson v. Maryland*, 254 U.S. 51, 57 (1920) (state license requirement imposed on federal employees); *Hancock v. Train*, 426 U.S. 167, 179–80 (1976) (state permit requirement for federal facilities that was "tantamount to prohibiting operation of the federal installations"); *California*, 173 F.4th at 1067 (state law governing law enforcement identification practices that "expressly applie[d] to federal officers"); *CoreCivic, Inc. v. Gov. of N.J.*, 145 F.4th 315, 325–28 (3d Cir. 2025) (state law banning private detention contracts that "destroy[ed]" the federal government's ability to have immigration detention facilities in the state). In fact, several cases support that their findings would not apply to the type of neutral, internal, local rule at issue here. *See Johnson*, 254 U.S. at 56

(noting that facially neutral laws that "affect incidentally the mode of carrying out [federal] employment" are likely permissible); *Hancock*, 426 U.S. at 180 (stating this doctrine does not "bar[] all state regulation which may touch the activities of the Federal Government"); *CoreCivic, Inc.*, 145 F.4th at 327 (distinguishing a case concerning a state's regulation of its own resources, *McHenry Cnty.*, 44 F.4th at 593).

The United States' position reduces to this: while the INA does not require civil arrests at FCMC, and the common law and Ohio law prohibit such arrests, FCMC nevertheless acts illegally by adopting a rule recognizing those facts. That is not the law, and the United States is unlikely to succeed on this claim.

### ***C. The Tenth Amendment Forbids the Relief the United States Seeks***

The United States' claims are also unlikely to succeed for the independent reason that this lawsuit is an obvious attempt to commandeer FCMC property and personnel, an effort repugnant to our federalist system. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Pursuant to that amendment and our federalist system, both federal and state governments "have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398–99 (2012). The anti-commandeering doctrine derived from that scheme—which "bound[s]" both federal preemption and intergovernmental immunity doctrines—"is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *New York*, 810 F. Supp. 3d at 354 (quoting *Murphy*, 584 U.S. at 470). Per that doctrine, "'[t]he Federal Government' may not 'command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory

program.'" *Murphy*, 584 U.S. at 473 (quoting *Printz v. United States*, 521 U.S. 898, 935 (1997)). "This holds true no matter how strong the federal interest at play." *New York,* 810 F. Supp. 3d at 354 (citing *New York v. United States*, 505 U.S. 144, 178 (1992)).

LR 2.10 is an exercise of FCMC's constitutionally protected decision to "decline to assist with federal immigration efforts." *See id.* at 356. Although the United States insists that it "does not seek to compel FCMC personnel to assist immigration enforcement or to perform federal functions," PI Br. at 13 n.8, that is nonsense. Instead, "commandeering is the entire purpose of this lawsuit." *See New York*, 810 F. Supp. 3d at 354–56. No further proof of that fact is needed than what the United States asserts in its own filings. Throughout, the United States argues that it must be granted access to FCMC to make civil arrests, because courthouses are a "controlled setting," where "individuals are usually screened for weapons or other contraband," and because courthouses offer "predictability," "because the date and time of the individual's appearance is known in advance." *See, e.g.*, Compl. ¶¶ 4, 9, 71, 78; Affholter Decl. ¶¶ 21, 22, 39; PI Br. at 10, 16. But FCMC is "safe and controlled only because *[FCMC] officials* have screened entrants for weapons or other contraband"; and individuals' appearances at FCMC are only predictable because *FCMC* has compelled their presence in court and *FCMC "officials* have assembled and published court calendars"—"all in service of the safe and orderly operations of [*Franklin County's*] judicial system." *See New York*, 810 F. Supp. 3d at 355 (cleaned up). Simply put, "[c]ompelling [FCMC] to allow federal immigration authorities to reap the benefits of the work of [its] employees is no different than permitting the federal government to commandeer [FCMC] officials directly in furtherance of federal objectives." *See id.* at 355.

But even that act of commandeering is insufficient for the United States—it wants more. As the United States' own policy dictates, "to the fullest extent possible," courthouse arrests

"should be conducted in non-public areas, outside public view, in collaboration with courthouse security personnel," "so as not to unnecessarily impinge upon the core principle of preserving access to justice." *See, e.g.*, Compl. ¶¶ 41, 42; Affholter Decl. ¶¶ 25, 37; PI Br. at 6. But abiding by that policy would conscript FCMC personnel and resources directly into immigration enforcement. As a result, absent LR 2.10, FCMC would face an impossible choice: suffer the havoc of uncoordinated, public courthouse arrests (involuntarily, under compulsion by the federal government) or enlist FCMC personnel directly into conducting immigration enforcement in non-public areas of FCMC (also involuntarily and at only slightly less detriment to the administration of justice). That is no choice at all, and it is certainly not a dilemma permitted by the Tenth Amendment. *See New York*, 810 F. Supp. 3d at 355.[16]

To add insult to injury, the United States seeks to inflict this injury on FCMC's prerogatives—all allegedly to limit the *United States'* costs and the *United States'* risks—without any consideration of the costs imposed on FCMC. FCMC's ability to administer justice turns on its ability to compel and receive individuals to court. But, as the record in this case and the record of civil courthouse arrests in other cases make clear, civil immigration arrests directly interfere with that basic duty. When ICE is active inside FCMC, victims resist cooperating with law

[16] It is difficult to understand why the United States repeatedly insists that arrests at FCMC would limit "doxing," *see* Compl. ¶ 75; Affholter Decl. ¶¶ 52, 56; PI Br. at 17, given that FCMC does not prohibit cellphones; video recording is permitted in FCMC outside of courtrooms; and FCMC surveillance video is publicly available under the Ohio Public Records Act. *See* Tobias-Hunter Decl. ¶¶ 52–54; Dunbar Decl. ¶¶ 24–28. To the extent the United States asserts that FCMC personnel should "eject" court attendees or collect their devices in response to the permissible use of cellphones, *see* Compl. ¶ 40, that would enlist FCMC personnel in violating court attendees' First Amendment rights to record public acts by law enforcement, *see Moorman v. Doe*, No. 3:26-CV-327, 2026 WL 2620501, at *4 (S.D. Ohio Sept. 4, 2026). To the extent the United States asserts that arrests should occur in private areas of FCMC, away from the public's view, that would directly conscript FCMC personnel and resources into immigration enforcement, and would *still* use FCMC as a tool to deny First Amendment rights.

enforcement, defendants flee prosecutions, staff members fear retaliation from ICE, and the administration of justice suffers. This incursion on FCMC's prerogatives thus threatens to inflict the very ills the anti-commandeering doctrine combats: the United States seeks to "shift[] the costs" of immigration enforcement to FCMC, by conscripting FCMC's personnel and resources into assisting with ICE's regulatory program, at great cost to FCMC's own operations; it seeks to thwart "political accountability," given that conducting civil immigration arrests within FCMC's walls implies FCMC's approval of those arrests; and it seeks to heighten "the risk of tyranny and abuse," by tying the hands of FCMC to respond to the demands of its community. *See Murphy*, 584 U.S. at 473–74. Numerous courts have rejected similar claims for similar reasons. *See, e.g.*, *New York*, 810 F. Supp. 3d at 354–56; *Cnty. of Washtenaw*, 2026 WL 2453724, at *8, *21 & n.18; *New Jersey*, 2026 WL 2621025, at *9; *McHenry Cnty.*, 44 F.4th at 590 n.4, 591–92; *Colorado*, 831 F. Supp. 3d at 1117; *Illinois*, 796 F. Supp. 3d at 531.

Simply put, the United States cannot conscript FCMC personnel and resources into acting as the security apparatus for the federal government's immigration enforcement efforts. Because that effort violates the Tenth Amendment, both of the United States' claims are unlikely to succeed.[17]

### *III. The Remaining Preliminary Injunction Factors Foreclose Relief*

#### *A. The United States Has Not Identified an Immediate, Irreparable Harm*

[17] The United States' claims are also not likely to succeed for the independent reason that the United States has brought a facial challenge to LR 2.10—and while the United States has failed to establish that LR 2.10 is unconstitutional in *any* respect, it has also failed to establish that LR 2.10 is unconstitutional in *every* respect, the requisite standard for success on a facial attack. *See Cnty. of Washtenaw*, 2026 WL 2453724, at *22 (rejecting similar facial challenge and collecting cases).

The existence of irreparable harm is "mandatory" to obtain a preliminary injunction, and "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." *D.T.*, 942 F.3d at 326–27 (cleaned up). Further, a "hypothetical threat . . . is not an immediate, irreparable injury that warrants the extraordinary remedy of a preliminary injunction." *Id.* at 327 (cleaned up). If there are "a lot of ifs," an injunction should not issue. *Id.*

***i. The Alleged Sovereign Injury Does Not Qualify as Irreparable Harm***

The United States again asserts its "sovereign injury" theory, alleging that irreparable harm "necessarily results" from any Supremacy Clause violation. *See* PI Br. at 15. That language is borrowed from an injunction-pending-appeal ruling in the Ninth Circuit, which held that the likelihood of success analysis "necessarily" decided the irreparable harm analysis in a Supremacy Clause case. *California*, 173 F.4th at 1069. But the Sixth Circuit does not permit that shortcut. In this Circuit, irreparable harm is an "indispensable" requirement for preliminary relief, and "a plaintiff *must* present the existence of an irreparable injury to get a preliminary injunction." *D.T.*, 942 F.3d at 327. Further, an alleged conflict between laws does not by itself establish irreparable harm. In cases finding irreparable harm from a constitutional violation, constitutional rights were *actually* threatened and impaired. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (noting that individuals' constitutional rights "must be carefully guarded against *infringement* by public office holders" and finding irreparable harm where those rights "were either threatened or in fact being impaired at the time relief was sought" (citation omitted and emphasis added)); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (similar). Mere alleged infringement of the Supremacy Clause does not fit this rubric, given that the Supremacy Clause "is not the 'source of any federal rights'" and instead "creates a rule of decision." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–27 (2015) (noting injunctive "relief may be given" "to prevent *an injurious act* by

a public officer" and not just because a Supremacy Clause violation is alleged (emphasis added and citation omitted)); *accord Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014).

The other cases the United States cites do not provide support to the contrary. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366–68 (1989) (analyzing the alleged "irreparable harm" as an exception to the *Younger* abstention doctrine, not in the context of preliminary relief, and expressly declining to decide whether the existence of a preempted law amounted to "irreparable harm" under *Younger*); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *aff'd in part and rev'd in part on other grounds*, 567 U.S. 387 (2012) (relying on *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847 (9th Cir. 2009), which was dismissed on remand in *Santa Rosa Mem'l Hosp. v. Maxwell-Jolly*, No. 08-CV-5173 SC, 2015 WL 4451377, at *1 (N.D. Cal. July 20, 2015), based on holding in *Armstrong*, 575 U.S. at 326, that the Supremacy Clause does not create a cause of action).

#### ***ii. The Alleged Operational Harms Are Hypothetical and Not Irreparable***

The United States' asserted operational harms fail for the same reasons given above. *See* PI Br. at 16; *supra* Part I.B. The United States identifies no arrest that LR 2.10 has blocked. Instead, a series of *ifs* are required to conjure a hypothetical arrest that could lead to the harms alleged here. Further, the United States does not explain why arrests "near" the courthouse—which its own policy deems acceptable—are inadequate to avoid the alleged harms. And it does not explain why judicial warrants are unavailable for the dangerous individuals its own policy targets. The United States' own conduct confirms this point. It waited *months* after LR 2.10 was initially published and made effective to file this suit. That delay "undercut[s] its representations of great urgency." *See Kentucky v. Biden*, 23 F.4th 585, 610 (6th Cir. 2022); *see also Kerwin v. Trinity Health Grand*

*Haven Hosp.,* 174 F.4th 942, 958 (6th Cir. 2026) (finding four-month delay cut against irreparable harm finding). Even more striking, the United States has done nothing to challenge the nearly identical rule adopted in February 2025 by the Franklin County Court of Common Pleas—a courthouse that is next door and physically connected to FCMC. The Court of Common Pleas is where felonies are tried and where individuals posing "serious risks to public safety," *see* PI Br. at 18, are far more likely to be found. FCMC judges hear traffic and misdemeanor cases. That the United States could tolerate one rule while suffering irreparable harm from the other does not pass muster. The extraordinary remedy of a preliminary injunction is not warranted on this record.[18]

### *B. The Balance of Equities and Public Interest Tip Decisively in FCMC's Favor*

The balance of equities can defeat a request for injunctive relief even when other factors favor it. *See Winter*, 555 U.S. at 23–24; *see also NetChoice, LLC v. Fitch*, 145 S. Ct. 2658, 2658 (2025) (Kavanaugh, J., concurring). Here, the equities and public interest do not come close to supporting the United States. On its side of the ledger, the United States invokes the public interest in preventing "obstructionism" and in apprehending dangerous individuals. PI Br. at 18. But LR 2.10 has obstructed no arrest the government has identified, and dangerous individuals remain subject to arrest near the courthouse, in myriad other locations in Columbus, or inside FCMC pursuant to a judicial warrant.

The United States also reasserts its Supremacy Clause theory—that, because it alleges a Supremacy Clause violation, the public interest necessarily favors relief, *see* PI Br. at 18—but that theory fails here for the same reasons it failed with respect to irreparable harm. *See supra* Part III.A.i. The Supremacy Clause is not a source of federal rights, and the equities tilt when

[18] The United States' final alleged harm—that rejecting its claims would leave "other municipal courts and governments" free to restrict their cooperation with immigration enforcement, *see* PI Br. at 17—is a complaint about federalism and the INA, not LR 2.10.

constitutional rights are violated. *See* PI Br. at 18–19 (citing *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1399–1400 (6th Cir. 1987) (finding public interest served by enjoining an ordinance that would likely deprive individuals of their due process rights)); *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 736 (6th Cir. 2021) (finding enforcement of the challenged policy "likely would deprive plaintiffs of their First Amendment rights"); *Brown v. Yost*, 133 F.4th 725, 738 (6th Cir. 2025) (finding that, without preliminary relief, the plaintiffs faced irreparable harm to their First Amendment rights).[19]

On FCMC's side of the ledger, the threats to the equities and public interest are concrete and significant.[20] The parties agree: civil arrests by ICE at courthouses "may chill individuals' access to courthouses and, as a result, impair the fair administration of justice." *See* Ex. D at 1. At FCMC, those harms have already occurred. Following the surge in ICE enforcement activity at FCMC, victims and witnesses resisted cooperating with law enforcement, hindering prosecutions and public safety in Columbus. *See* Tobias-Hunter Decl. ¶¶ 25–28. Defendants stayed away from FCMC to avoid ICE, fled the building upon seeing ICE, and were arrested by ICE before they appeared for scheduled proceedings, stalling cases, denying defendants the opportunity to press their cases and vindicate their rights, and depriving victims and the community of just resolutions.

---

[19] The United States briefly asserts that "the Sixth Circuit has also recognized that preventing immigration fraud is a legitimate federal interest." PI Br. at 18 (citation omitted). But it alleges no facts indicating how an injunction of LR 2.10 would combat fraud. The United States also reprises its frustration with having "to comply with varying state and local standards," *id.* at 19, but that, again, is a function of our federalist system, and abolition of that system would not be in the public interest.

[20] The FCMC reserves the right to call at least one judge from the Franklin County Common Pleas Court who will testify to problems their court suffered as a result of fear of immigration enforcement at courthouses. Based upon advice from the Executive Director of the Ohio Board of Professional Conduct, current sitting judges should not provide declarations for legal matters. Instead, they must be subpoenaed and provide testimony in that fashion.

*See id.* ¶ 30; Williams Decl. ¶¶ 15, 17. Attorneys and staff who work in the courthouse have also faced astounding new obstacles, including having to represent the state and clients while working under fear of reprisal and violence. *See, e.g.*, Tobias-Hunter Decl. ¶¶ 30–31, 34–37; Williams Decl. ¶¶ 9, 14–15, 17–18. The threats here are not hypothetical; they are realized—and they threaten the rights of every Columbus resident and visitor who may seek justice in FCMC's halls.[21] The administration of justice cannot survive these ills intact. Centuries of law have protected FCMC from just these harms, and the United States has not met its burden to upset that protection here.

## ***Conclusion***

For these reasons, the United States' motion for a preliminary injunction should be denied.

Respectfully submitted,

**CITY OF COLUMBUS, DEPARTMENT OF LAW**
**ZACH KLEIN, CITY ATTORNEY**

/s/ Richard N. Coglianese
Richard N. Coglianese* (0066830)
*Lead Counsel
Aaron D. Epstein (0063286)
Sheena D. Roseberg (0088137)
Assistant City Attorneys
City of Columbus
77 N. Front Street, Columbus, Ohio 43215
(614) 645-7385
(614) 645-6949 (fax)
RNCoglianese@columbus.gov
ADEpstein@columbus.gov
SDRosenberg@columbus.gov
*Counsel for Defendant*

[21] At a minimum, these harms imperil the First Amendment (rights to petition the government for redress of grievances and access to the courts), Sixth Amendment (rights to a fair and public trial, and to call and confront witnesses), and Fourteenth Amendment (due process) rights of every litigant in Franklin County.

By: *_/s/ Erin Monju_*
Erin Monju^* (DC Bar # 90036952)
Kayla Svihovec^* (DC Bar # 1735588)
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
(510) 738-6788
erin.monju@publicrightsproject.org
kayla.svihovec@publicrightsproject.org

^ admitted *pro hac vice*
* *Not licensed to practice law in California.*

## CERTIFICATE OF SERVICE

I hereby certify that, on **September 25, 2026**, I electronically filed the foregoing with the Clerk of the Court by using this Court's e-Filing System, which will send a notice of this electronic filing to all counsel of record in this matter.

/s/ Richard N. Coglianese
Richard N. Coglianese