**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

THE UNITED STATES OF AMERICA,

Plaintiff,

v.

FRANKLIN COUNTY MUNICIPAL COURT, ET AL.,

Defendants.

Case No. 2:26-cv-1025

Judge Edmund A. Sargus

Magistrate Judge Kimberly Jolson

**DECLARATION OF MELANIE TOBIAS-HUNTER**
**CRIMINAL DIVISION CHIEF**
**COLUMBUS CITY ATTORNEY'S OFFICE**

I, Melanie Tobias-Hunter, declare and testify as follows:

## I. Background:

1. This declaration is based on my own personal knowledge, experience, and review of relevant business records and other sources. If I were called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

2. I am the Chief of the Criminal Division of Columbus City Attorney Zach Klein. I have served in this position since April of 2019. In that role, I supervise 29 assistant prosecutors who practice in front of the judges of the Franklin County Municipal Court, as well as a victim advocacy unit that provides support services to crime victims, and an administrative staff. I work to ensure that our office listens to victims of crime, prosecutes criminal cases justly, and protects the general public.

3. I am a licensed attorney in the State of Ohio and have been licensed since 1999.

4. I have worked for the Columbus City Attorney's Office since 1999 and have been in the Criminal Division of that office for 27 years.

## II. The Criminal Division of the City Attorney's Office

5. The Criminal Division of the Columbus City Attorney's Office is located in the Franklin County Municipal Court building at 375 South High Street Columbus, Ohio. Our offices are located on the 7th floor of that building.

6. The Criminal Division currently has 97 full time employees and two vacancies. Due to fluctuations in hirings and terminations, we usually have between 91 and 99 employees. These employees include courtroom prosecutors, domestic violence prosecutors, Victim Advocates, and Intake.

7. The Criminal Division prosecutes misdemeanors and traffic offenses that occur inside the City of Columbus.

8. These prosecutions range anywhere from traffic citations to more serious crimes such as vehicular homicide, stalking, and domestic violence.

9. The Franklin County Municipal Court consists of fifteen judges, and the Criminal Division assigns a prosecutor to each of those courtrooms. In addition, the Criminal Division also assigns domestic violence prosecutors to the various courtrooms. The domestic violence prosecutors specialize in handling domestic violence and stalking criminal charges.

10. The Columbus City Attorney's Office Criminal Division employs Victim Advocates who work with victims of crime. They help individuals who were victims of crime to navigate the court system and seek and obtain civil protection orders; they help ensure that their Marsy's Law rights are protected; and they generally help them navigate the court system by knowing when and where the victims should report. These Victim Advocates work closely with individuals who may not be familiar with the justice system. Some of the individuals who work with our Victim Advocates have limited or no proficiency in the English language.

11. In addition, the Criminal Division runs a section that is commonly referred to as Intake. This section exists for individuals who believe they were victims of crime but, for whatever reason, the Columbus Division of Police did not file criminal charges on their behalf. Intake is primarily staffed by intake officers who are currently enrolled as law students at either The Ohio State University Moritz College of Law or Capital University Law School.

12. Intake usually has between seven and fifteen law students assigned to work with the public and take reports of possible criminal activity.

13. Intake operates on an appointment-only basis and requires individuals who wish to use their services to do so in person on the 7th floor of the Municipal Court building.

14. When individuals seek to have criminal charges brought through Intake, they are interviewed by an intake officer. The individuals are not asked about their immigration status; however, those individuals may raise their own legal status to our employees and ask what that status means for their cases and whether that will be an issue for the case itself or for them as they navigate the justice system.

15. Once the intake officers have collected the relevant facts and law, and completed a packet, that packet is reviewed by an attorney who makes the ultimate decision on whether or not to file criminal charges.

16. Our Intake group handles around 2,000 complaints each year. We file criminal charges in about 10% of the cases that come to us through Intake.

**III. Criminal Prosecutions**

17. As mentioned earlier, domestic violence and stalking cases are among the most serious cases our office prosecutes.

18. Last year, we prosecuted around 5200 domestic violence cases.

19. On top of that, we prosecuted around an additional 500 to 750 aggravated menacing and menacing by stalking cases.

20. For these cases, our office employes Victim Advocates who interact directly with the victim and provide information about navigating the court system. Two of our Victim Advocates are fluent in Spanish and will provide these services to individuals who are Spanish speakers.

21. In addition, our Victim Advocates will interact with other people who do not speak English as a first language. Some of the individuals we work with speak languages such as Somali, Haitian Creole, or a myriad of other languages. For these individuals, we rely on the service of translators to help us communicate with them.

22. Our Victim Advocates will talk with crime victims both over the telephone as well as in person, including at the Franklin County Municipal Court.

23. As people began discovering that federal immigration arrests were occurring in the Franklin County Municipal Court, our Victim Advocates noticed that the victims they were contacting became more distrustful of us and our office. They would inform our Advocates that they thought we were an extension of immigration enforcement and they did not want to provide us with any of their information, including contact information.

24. This became pronounced in early 2025.

25. Prior to 2025, victims of crime were more willing to work with our Victim Advocates and provide necessary information, such as a current address and telephone number, and were more willing to appear in court as they were needed.

26. Because, beginning in 2025, individuals were more likely not to want to work with our Victim Advocates or to trust them, and to fear that the Victim Advocates would turn

them or their family members over to federal immigration detention, it made it more difficult for us to ensure that crime victims were in court to testify against their offenders. It also made it more difficult for our prosecutors to be able to successfully prosecute cases.

27. Our Victim Advocates have noticed that, in the immediate aftermath of a crime, victims are willing to file a police report and tell the police what happened. However, as time passes, the victim's fear of immigration enforcement grows and they are less likely to cooperate with the prosecution of cases. This became more pronounced as reports of increased federal immigration activity in the Franklin County Municipal Court became widespread.

28. Recently, we had a case where the criminal defendant identified as a Caucasian male and the victim and witnesses identified as Hispanic. The victim and witnesses were afraid to come into the courthouse because they believed that federal immigration authorities would detain them. As a result, the prosecutors in that case had to plead down the original charge because neither the victim nor the witnesses felt comfortable appearing in court due to their belief that federal immigration authorities would detain them. Had the victim and witnesses appeared for the case, we likely would have been able to secure a conviction on more serious charges.

## III. Immigration Agents in the Courthouse

29. In some of the municipal courtrooms, our prosecutors check defendants in as they arrive for their hearings. In other courtrooms, the court staff checks defendants in as they arrive.

30. When federal immigration agents were active in the Franklin County Municipal Court, people would come into the building and check in with the appropriate personnel for their hearing. However, once they saw immigration officials walking around the building, these defendants would flee the courthouse. For example, the judge in one case impacted by this

conduct had to issue a warrant because the individual failed to appear for a hearing, even though the individual defendant had checked in and, for all intents and purposes, had appeared in the court but then fled because of fear of immigration enforcement.

31. We had other situations where defense attorneys would inform our prosecutors that their defendants were present in the building but were hiding on other floors because of immigration enforcement activity in the courthouse. The defense attorneys would say that they would bring their defendants to the courtroom but could not do so while federal immigration officers were wandering the floors of the courthouse.

32. Immigration enforcement at the courthouse created a sense of panic on a daily basis. It made it difficult for prosecutors to prosecute cases because witnesses and victims were less likely to cooperate and defendants were refusing to appear in court for fear of possible detention.

33. Immigration enforcement also made it difficult to manage the Criminal Division itself. Our prosecutors and Victim Advocates became very upset because crime victims and witnesses were less willing to work with our Advocates and attorneys. Our prosecutors and Victim Advocates were also fearful that they might be accused of committing violations of federal law if they were perceived to have "interfered" with immigration enforcement actions, even if that perception was incorrect. In addition, our prosecutors and Victim Advocates were aware that, under Columbus City Code, they were prohibited from denying any city services to individuals on the basis of immigration status and that they further could not use city resources to apprehend someone solely on the basis of their immigration status or to assist in the investigation of the person's immigration status unless a judicial warrant existed.

34. For example, some of these concerns included dealing with victims of crime who became agitated upon learning that immigration enforcement actions were occurring at the courthouse and who asked staff to walk them out of the courthouse. Staff were fearful that they could be charged with obstruction or interference by federal agents for simply helping an individual leave the building if they no longer wanted to be there.

35. One Advocate had a distressing interaction with federal immigration officials when she simply asked that official if he was from ICE. The individual told our Advocate that she was not allowed to ask that question. The Advocate was fearful that she would get into trouble for asking a simple and perfectly acceptable question.

36. The courtroom prosecutors who checked defendants in have also been approached by federal immigration officials and have been asked if certain named individuals had checked in. Our office, as a policy, decided to tell immigration officials that they had to interact with the court's bailiff. We perform these check ins as a courtesy to the court. However, we did not want to create unnecessary problems for our employees by having them provide information to immigration officials that might run afoul of the City Code.

37. In short, our staff did not want to run afoul of federal law and be charged, potentially criminally, for interference or obstruction, nor did they want to run afoul of their obligations under the City Code not to use City resources or personnel solely for immigration enforcement actions. As a result of this situation, City Attorney Klein and Chief of Staff Meredith Tucker had to take time out of their schedules to meet with employees of the Criminal Division to assure them. and to express their empathy for the fear and anxiety ICE enforcement was causing for the staff. Despite those assurances, I understand that the staff's reasonable fears continued so long as immigration enforcement activity continued in the building.

**IV. U Visas**

38. In my role as Chief of the Criminal Division, I am also responsible for signing U Visa applications.

39. U Visas are available to certain non-citizens who are victims of particular types of crimes, including human trafficking and domestic violence.

40. Since I have been Chief of the Criminal Division, I have signed over 35 U Visa Applications.

41. One of those applications includes a person who was choked, punched and scratched by a domestic partner.

42. In another application, the crime victim was strangled and racially abused during a neighborhood dispute.

43. I have signed the U Visa application of a crime victim who had an assailant crash a vehicle into a car driven by the applicant. The assailant then got out of his car, drew a firearm, and shot the gun into the ground before fleeing the scene.

44. In another situation, the U Visa applicant had an assailant attempt to push her down the stairs, drew a knife on her, and threatened to kill her.

45. Many of the U Visa applicants report domestic violence crimes and include threats to kill the victim. In fact, 27 applications specifically mention acts of domestic violence as the crime that the applicant had suffered.

46. In order for me to sign a U Visa application, the victim must have cooperated with law enforcement and prosecutors.

47. I believe that federal immigration activity at the courthouse will make it less likely that victims such as these will cooperate with law enforcement and prosecutors in the

future. Based on my experience of the pervasive fear among immigrant victims and witnesses when immigration enforcement activities were occurring in the Franklin County Municipal Court, and the harm that fear caused to ongoing prosecutions, I believe that it will be more difficult for our office to secure convictions in cases where individuals with undocumented status are either the victims of crimes or are witnesses to criminal behavior.

48. This also makes Columbus and its residents less safe. When individuals who commit acts of domestic violence or stalking are not prosecuted, risks to their victims and the community at large grow. We understand that individuals who commit domestic violence are far more likely to ultimately kill their partners.

49. We understand that female victims of domestic violence are at an increased risk of being killed. Data from the most recent Ohio Domestic Violence Network (ODVN) Fatality Report (https://www.odvn.org/reports/) shows a stark surge in domestic violence fatalities in Ohio, marking the highest number of lives lost since tracking began a decade ago. During the tracked 12-month period, Ohio recorded 157 domestic violence fatalities across 108 cases, representing a 37% increase from the 114 deaths reported the prior. 55% of perpetrators had a criminal history, 37% included felonies.

**V. Cellphones in the Franklin County Municipal Court**

50. I have worked in the Municipal Court building for most of my 27-year career.

51. I am aware that the Municipal Court allows attorneys and members of the public to bring cellphones into the building, and to use cellphones in the hallways and public areas of the Municipal Court.

52. In addition, the judges of the Municipal Court have their own rules about cellphone use in their individual courtrooms.

53. This means that anyone can use their cellphone to video record activity or take photographs in the areas of the courthouse outside of courtrooms. Any person outside of a courtroom in the Municipal Court would be allowed to video record or take photographs of federal immigration officials who are in the courthouse, including while those officials attempted to apprehend any individuals.

54. I am also aware that, while they were conducting activities inside the Franklin County Municipal Court, federal immigration officials did not conceal their faces by wearing masks. Thus, any person who was in the courthouse could see the federal immigration official's face and could take either photographs of the official or video of the official.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 24, 2026

/s/

Melanie Tobias-Hunter
Chief of the Criminal Division
Columbus City Attorney Zach Klein
City of Columbus, Ohio