**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JESSICA D'VARGA, Administrative and Presiding Judge for Franklin County Municipal Court, in her official capacity,<br><br>Defendant. | Case No. 2:26-cv-1025<br><br>Judge Edmund A. Sargus, Jr.<br><br>Magistrate Judge Kimberly A. Jolson |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


INTRODUCTION .......... 1

ARGUMENT .......... 3

I. THE UNITED STATES HAS STANDING BECAUSE RULE 2.10 BARS ITS OFFICERS, ON PAIN OF CONTEMPT, FROM ARRESTS CONGRESS AUTHORIZED. .......... 3

A. The Rule inflicts a present, concrete injury on the United States. .......... 3

1. The Rule restrains federal officers, burdens federal operations, and impairs federal sovereignty. .......... 4

2. FCMC's objections to standing misread both the law and the record. .......... 5

B. An injunction would redress the injury because Ohio's debtor-arrest statutes govern private process and never stopped these arrests. .......... 9

II. RULE 2.10 DIRECTLY REGULATES THE FEDERAL GOVERNMENT BECAUSE IT TELLS FEDERAL OFFICERS WHEN AND WHERE THEY MAY NOT MAKE ARRESTS. .......... 12

A. A rule whose only command is "no civil arrest" without a judicial warrant regulates the officers who make arrests. .......... 13

B. FCMC calling itself a property owner, or calling a prohibition a refusal to help, does not change what the Rule does. .......... 16

III. THE INA PREEMPTS RULE 2.10 BECAUSE CONGRESS DECIDED WHEN FEDERAL OFFICERS MAY ARREST. .......... 19

A. Congress authorized arrests on an administrative warrant or no warrant at all, and the Rule demands a judicial warrant Congress never required. .......... 19

B. No common-law privilege lets a municipal court regulate federal officers, and the INA never incorporated one. .......... 24

IV. THE TENTH AMENDMENT DOES NOT HELP FCMC BECAUSE THE INJUNCTION WOULD REQUIRE IT TO DO NOTHING. .......... 30

V. EVERY REMAINING INJUNCTION FACTOR FAVORS AN INJUNCTION. .......... 33

A. The Rule inflicts irreparable harm every day it stands, and the record documents it. .......... 33

B. The equities and the public interest favor relief because the harms FCMC describes flow from federal law, not from this injunction. .......... 35

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adderley v. Florida*,
385 U.S. 39 (1966) .......... 15, 16
*Akron v. Mingo*,
160 N.E.2d 225 (Ohio 1959) .......... 25
*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
458 U.S. 592 (1982) .......... 4
*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) .......... 5
*Arizona v. California,*
*283 U.S. 423 (1931)* .......... 13, 15, 16
*Arizona v. United States*,
567 U.S. 387 (2012) .......... passim
*Arizona v. Yellen*,
34 F.4th 841 (9th Cir. 2022) .......... 4
*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .......... 33
*Atl. Coast Line R. Co. v. Bhd. of Locomotive Eng'rs*,
398 U.S. 281 (1970) .......... 16
*Block v. Canepa*,
175 F.4th 642 (6th Cir. 2026) .......... 9, 11
*Bost v. Illinois State Bd. of Elections*,
607 U.S. 71 (2026) .......... 3
*Brown v. Yost*,
133 F.4th 725 (6th Cir. 2025) .......... 36
*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) .......... 25
*California v. Texas*,
593 U.S. 659 (2021) .......... 6
*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) .......... 33
*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999) .......... 29
*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2025) .......... 12, 15
*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .......... 5, 19, 21, 23
*DeCanas v. Bica,*
424 U.S. 351 (1976) .......... 23
*Dep't of Homeland Sec. v. Texas,*
144 S. Ct. 715 (2024) .......... 16
*FEC v. Cruz*,
596 U.S. 289 (2022) .......... 5

*GEO Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) ........................................................ 23
*Goodyear Atomic Corp. v. Miller*,
486 U.S. 174 (1988)........................................................ 12, 15
*Gregory v. Ashcroft*,
501 U.S. 452 (1991)........................................................ 23
*Hancock v. Train*,
426 U.S. 167 (1976)........................................................ 12
*Hines v. Davidowitz*,
312 U.S. 52 (1941)........................................................ 22
*In re Neagle*,
135 U.S. 1 (1890)........................................................ 14
*Jama v. Immigration & Customs Enf't*,
543 U.S. 335 (2005)........................................................ 20
*Johnson v. Maryland*,
254 U.S. 51 (1920)........................................................ 12, 14, 15
*KalshiEX LLC v. Johnson*,
832 F. Supp. 3d 954 (D. Ariz. 2026) ........................................................ 5
*Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*,
927 F.3d 396 (6th Cir. 2019) ........................................................ 7
*Lamb v. Schmitt*,
285 U.S. 222 (1932)........................................................ 25
*Larson v. Valente*,
456 U.S. 228 (1982)........................................................ 11
*Larweth v. Magellan Health, Inc.*,
841 F. App'x 146 (11th Cir. 2021) ........................................................ 34
*Leslie Miller, Inc. v. Arkansas*,
352 U.S. 187 (1956)........................................................ 12
*Lomax v. Ortiz-Marquez*,
140 S. Ct. 1721 (2020)........................................................ 20
*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)........................................................ 4, 8
*Lunn v. Commonwealth*,
78 N.E.3d 1143 (Mass. 2017) ........................................................ 10
*Maryland v. Louisiana*,
451 U.S. 725 (1981)........................................................ 10
*Massachusetts Mut. v. Associated Dry Goods*,
786 F.Supp. 1403 (N.D.Ind.1992) ........................................................ 36
*Massachusetts v. EPA*,
549 U.S. 497 (2007)........................................................ 10
*Mayo v. United States*,
319 U.S. 441, 445 (1943)........................................................ 11, 13, 16
*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819)........................................................ 12, 14
*McHenry County v. Raoul*,
44 F.4th 581 (7th Cir. 2022) ........................................................ 18

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) .......... 4

*Mktg. Displays Int'l v. Shaw*,
93 F.4th 967 (6th Cir. 2024) .......... 24

*Montgomery v. Carr*,
848 F. Supp. 770 (S.D. Ohio 1993) .......... 36

*Murphy v. NCAA*,
584 U.S. 453 (2018) .......... 29, 30, 31, 32

*Nat'l Meat Ass'n v. Harris*,
565 U.S. 452 (2012) .......... 15, 29

*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*,
491 U.S. 350 (1989) .......... 32

*New York v. Dep't of Justice*,
951 F.3d 84 (2d Cir. 2020) .......... 29

*New York v. ICE*,
431 F. Supp. 3d 377 (S.D.N.Y. 2019) .......... 20

*New York v. United States*,
505 U.S. 144 (1992) .......... 31

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 35

*North Dakota v. United States*,
495 U.S. 423 (1990) .......... 11

*Obama for Am. v. Husted*,
697 F.3d 423 (6th Cir. 2012) .......... 33

*Pasquantino v. United States*,
544 U.S. 349 (2005) .......... 27

*PDK Labs., Inc. v. DEA*,
362 F.3d 786 (D.C. Cir. 2004) .......... 24

*Pension Ben. Guar. Corp. v. LTV Corp.*,
496 U.S. 633 (1990) .......... 9

*Perez v. Campbell*,
402 U.S. 637 (1971) .......... 23

*Printz v. United States*,
521 U.S. 898 (1997) .......... 29

*Reno v. Condon*,
528 U.S. 141 (2000) .......... 31

*Ryan v. U.S. Immigr. & Customs Enf't*,
974 F.3d 9 (1st Cir. 2020) .......... passim

*Saginaw Cnty., Michigan v. STAT Emergency Med. Servs.*,
946 F.3d 951 (6th Cir. 2020) .......... 6

*Seatrain Shipbuilding Corp. v. Shell Oil Co.*,
444 U.S. 572 (1980) .......... 21

*Sheppard v. Maxwell*,
384 U.S. 333 (1966) .......... 14

*State ex rel. Johnston v. Taulbee*,
66 Ohio St. 2d 417 (1981) .......... 17

*Stauffer v. Brooks Bros.*,
619 F.3d 1321 (Fed. Cir. 2010)........................................................................................ 3
*Stewart v. Ramsay*,
242 U.S. 128 (1916)................................................................................................... 25, 28
*Texas v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
737 F. Supp. 3d 426 (N.D. Tex. 2024) ............................................................................ 24
*Texas v. Dept' of Homeland Sec.*,
123 F.4th 186 (5th Cir. 2024) ......................................................................................... 16
*Times Mirror Mags., Inc. v. Las Vegas Sports News*,
212 F.3d 157 (3d Cir. 2000)............................................................................................ 34
*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)..................................................................................................... 7, 11
*United States v. King Cnty., Washington*,
122 F.4th 740 (9th Cir. 2024) ..................................................................................... 30, 31
*United States v. Virginia*,
2026 WL 2411521 (E.D.Va. Aug. 18, 2026)................................................................... 33
*United Auto., Aerospace & Agric. Implement Workers of Am. Local 3047 v. Hardin County*,
842 F.3d 407 (6th Cir. 2016) .......................................................................................... 12
*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012) ........................................................................................ 5
*United States v. Arizona*,
641 F.3d 339 (9th Cir. 2011) .......................................................................................... 32
*United States v. California*,
173 F.4th 1060 (9th Cir. 2026) ................................................................................. passim
*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ........................................................................................ 7, 17
*United States v. City of Arcata*,
629 F.3d 986 (9th Cir. 2010) .......................................................................................... 12
*United States v. City of Boston*,
833 F. Supp. 3d 30 (D. Mass. 2026) ............................................................................. 6, 9
*United States v. Cnty. of Washtenaw*,
2026 WL 2453724 (E.D. Mich. 2026)...................................................................... 7, 17, 21
*United States v. Craft*,
535 U.S. 274 (2002)........................................................................................................ 26
*United States v. Fausto*,
484 U.S. 439 (1988)........................................................................................................ 21
*United States v. Hawaii,*
830 F. Supp. 3d 1028 (D. Haw. 2026) .............................................................................. 6
*United States v. Locke*,
529 U.S. 89 (2000).......................................................................................................... 22
*United States v. Miami Univ.*,
91 F. Supp. 2d 1132 (S.D. Ohio 2000) .............................................................................. 5
*United States v. Minnesota*,
2026 WL 2085701 (D. Minn. 2026) ................................................................................. 7
*United States v. Missouri*,
114 F.4th 980 (8th Cir. 2024) ........................................................................................... 7

*United States v. New York*,
810 F. Supp. 3d 329 (N.D.N.Y. 2025) ........ 26
*United States v. Texas*,
507 U.S. 529 (1993) ........ 26
*United States v. Texas*,
599 U.S. 670 (2023) ........ 7, 34
*United States v. Virginia*,
2026 WL 2257488 (E.D. Va. Aug. 5, 2026) ........ 13
*United States v. Washington*,
596 U.S. 832 (2022) ........ 11
*United States v. West Virginia*,
295 U.S. 463 (1935) ........ 6
*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) ........ 24
*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021) ........ 10
*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000) ........ 5
*Virginia v. Am. Booksellers Ass'n,*
484 U.S. 383 (1988) ........ 6
*Winter v. Nat. Resources Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 24
*Wyandotte Transp. Co. v. United States*,
389 U.S. 191 (1967) ........ 3, 5
*Zumsteg v. Am. Food Club, Inc.*,
143 N.E.2d 701 (Ohio 1957) ........ 25, 27

**Statutes**

8 U.S.C. § 1229(e)(2)(B) ........ 20
8 U.S.C. § 1226(a) ........ passim
8 U.S.C. §1227(a)(1)(B)–(C) ........ 19
8 U.S.C. §1357(a)(2) ........ passim
8 U.S.C. §1357(a)(3) ........ 20
Ohio Rev. Code §§ 1901.13(A)(1), 2705.02(A), 2705.05(A)(1–3) ........ 4
Ohio Rev. Code §§ 2331.01–2331.14 ........ 27
Ohio Rev. Code §§ 2331.11(A)(4), 2331.12 ........ 25, 28
Ohio Rev. Code § 2331.14 ........ 9

**Rules**

Fed. R. Crim. P. 4(a), 9(a) ........ 19

**Regulations**

8 C.F.R. §§ 236.1(b), 287.5(e)(2) .......................................................................................... 8, 19

**Other Authorities**

The Doctrine of Standing as an Essential Element of the Separation of Powers,
17 Suffolk U. L. Rev. 881 (1983) ........................................................................................ 3

## INTRODUCTION

Under both the Constitution and the Immigration and Nationality Act ("INA"), the Executive Branch has "broad, undoubted power" to arrest and detain aliens to effectuate their removal. *Arizona v. United States*, 567 U.S. 387, 394 (2012). For more than a decade, across administrations, ICE has exercised that power in courthouses, because a courthouse is one of the safest places to make an arrest. Everyone who enters has been screened for weapons. The arrest happens in a controlled setting, away from the streets, homes, and workplaces where a subject may be armed and bystanders may be hurt. Compl. ¶¶ 4, 55–57; Affholter Decl. (ECF No. 1-3) ¶¶ 41, 47, 51. Through 2025, ICE made such arrests at the Franklin County Municipal Court, coordinating with court security and waiting until hearings ended. Compl. ¶¶ 38–42; Affholter Decl. ¶¶ 26–34, 37.

Then Franklin County Municipal Court ("Defendant" or "FCMC") enacted Local Rule 2.10 (the "Rule") to stop those arrests. Compl. ¶¶ 43–44; ECF No. 21-3 at 3, ¶ 10; ECF No. 21 at 1, 7. Since the Rule took effect in April, ICE has made no arrest at the courthouse. Compl. ¶ 79; Affholter Decl. ¶ 38. It has instead sent more officers, working more hours, into the community to find the same people. Two of those officers have been hospitalized after violence during at-large arrests. Affholter Decl. ¶¶ 43–44, 47.

According to FCMC's opposition (ECF No. 21) ("PI Opp."), the Rule is a simple courtroom-management measure: a "modest" rule, an "inward-facing policy," that "does not 'directly' require anything of federal officers." PI Opp. at 1, 26. The text of the Rule says otherwise. It provides that "[n]o individual shall be subject to a civil arrest while present in the courthouse for the purpose of attending a court proceeding or conducting other lawful court business," and it defines the courthouse as "any building or space used by Franklin County

Municipal Court along with the curtilage of the building." ECF No. 1-4, Rule 2.10(B)(1). The only exception is for an arrest pursuant to a judicial warrant. *Id.* (B)(2). But the INA imposes no judicial-warrant requirement. Congress authorized immigration officers to arrest on an administrative warrant or, in defined circumstances, no warrant. 8 U.S.C. §§ 1226(a), 1357(a)(2). Thus, the Rule bars federal immigration officers from making arrests Congress authorized, on pain of contempt. Compl. ¶ 70. That is direct regulation of the United States, and direct regulation is void "irrespective of the degree to which the state law interferes with federal functions." *United States v. California*, 173 F.4th 1060, 1067 (9th Cir. 2026); *see* Plaintiff's Mem. in Support of Preliminary Injunction (ECF No. 2-1) ("PI Br.") at 11–13. That alone is enough to warrant a preliminary injunction.

None of FCMC's defenses overcomes that defect.[1] First, the United States has standing. The Rule restrains federal officers today, on pain of contempt, and the Ohio debtor-arrest statutes FCMC invokes govern private civil process, so they pose no independent bar to relief. Second, the Rule directly regulates federal officers, and FCMC cannot recast that regulation as a property owner's prerogative or a refusal to assist. Third, the Rule independently conflicts with the INA, which authorizes arrests on an administrative warrant or no warrant at all, and no common-law privilege lets a municipal court add a judicial-warrant requirement Congress omitted. Fourth, the Tenth Amendment does not help FCMC, because the injunction would require nothing of it. Finally, the remaining injunction factors favor relief. The Court should grant the motion and preliminarily enjoin Defendants from enforcing the Rule against the United States and its officers.

[1] FCMC says courts "across the country" have rejected the United States' theory and lists twelve district-court decisions. PI Opp. at 2 & n.1. None binds this Court, and several are on appeal, including *United States v. New York*, No. 26-104 (2d Cir. Jan. 16, 2026). This reply addresses the decisions on which FCMC relies.

## ARGUMENT

### I. THE UNITED STATES HAS STANDING BECAUSE RULE 2.10 BARS ITS OFFICERS, ON PAIN OF CONTEMPT, FROM ARRESTS CONGRESS AUTHORIZED.

FCMC challenges both injury and redressability. Neither challenge has merit. The Rule injures the United States now, by restraining its officers on pain of contempt, and the injury is concrete, operational, and sovereign. An injunction would redress that injury, because the Ohio debtor-arrest statutes FCMC invokes govern private civil process and have never stopped a federal immigration arrest.

#### A. The Rule inflicts a present, concrete injury on the United States.

Article III requires a plaintiff to "have a 'personal stake' in a case to have standing to sue." *Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 76 (2026). That is, a plaintiff must "be able to answer a basic question: 'What's it to you?'" *Id*. (quoting A. Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983)). And here, there is an "obvious answer": the Federal Government has a unique and concrete interest in the enforcement of federal law. 607 U.S. at 76. To be sure, "a private individual's abstract interest in seeing that the law is obeyed" does not support standing, but "the government's interest in seeing that its own law is obeyed" does. *Stauffer v. Brooks Bros.,* 619 F.3d 1321, 1326 (Fed. Cir. 2010), *superseded by statute on other grounds*, *Adirondack Cookie Co. Inc. v. Monaco Baking Co*., 619 F.3d 1321 (Fed.Cir.2010). And the Federal Government "may sue to protect its interests," *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967), including by enjoining unlawful state regulation*. See Arizona*, 567 U.S. at 416 (affirming in part a preliminary injunction in favor of the United States against enforcement of preempted state law). The Rule injures that

interest in three ways. It restrains federal officers today, on pain of contempt. It imposes concrete operational harm. And it intrudes on the United States' sovereign authority over immigration.

**1. The Rule restrains federal officers, burdens federal operations, and impairs federal sovereignty.**

First, the Rule restrains federal officers today. Since April 2026, it has barred them from making the arrests that §§ 1226(a) and 1357(a)(2) allow anywhere in the courthouse or its curtilage. FCMC enforces the ban through its security staff and its contempt power, which carries fines and up to thirty days in jail. Compl. ¶¶ 39–40, 44–48, 70; Ohio Rev. Code §§ 1901.13(A)(1), 2705.02(A), 2705.05(A)(1–3). When a plaintiff "is himself an object of the action," there is "ordinarily little question" that it has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). The Rule leaves federal officers a Hobson's choice: forgo federally authorized lawful arrests or make them and face contempt. But Article III does not make the United States choose. "The rule that a plaintiff must destroy a large building, bet the farm, or (as here) risk [contempt], before seeking a declaration of its actively contested legal rights finds no support in Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 134 (2007). The United States need not "bet the farm" by defying the Rule and defending its officers in contempt proceedings to challenge a rule that governs them today.

Second, the Rule imposes concrete operational harm. It has forced ICE to divert officers, vehicles, surveillance, and overtime to at-large arrests that take more personnel and carry more risk than arrests in a screened courthouse. Compl. ¶¶ 8–11, 71–78; Affholter Decl. ¶¶ 38, 41, 43–44, 46–47; PI Br. at 9–10. Those are harms to the United States' ability to enforce federal law through its own officers.

Third, and independently, the Rule inflicts sovereign injury. Harms to a sovereign's "ability to exercise its sovereign prerogatives, intangible as those prerogatives may be," are injuries in fact,

*Arizona v. Yellen*, 34 F.4th 841, 852 (9th Cir. 2022), and a sovereign's interests include its "power to create and enforce a legal code" and "recognition" of that code "from other sovereigns," *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). Those interests are at their height in immigration, where the National Government, not the States, is the sovereign with authority to act. *Arizona v. Biden*, 40 F.4th 375, 386–87 (6th Cir. 2022) ("The key sovereign with authority. . . with respect to immigration is the National Government, not the States."). "It is beyond doubt" that the United States suffers injury from "injury to its sovereignty arising from violation of its laws," *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000), and it "suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations," *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012). A rule that unlawfully regulates federal officers is "unconstitutional, under the Supremacy Clause." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 388 (2000). That the injury overlaps with the merits is no obstacle, because "[f]or standing purposes," courts "accept as valid the merits of [the plaintiff's] legal claims." *FEC v. Cruz*, 596 U.S. 289, 298 (2022). Accepting that the Rule unlawfully regulates federal officers and conflicts with the INA, the injury to the United States' sovereign authority is neither abstract nor hypothetical. *See* PI Br. at 9–10; *United States v. Miami Univ.*, 91 F. Supp. 2d 1132, 1146 n.12 (S.D. Ohio 2000) (recognizing that the government may litigate "to protect its sovereign interest").

**2. FCMC's objections to standing misread both the law and the record.**

FCMC characterizes the United States' theory as a "novel claim" that lacks case-law support. PI Opp. at 10. On the contrary, the theory is well established. The Federal Government "may sue to protect its interests," and that authority extends to suits to enjoin enforcement of a preempted law. *KalshiEX LLC v. Johnson*, 832 F. Supp. 3d 954 (D. Ariz. 2026) (quoting

*Wyandotte*, 389 U.S. at 201).[2] FCMC also claims the United States has shown only a "disagreement with a local rule," not "actual or threatened interference with the authority of the United States." Pl. Opp. at 10 (quoting *United States v. West Virginia*, 295 U.S. 463, 473 (1935)). The Rule is an operative command, enforced by contempt, that bars federal officers from exercising arrest authority Congress conferred. That is actual interference, and it is the "tangible interference with [the government's] authority to regulate or enforce its laws" that FCMC's own cited authority requires. *Id.* (quoting *Saginaw Cnty., Michigan v. STAT Emergency Med. Servs.*, 946 F.3d 951, 957 (6th Cir. 2020)). Enforcement is actual, too. On August 18, FCMC told the Department of Justice that the Judges believe the Rule is "an appropriate and necessary measure," and it has not rescinded the Rule. ECF No. 1-6; PI Br. at 3, 8. So the concern animating the cases on which FCMC relies—that a plaintiff might challenge a dormant or nonbinding measure—is absent. *See California v. Texas*, 593 U.S. 659, 670 (2021) (requiring "an injury that is the result of a statute's actual or threatened enforcement"). *Cf. Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383,

[2] FCMC recently filed a notice of supplemental authority alleging to support its argument that "the mere existence of a conflict between state and federal law does not itself" injure the United States. ECF No. 26 at 1. In *United States v. Michigan*, No. 1:26-cv-246, (W.D. Mich. Oct. 7, 2026) (Exhibit A), the court dismissed a challenge to state restrictions on private egg sellers because the United States had not alleged how those restrictions impaired federal operations or enforcement. The court emphasized that the United States was not itself the object of the challenged regulation. *Id.* at 6. Here, as discussed, federal officers are the objects of the Rule, which bars otherwise authorized civil immigration arrests at the courthouse or its curtilage absent a judicial warrant, on pain of contempt. The opinion's discussion of *Arizona v. United States* reinforces the distinction. It identified concrete injury in allegations that Arizona's laws would impose "significant and counterproductive burdens on federal agencies" by "diverting resources and attention" from federal enforcement priorities. *Id.* at 9 (quoting the complaint in *Arizona*). The United States has shown the same kind of operational injury here: Rule 2.10 has forced ICE to divert officers, vehicles, surveillance, and overtime to more dangerous at-large arrests. Compl. ¶¶ 71–79; Affholter Decl. ¶¶ 38, 41, 43–44, 46–47. Those arrests require four to six officers rather than the two needed for courthouse arrests, along with extended surveillance and overtime. Affholter Decl. ¶¶ 43–44, 46. Indeed, the *Michigan* court expressly distinguished cases involving "challenges by the United States to state laws concerning immigration." *Michigan*, slip op. at 9 n.3. The court likewise recognized standing to challenge "actual or threatened interference with the performance of [the United States'] proper governmental functions." *Id.* at 8 (quoting *United States v. Ekblad*, 732 F.2d 562, 563 (7th Cir. 1984)). That is precisely the injury here. An injunction would remove the restriction causing those operational harms. In other words, *Michigan* does not help FCMC.

393 (1988) ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise.").

FCMC's other cases are inapposite. PI Opp. at 11. *United States v. City of Boston* addressed an ordinance limiting city employees' cooperation with federal immigration enforcement, and it rejected a theory of sovereign injury that the court read to reach even a "nonbinding city-council resolution." 833 F. Supp. 3d 30, 45 (D. Mass. 2026). A nonbinding resolution commands no one. The Rule, by contrast, commands federal officers on pain of contempt. In *United States v. Hawaii*, the complaint did "not describe any concrete injury" and instead relied on "conclusory allegations." 830 F. Supp. 3d 1028, 1040 (D. Haw. 2026). Here, by contrast, the Complaint and the Affholter declaration document a concrete injury: since the Rule took effect, ICE has made no courthouse arrests and has diverted officers and resources to more dangerous at-large arrests. Compl. ¶¶ 71–79; Affholter Decl. ¶¶ 38, 41, 43–44. Although *California*, 173 F.4th 1060, addressed the preliminary-injunction factors, not standing, *id.* at 12, the Ninth Circuit granted relief to the United States against a law regulating federal officers, and FCMC cites no decision denying the United States standing on comparable facts. To the contrary, as the cases cited by FCMC found, "where [as here] the proper defendants are named as to policies within their control, district courts have found that the United States has sufficiently asserted standing." *United States v. Cnty. of Washtenaw*, 2026 WL 2453724, at *4 (E.D. Mich. 2026); *United States v. Minnesota*, 2026 WL 2085701, at *9 (D. Minn. 2026) (the United States' "allegations plausibly show an impairment to the United States' 'legally protected interest in enforcing federal law.'") (quoting *United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024), *cert. denied*, 146 S. Ct. 90 (2025)).

Nor is the United States' position limitless, as FCMC fears. Pl. Opp. at 11. It requires a binding rule—not a resolution or a statement of policy—that regulates federal officers or conflicts

with federal law, and actual or threatened enforcement of that rule. The Executive enforces laws Congress enacted. It does not impose the law for "political purposes,", PI Opp. at 11, by asking a court to apply the Supremacy Clause. To the contrary, "preventing a violation of the Supremacy Clause serves the public interest," *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019), and "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021); *see United States v. Texas*, 599 U.S. 670, 678–79 (2023) (same).

FCMC says the United States must identify "a single arrest, past or impending, that LR 2.10 stands in the way of." Pl. Opp. at 14. It builds that demand on a chain of "ifs," *id.* at 13, and invokes the rule that a plaintiff "must show actual present harm or a significant possibility of future harm." *Id.* at 12 (quoting *Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 405–06 (6th Cir. 2019)). The United States has shown both. The injury is the restraint, and a party subject to an operative prohibition need not violate it to challenge it. *Lujan*, 504 U.S. at 561–62. And even if FCMC were right that the United States must point to specific arrests, the record identifies repeated pre-Rule courthouse arrests and establishes that ICE would continue to use FCMC for qualifying actions but for the Rule. ICE arrested people at the courthouse in coordination with court security before the Rule. Compl. ¶¶ 38–42; Affholter Decl. ¶¶ 26–34, 37. FCMC's own declarant describes arrests in a hallway and a lobby after arraignments ended. ECF No. 21-3 at 3, ¶¶ 12–13. FCMC concedes that at least two arrests occurred under the 2021 guidance it says now governs. Pl. Opp. at 13–14. Since the Rule took effect, ICE has made no arrests at the courthouse and has sent more officers, vehicles, and overtime to (more dangerous) at-large arrests elsewhere. Affholter Decl. ¶¶ 38, 41, 43–44; Compl. ¶ 79.

FCMC's remaining arguments—that the 2021 guidance, the option to arrest "near" the courthouse, and the availability of judicial warrants leave the Rule nothing to restrain—fare no better. To start, FCMC says the 2021 guidance makes courthouse arrests "vanishingly rare." PI Opp. at 12. But that guidance still permits arrests of national-security threats and people who pose an imminent risk of violence, PI Opp. at 12; ECF No. 21-8 at 2, and the Rule forbids those too. Next, FCMC says ICE may arrest "near" the courthouse. PI Opp. at 13, 26. But the operative ICE guidance defines "near" to include "the entrance and exit of a courthouse" and an adjacent parking lot or bus stop, ECF No. 21-8 at 2, which is what the Rule's curtilage covers. Finally, FCMC says a judicial warrant will "almost invariably" be available. PI Opp. at 26. FCMC cites nothing for that proposition, and the INA provides no routine mechanism for obtaining a judicial warrant solely for a civil removal arrest. 8 U.S.C. §§ 1226(a), 1357(a)(2); 8 C.F.R. §§ 236.1(b), 287.5(e)(2); *see* PI Opp. at 4–5. Moreover, the record refutes that idea. Of the courthouse arrests the Affholter declaration identifies, only one involved a judicial criminal warrant, and even that arrest also rested on an administrative warrant. Affholter Decl. ¶ 27. The rest were on administrative warrants alone. *Id.* ¶¶ 28–35. In short, the Rule has done exactly what FCMC adopted it to do: it has stopped federal arrests at the courthouse. That ongoing restraint is a concrete injury in fact.

### B. An injunction would redress the injury because Ohio's debtor-arrest statutes govern private process and never stopped these arrests.

FCMC adopted and enforces the Rule through its Presiding Judge, so an order barring this Defendant would remove the restraint. Compl. ¶¶ 21–22, 39–40, 44–47; Pl. Opp. at 10. FCMC argues that an injunction cannot redress the injury because Ohio law imposes "an unchallenged bar coextensive with LR 2.10." PI Opp. at 14 (quoting *Block v. Canepa*, 175 F.4th 642, 652 (6th

Cir. 2026)). That fails for four reasons. First, FCMC points to no authority that these statutes reach federal arrests, let alone civil immigration arrests.[3] Chapter 2331 is titled "Execution Against the Person," and its remedy has always run against "the party suing out such process." ECF No. 21-6 at 4; Ohio Rev. Code § 2331.14.

Second, Chapter 2331 is not an independent bar on federal officers. FCMC's theory depends on the Ohio law already forbidding the arrests the Rule forbids, so that the Rule adds nothing. *See* PI Opp. at 14. But an overlapping state law defeats redressability only when it authoritatively forecloses the conduct at issue. *Cf. City of Boston*, 833 F. Supp. 3d at 42 (D. Mass. 2026) (finding no redressability where Massachusetts's highest court had already held that state law gives local officers no authority to hold individuals on civil immigration detainers) (citing *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1160 (Mass. 2017)). Here, the arrests the Rule bars are made by federal officers, whose authority comes from federal statute, not Ohio law. 8 U.S.C. §§ 1226(a), 1357(a)(2). Ohio may define what its own officers may do, but it cannot define, or withdraw, the arrest authority Congress conferred on federal officers. Nor has any Ohio court read Chapter 2331 to reach a federal officer, let alone a civil immigration arrest. Indeed, FCMC concedes that § 2331.12 "has been little analyzed or applied." PI Opp. at 14 n.7. And Ohio could not impose such a bar if it tried. A state statute that purported to restrict federal arrests would be void for the same reasons the Rule is, and a void statute cannot supply an independent barrier to relief. *See Maryland v. Louisiana*, 451 U.S. 725, 747 (1981) ("Of course, a state statute is void to

[3] FCMC cites a legislative analysis of S.B. 172 for the proposition that Ohio law bars civil arrests of persons attending court. PI Opp. at 14 n.7. The analysis says only that an administrative-warrant arrest "also might be considered a civil arrest." ECF No. 21-13 at 3. S.B. 172 passed the Senate but not the House. ECF No. 21-14 at 1. And "[i]t is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law." *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990). A bill that did not become law says nothing about what §§ 2331.11 or 2331.12 mean or whether Ohio may limit federal arrests (it may not).

the extent it conflicts with a federal statute . . . ."). Even assuming Chapter 2331 has some overlap with the Rule, even "a partial remedy satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (citation modified); *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007) (Standing exists even where a court decision can provide "a small incremental step" to reduce the harm facing plaintiffs "to some extent").

Third, the Rule filled a gap the statutes left open, which is why FCMC needed it. The statutes never stopped federal immigration arrests at FCMC. None of FCMC's declarants—the Public Defender, the City Attorney's Property Action Team, and a private practitioner—describes anyone invoking § 2331.11, § 2331.12, or § 2331.14 against an ICE arrest. *See* ECF Nos. 21-2, 21-3, 21-4. Rather than invoke the statutes, the Public Defender urged FCMC to adopt a local rule. ECF No. 21-3 at 3, ¶¶ 10–11. And the only FCMC exhibit that mentions the statutes, the preamble to the Court of Common Pleas' Local Rule 111, calls that rule "[c]onsistent with" § 2331.11 and then adds what the statute lacks: a bar on arrest "without a judicial warrant or judicial order." ECF No. 21-3 at 6. The Rule reaches conduct the statutes never touched. Section 2331.11(A)(4) covers listed participants "while going to, attending, or returning from court," and § 2331.12 applies only "during the sitting of such court." The Rule covers every "individual" present for "any lawful court business," whether or not court is sitting, throughout the courthouse and its curtilage, and FCMC enforces it through contempt rather than a $100 remedy. ECF No. 1-4; Compl. ¶¶ 39–40, 70. A narrower law with a different remedy cannot inflict "the same alleged injury." *Block*, 175 F.4th at 652.

Fourth, redress need not be complete. It is enough for a plaintiff to show "the injury would *likely* be redressed by judicial relief." *TransUnion LLC*, 594 U.S. at 423 (emphasis added); *accord Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] favorable decision" need not "relieve

[plaintiffs'] *every* injury") (emphasis in original). The United States has satisfied the redressability standard here.

## II. RULE 2.10 DIRECTLY REGULATES THE FEDERAL GOVERNMENT BECAUSE IT TELLS FEDERAL OFFICERS WHEN AND WHERE THEY MAY NOT MAKE ARRESTS.

The Supremacy Clause bars States from "regulat[ing] the [federal] Government directly or discriminat[ing] against it." *North Dakota v. United States*, 495 U.S. 423, 434 (1990) (plurality opinion).[4] "[T]he activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). That prohibition applies even without preemptive legislation, because the Supremacy Clause itself invalidates such state regulation: "intergovernmental immunity has independent bite, and courts must apply it to referee 'clashing sovereignty.'" *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 328 (3d Cir. 2025) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 430 (1819)). Congress may authorize such regulation only in "clear and unambiguous" terms, *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 175 (1988) (citation omitted), and FCMC points to none. A court's local rule receives no special treatment. Rather, like a local ordinance, it should be "analyzed in the same way as that of statewide laws." *United Auto., Aerospace & Agric. Implement Workers of Am. Local 3047 v. Hardin County*, 842 F.3d 407, 418 (6th Cir. 2016).

[4] FCMC addresses preemption first because Congress has "the primary role" in resolving conflicts between the National and State Governments. PI Opp. at 15 n.8 (quoting *North Dakota*, 495 U.S. at 435). But *North Dakota* identifies direct regulation and preemption as two "distinct" ways a state law may violate the Supremacy Clause, 495 U.S. at 434, and the Court has held laws void as direct regulation without any preemption analysis. *E.g.*, *Mayo*, 319 U.S. at 445–48 (holding a state fee unlawful as applied to the Federal Government without reaching preemption). That the United States pleads no discrimination claim, PI Opp. at 25 n.14, is irrelevant, because discrimination is a separate route to the same conclusion. *United States v. Washington*, 596 U.S. 832, 838–39 (2022) (recognizing discrimination against the Federal Government as an independent ground of intergovernmental immunity apart from direct regulation).

### A. A rule whose only command is "no civil arrest" without a judicial warrant regulates the officers who make arrests.

A State may not require federal officers to "desist from performance until they satisfy a state officer." *Johnson v. Maryland*, 254 U.S. 51, 57 (1920) (invalidating a state license requirement for a Post Office driver because it added "qualifications in addition to those that the [federal] Government has pronounced sufficient"). For more than a century, the Supreme Court has applied that principle to strike down state laws that condition or forbid the performance of federal functions. *See, e.g.*, *Hancock v. Train*, 426 U.S. 167, 179–80 (1976) (State may not condition a federal facility's operation on a state permit, a requirement that "place[s] a prohibition on the Federal Government"); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956) (per curiam) (applying *Johnson* to invalidate a state licensing requirement that gave the State "a virtual power of review over the federal determination"). Lower courts have applied the same rule to invalidate a city ordinance barring military recruiters from recruiting minors, *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010), and, in the immigration context, a state ban on private immigration-detention contracts, *CoreCivic*, 145 F.4th at 325. Most recently, the Ninth Circuit held that a California law requiring federal officers to display identification "attempt[ed] to directly regulate the federal government in its performance of law enforcement operations." *California*, 173 F.4th at 1067.

FCMC tries to distinguish these decisions because each concerned an effort to control federal employees and contractors, and none involved "the core state powers or proprietary interests at issue here." PI Opp. at 27. But the Rule does regulate federal employees. That is the point. Indeed, the Rule "does not regulate conduct [(arrests)] that any ordinary citizen could perform." *California*, 173 F.4th at 1068. "Rather, it applies exclusively to law enforcement agencies and their officers, including federal law enforcement agencies and federal law

enforcement officers." *California*, 173 F.4th at 1068. Thus, the Rule "directly regulates conduct reserved to sovereigns." *California*, 173 F.4th at 1068.

Still, core state interests did not save the laws in *Arizona v. California, 283 U.S. 423 (1931)* or *Mayo*. *See infra* Section II.B. A State's interest in the subject it regulates has never been a defense to regulating the Federal Government directly. On the contrary, "[t]he state cannot regulate the federal government *at all*." *United States v. Virginia*, 2026 WL 2257488, at *2 (E.D. Va. Aug. 5, 2026) (emphasis added); *see also Arizona*, 283 U.S. at 451 ("The United States may perform its functions without conforming to the police regulations of a state.").

Measured against that settled rule, Rule 2.10 is direct regulation, because its only command governs the officer who makes the arrest. Its operative sentence says that "[n]o individual shall be subject to a civil arrest while present in the courthouse." ECF No. 1-4. That sentence says nothing to FCMC's bailiffs, clerks, or security officers. It tells whomever would arrest—here, federal immigration officers—to stop. The exception for judicial warrants likewise conditions the officer's conduct, and FCMC backs the Rule with contempt. Compl. ¶ 70. The Constitution does not tolerate a State chilling federal activity by punishing federal officers for carrying out their official duties. *See In re Neagle*, 135 U.S. 1, 75 (1890) (holding that a federal officer who does no more than his federal duty requires cannot be held answerable under state law). The command also reaches every building and space FCMC uses and its curtilage. Compl. ¶ 46. That goes well beyond courtroom management. PI Opp. at 12.[5]

[5] FCMC cites *Sheppard v. Maxwell* for the proposition that "courtroom and courthouse premises are subject to the control of the court." PI Opp. at 26 n.15 (quoting *Sheppard*, 384 U.S. 333, 358 (1966)). *Sheppard* addressed a court's control over trial participants and the press. It did not hold that a court may forbid another sovereign's officers to exercise authority conferred by federal law.

The Rule also intrudes more deeply than the law in *California*, 173 F.4th at 1068. It does not regulate what an officer wears during an arrest. It forbids the arrest altogether unless the officer first "satisf[ies] a state officer." *Johnson*, 254 U.S. at 57. And it displaces the Federal Government's enforcement judgment. The 2021 guidance preserves courthouse arrests for national-security threats, imminent risks of death or violence, hot pursuit of public-safety threats, and imminent risks that evidence will be destroyed. PI Br. at 12; ECF No. 21-8 at 2. The Rule eliminates every one of those exceptions unless the officer first obtains a judicial warrant. If such rules were replicated in courthouses across the country, they would stymie federal immigration enforcement nationwide. That is why States have no power "to retard, impede, burden, or in any manner control" the operations of federal law. *McCulloch*, 17 U.S. (4 Wheat.) at 436.

FCMC offers four reasons why the Rule does not regulate federal officers. None survives the text. First, FCMC says the Rule "does not 'directly' require anything of federal officers." Pl. Opp. at 25. But a rule whose only command is that arrests do not occur requires something of those who would arrest. This Court should "see the law for what it really is": an attempt to "dictate the manner in which the federal [immigration] function is carried out." *CoreCivic*, 145 F.4th at 329 (alteration in original) (quoting *Goodyear Atomic Corp.*, 486 U.S. at 181 n.3).

Second, FCMC says the Rule "expressly disclaims any effort to regulate the United States." *Id.* A law's self-description does not control what it does. Otherwise every State could immunize its laws with a saving clause. Compl. ¶ 50. FCMC may not escape the Supremacy Clause "just by framing" its Rule in an artful way, *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012).

Third, FCMC says "[a]ny burden on the United States is also modest" because officers may arrest "near" FCMC or obtain a judicial warrant. PI Opp. at 26. The Ninth Circuit recently rejected that line of argument: a law that directly regulates the United States is void whatever the degree of

interference. *California*, 173 F.4th at 1067. And the judicial-warrant alternative is largely illusory, because such a warrant requires probable cause of a crime, and civil removability is not one. *See infra* Section III.A.

Lastly, FCMC says that rules that "affect incidentally the mode of carrying out [federal] employment" are permissible, and that the Rule is a "neutral, internal, local rule." PI Opp. at 27–28 (quoting *Johnson*, 254 U.S. at 56). But *Johnson*'s example of an incidental effect was "a statute or ordinance regulating the mode of turning at the corners of streets." 254 U.S. at 56, not an exclusively sovereign function like civil immigration enforcement.

### B. FCMC calling itself a property owner, or calling a prohibition a refusal to help, does not change what the Rule does.

FCMC's main defense is that it acts like a property owner, entitled "no less than a private owner of property" to "preserve the property under its control for the use to which it is lawfully dedicated." PI Opp. at 27 (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)). But the Supreme Court has repeatedly rejected the notion that a state can justify laws regulating the Federal Government by invoking the state's proprietary interests. In *Arizona v. California*, the Supreme Court concluded that intergovernmental immunity principles barred a state from subjecting a federal dam construction project to a state approval process, rejecting the state's invocation of its "quasi sovereign rights." 283 U.S. at 451–52. And in *Mayo*, the Supreme Court held that a state could not require the Federal Government to pay an inspection fee for fertilizer that the Federal Government distributed, concluding that "the federal function must be left free" despite the state's interest in "protect[ing] consumers from fraud." 319 U.S. at 447. That States retain the "maintenance of state judicial systems," Pl. Opp. at 16–17 (quoting *Atl. Coast Line R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 285 (1970)), does not let them regulate federal officers within

those systems. In other words, the bar on state regulation of federal activities permits "[n]o other adjustment of competing enactments or legal principles." *Id.* at 445.

Even setting that aside, FCMC's property-owner cases are distinguishable. *Adderley* concerned college students protesting on jail grounds, 385 U.S. at 40, and *Texas v. Department of Homeland Security* rested on a district court factual finding that federal agents cut Texas's concertina wire "for no apparent purpose other than to allow migrants easier entrance further inland," 123 F.4th 186, 207 (5th Cir. 2024). In other words, the agents were not enforcing federal law in cutting the concertina wire.[6] Here, however, no one disputes that ICE and other federal agencies are engaged in law enforcement when they make civil immigration arrests covered by the Rule. FCMC's property-owner analogy is hardly analogous. A private owner invites whom it likes. FCMC compels attendance. Its own examples involved people present "for a bond revocation hearing," "for [a] jury trial," and "on the day of [a] traffic court arraignment." PI Opp. at 6–7. FCMC cannot invoke a general property-owner analogy to prohibit federal officers from acting against individuals whom the court has required to appear.

Nor can FCMC rescue the Rule by pointing to its statement of purpose. FCMC says the Rule "roots its purpose" in the principle that courts "cannot be directed, controlled, or impeded" in their judicial functions. PI Opp. at 8. That principle governs the branches of Ohio's government, and the Federal Executive is not one of them. *See generally State ex rel. Johnston v. Taulbee*, 66 Ohio St. 2d 417, 421 (1981); *see also id.* at 426 (Holmes, J., concurring in part and dissenting in part) ("But just as the judicial branch must not be impeded by the other branches, the judicial

[6] While distinguishable, this decision was also incorrect, and the Supreme Court vacated a previous injunction in the case the only time the issues were presented to that Court. *See Dep't of Homeland Sec. v. Texas*, 144 S. Ct. 715 (2024). After the change in Administration, the United States decided not to seek further review of the Fifth Circuit decision on which FCMC relies here.

branch must not be allowed to run rampant over the other branches.”). In any event, it is unclear how the judicial functions of Ohio courts are “impeded” by following the Constitution. Nor does the Rule’s disclaimer that nothing in it violates the Supremacy Clause, Compl. ¶ 50, override its operative command, which contains no federal-officer exception. Compl. ¶ 47; PI Br. at 7–8. FCMC may protect its proceedings with neutral rules against disruption, violence, and unauthorized entry, and it “may generally control its employees and access to nonpublic spaces.” PI Br. at 13. But the Rule also forbids arrests in the hallway and lobby where two of the three arrests FCMC describes occurred. *Id.* at 3, ¶¶ 12–13. FCMC may not decide when or where federal officers may enforce federal law.

Finally, FCMC says the Rule affects federal operations “only by withdrawing use of FCMC property and personnel from immigration enforcement,” and that localities “do not directly regulate the federal government by withholding assistance they are not required to provide.” Pl. Opp. at 26 (quoting *County of Washtenaw*, 2026 WL 2453724, at *20). But “refusing to help is not the same as impeding.” *California*, 921 F.3d at 886. The decisions FCMC cites addressed whether States and localities may decline to devote their own officers and resources to federal immigration enforcement—a question the United States continues to contest, and one this case does not present. *See generally McHenry County v. Raoul*, 44 F.4th 581, 592–93 (7th Cir. 2022) (addressing a state law barring state and local governments from contracting to house immigration

detainees). Rule 2.10 is different in kind: it tells federal officers not to arrest. FCMC names no assistance it has withdrawn,[7] because ICE needs none to make an arrest in a hallway.[8]

In short, the Rule does not withhold FCMC's help. It dictates when and where federal officers may exercise arrest authority that federal law confers. That is direct regulation of the Federal Government, and it is invalid under the Supremacy Clause. That alone warrants a preliminary injunction.

## III. THE INA PREEMPTS RULE 2.10 BECAUSE CONGRESS DECIDED WHEN FEDERAL OFFICERS MAY ARREST.

### A. Congress authorized arrests on an administrative warrant or no warrant at all, and the Rule demands a judicial warrant Congress never required.

FCMC argues that the Rule and the INA can coexist—they cannot—because Congress did not specify where civil immigration arrests may occur. PI Opp. at 15–20. Even apart from intergovernmental immunity, the Rule is conflict-preempted because it stands in the way of Congress's "extensive and complex" arrest scheme. *Arizona*, 567 U.S. at 395. A State may not take action that "either frustrates the purpose of the national legislation or impairs the efficiency of these agencies of the federal government to discharge the duties for the performance of which

[7] Indeed, remove every conceivable form of local assistance. Suppose federal officers identify the individual themselves, enter through doors open to the public, use no FCMC personnel or information, and carry out the arrest using only federal resources. The Rule still forbids the arrest. So even assuming FCMC's line of argument was correct, the Rule still directs federal officers. The same is true if the Rule's reach changes. Suppose the Rule said that "no law enforcement officer may make any arrest—civil or criminal—on FCMC property." No one would describe that Rule as a refusal to assist federal law enforcement. It would be an instruction governing when federal officers may exercise federal arrest authority. Limiting that prohibition to civil arrests lacking a judicial warrant changes the Rule's "degree," not its character. *California*, 173 F.4th at 1067. In both cases, FCMC dictates when and how federal officers may enforce federal law.

[8] FCMC argues that the INA creates a "purely voluntary regime" for state and local cooperation. PI Opp. at 18 & n.11 (collecting cases). Whatever their merits, those decisions concern laws directing state and local officials to decline to act. None involved a rule forbidding federal officers to arrest. *See McHenry County*, 44 F.4th at 593 (explaining that the challenged law "directly regulate[d] only" state and local entities, "not the federal government").

they were created." *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896). Congress decided "when it is appropriate to arrest an alien during the removal process," *Arizona*, 567 U.S at 407: on an administrative warrant, 8 U.S.C. § 1226(a), or without a warrant when an alien is likely to escape, *id.* § 1357(a)(2). The Rule adds a condition Congress omitted, a judicial warrant, and that condition "stands as an obstacle to the accomplishment and execution" of the scheme. *Crosby*, 530 U.S. at 373 (quotation marks omitted). Simply put, if Congress did not impose a courthouse-specific judicial-warrant requirement on federal officers, FCMC may not add one.

In other words, the Rule substitutes criminal process for the civil process Congress chose. A judicial arrest warrant issues on probable cause that the person committed an offense. Fed. R. Crim. P. 4(a), 9(a). That does not cover civil removability: "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona*, 567 U.S. at 407. Unlawful presence, a visa overstay, and a final order of removal each support civil arrest and removal, *see* 8 U.S.C. §§ 1226(a), 1227(a)(1)(B)–(C), 1231(a), yet none, standing alone, establishes probable cause of a crime. The INA gives ICE no procedure to ask a magistrate judge for a warrant because a person is removable. Instead, the warrant Congress provided is administrative. 8 U.S.C. § 1226(a); 8 C.F.R. §§ 236.1(b), 287.5(e)(2). ICE cannot manufacture a criminal case to satisfy a local rule, and there is no mechanism for a judge to issue a criminal warrant for a civil violation of federal law. For the ordinary removal arrest, then, the judicial warrant the Rule demands is not just hard to obtain—it does not exist. That is why the arrests at FCMC proceeded on administrative warrants, *see supra* Section I.A, and it is why the Rule directly regulates the federal scheme.

FCMC says the INA's "silence" about where civil arrests may occur "is decisive," and that the Rule and the INA "can 'be reconciled'" because officers may arrest elsewhere. PI Opp. at 17-18. That argument fails for three reasons. First, the INA is not silent. Sections 1226(a) and

1357(a)(2) allow arrests wherever their conditions are met, and courts "may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020).[9] Congress knew how to impose geographic limits. Section 1357(a)(3) allows officers to enter private lands near the border but expressly excluded "dwellings." *Id*. FCMC seems to treat that express limitation on a distinct entry authority as proof that Congress silently withheld arrest authority in courthouses. PI Opp. at 19. That inference runs backward. Rather, Congress's express exclusion of dwellings shows that when Congress wanted to restrict where officers could exercise arrest authority, it said so. *See Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

Second, § 1229(e) contemplates an "enforcement action leading to a removal proceeding" against an alien "[a]t a courthouse." 8 U.S.C. § 1229(e)(2)(B). FCMC acknowledges that it "at most, recognizes that immigration enforcement arrests *may* occur at courthouses." PI Opp. at 20. That defeats the theory that Congress understood such arrests to be barred. Even the decision FCMC relies on for incorporation of the privilege recognized that § 1229(e) "suggests that Congress did anticipate at least some arrests occurring at courthouses." *New York v. ICE*, 431 F. Supp. 3d 377, 393 (S.D.N.Y. 2019). That § 1229(e) postdates the original INA does not matter. *See United States v. Fausto*, 484 U.S. 439, 453 (1988) ("[C]ourts frequently . . . interpret a statutory text in the light of surrounding texts that happen to have been subsequently enacted."). Reliance

[9] FCMC dismisses *Lomax* because "[t]here is no such 'text' here." PI Opp. at 18 n.10. That is the point: no text prohibits arrests under §§ 1226(a) and 1357(a)(2) from occurring in a courthouse. Yet FCMC would have this Court impose such a requirement on the Federal Government.

on a subsequently enacted provision is particularly appropriate when, as here, the later provision "seems clearly to have contemplated" a particular application of an earlier provision. *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 595 (1980). FCMC provides no explanation for why Congress would have created specific rules that apply only when arrests were made at courthouses unless it understood-consistent with longstanding practice and in the absence of any statutory text suggesting otherwise—that arrests could in fact be made at courthouses. *See* Op. & Order at 34, ECF No. 51, *African Communities Together v. Lyons*, No. 1:25-cv-6366 (S.D.N.Y. Sept. 12, 2025) ("Congress is presumed to know the law it is amending and if the INA had incorporated a privilege against service of process at courthouses, it would not have blithely adopted a requirement that a written disclosure accompany the service at a prohibited location, i.e., a courthouse.").

Third, the Rule cannot be "reconciled" with the INA on the theory that officers may arrest elsewhere. "[T]he removal process is entrusted to the discretion of the Federal Government." *Arizona*, 567 U.S. at 409. A "different, state system" for federal arrests would obstruct Congress's scheme no matter how broadly the INA speaks. *Crosby*, 530 U.S. at 376–77 (quotation marks omitted). If FCMC were right, a State could bar civil immigration arrests everywhere but one street and defend the scheme because officers remain free to arrest there. For the same reasons, the Rule does not "merely . . . inconvenience[]" the Federal Government. Pl. Opp. at 16 (quoting *County of Washtenaw*, 2026 WL 2453724, at *6). FCMC says a conflict must be "so direct and positive that the two acts cannot be reconciled or consistently stand together." *Id.* This one is. Federal law says the officer may arrest on an administrative warrant, or no warrant at all. The Rule says he may not. No reading reconciles those commands.

As explained, Congress charged the Executive with locating and arresting removable aliens and left the manner of doing so to its discretion. *Arizona*, 567 U.S. at 409. The Rule overrides that discretion. It forces officers to look for the same people in homes, workplaces, and streets, where arrests take more personnel, time, and risk than in a screened courthouse. Compl. ¶¶ 8–11, 71–78; Affholter Decl. ¶¶ 43–44, 46–47. A local rule that makes the federal immigration enforcement scheme harder and more dangerous to carry out "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

The Rule also disrupts settled federal practice. For more than a decade, across administrations, ICE has used civil arrest authority in and around courthouses under guidance that limits when and how it does so. Compl. ¶¶ 55–57; PI Br. at 5–6. The 2021 memorandum FCMC attaches recognizes the concern about court access and "is designed to address" it yet calls itself discretionary "management guidance" that "does not affect the statutory authority of ICE or CBP employees." ECF No. 21-8 at 1, 3. The Federal Government struck that balance as policy, without disturbing the authority Congress conferred. FCMC's Rule replaces it with a categorical bar.

FCMC also invokes the presumption against preemption and *Gregory v. Ashcroft*'s clear-statement rule. PI Opp. at 16–17. Neither applies. The presumption protects a State's historic police powers, and regulating federal arrests is not one of them. An "'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence," *United States v. Locke*, 529 U.S. 89, 108 (2000). Immigration is such an area. And such a presumption "does not apply when a state law would interfere with inherently federal relationships" or would "control federal operations." *GEO Grp., Inc. v. Newsom*, 50 F.4th

745, 761 (9th Cir. 2022) (en banc).[10] The Rule does both. Even a legitimate state interest does not save a rule that frustrates federal law. "[S]uch a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply publishing a legislative committee report articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law." *Perez v. Campbell*, 402 U.S. 637, 652 (1971). *Gregory v. Ashcroft*, 501 U.S. 452 (1991), does not apply. PI Opp. at 16. It decided "whether [Missouri's] mandatory retirement provision" for state court judges was preempted by a federal statute. *Id*. at 455. The Court rooted its finding that the state law was not preempted based on ["[t]he authority of the people of the States to determine the qualifications of their government officials. . . ." *Id*. at 463. But the INA does not interfere with Ohioans' decision to elect judicial officers. In any event, FCMC's approach would lead to what the First Circuit called "a strange result": "ICE's authority to conduct civil courthouse arrests might vary on a state-by-state basis, depending on each state's policy on the subject." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 32 n.9 (1st Cir. 2020). Under FCMC's approach it would vary court by court. And FCMC's invocation of *Kansas v. Garcia* and *Whiting* for a "brooding federal interest," PI Opp. at 16, 19, misses that the United States points to §§ 1226(a) and 1357(a)(2).

### B. No common-law privilege lets a municipal court regulate federal officers, and the INA never incorporated one.

FCMC's answer to preemption is that the INA left intact a common-law privilege against courthouse arrests that Ohio has codified since 1799, and that the Rule "merely effectuates." PI

[10] FCMC cites *Arizona* and *DeCanas v. Bica* for the presumption's application to laws "related to immigration." PI Opp. at 17 n.9. But *Arizona* invalidated three of four challenged provisions notwithstanding any presumption, 567 U.S. at 400–10, and *DeCanas* concerned a state law regulating private employers, not federal officers. 424 U.S. 351, 356–58 (1976). In any event, a state law is preempted if it "presents a sufficient obstacle to the full accomplishment of Congress's objectives," whatever presumption applies. *Crosby*, 530 U.S. at 374 n.8.

Opp. at 20–24. But the Court need not decide whether the privilege exists. A movant must show that it is "likely to succeed on the merits," *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008); PI Br. at 8, and the United States has done so on its direct-regulation claim, which supports the same relief as its preemption claim. Compl. ¶¶ 87–94; *id.*, Prayer ¶ B. Once a movant shows likely success on a claim that warrants the relief it seeks, the Court has no reason to resolve the others. "[I]f it is not necessary to decide more, it is necessary not to decide more." *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment). *See generally Texas v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 737 F. Supp. 3d 426, 443 (N.D. Tex. 2024), *appeal dismissed*, 2026 WL 1753983 (5th Cir. Apr. 16, 2026), *and order dissolved*, 2026 WL 1734866 (N.D.Tex. June 12, 2026). That is especially so here. A party "is not required to prove his case in full at a preliminary-injunction hearing," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), and a "court's resolution of issues in a preliminary-injunction order is never binding on a case's underlying merits." *Mktg. Displays Int'l v. Shaw*, 93 F.4th 967, 971–72 (6th Cir. 2024). The Court can leave English chancery reports and the history of Chapter 2331 for a full record, if they ever need to be analyzed at all.

More fundamentally, the privilege question is beside the point. Whether or not the INA incorporated a common-law privilege against courthouse arrests, FCMC may not enact its own version of that privilege and enforce it against federal officers. The question here is whether a municipal court may dictate when and where federal officers make arrests, and the existence of a privilege, state or federal, does not answer it. The remedy for any violation of federal law comes from federal law, and that does not permit a State to supplement federal limits on federal officers with penalties of its own choosing.

FCMC stresses that the privilege "is the privilege of the court, rather than of the defendant." PI Opp. at 22 (quoting *Stewart v. Ramsay*, 242 U.S. 128, 130 (1916)). Whoever holds it, the privilege has always operated as a defense to civil process of a summons or subpoena, not an arrest. Ohio's statutes say so. Section 2331.11 gives the arrestee a $100 remedy, and § 2331.14 directs his release by the issuing court "at the cost of the party who sued out the process." The Rule is different in kind. No one invokes it as a defense. FCMC enforces it against the officer before any arrest occurs. The plaintiffs in *Ryan* tried to assert the privilege against the Federal Government in federal court, and the First Circuit held that they were unlikely to succeed. 974 F.3d at 28. But even a successful defense of that kind would not authorize a municipal court regulate the relationship between the Federal Government and a private individual. *Cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character . . . .").[11]

Ohio courts also instruct that the privilege "is extended or withheld only as judicial necessities require." PI Opp. at 23 (quoting *Zumsteg*,143 N.E.2d at 703; *see also Lamb v. Schmitt*, 285 U.S. 222, 225 (1932) ("[T]he privilege should not be enlarged beyond the reason upon which it is founded . . . ."). The federal decisions FCMC cites were suits against federal agencies. PI Opp. at 23, 27. The decisions that upheld statutes limiting civil arrests at courthouses never explained

[11] The statutory text confirms that Chapter 2331 does not purport to apply to the Federal Government. The same section that bars arrests during the sitting of a court, Ohio Rev. Code § 2331.12, also bars arrests on Sundays and on the Fourth of July, and FCMC's own exhibits show that pairing is 200 years old. ECF No. 21-5 at 3; ECF No. 21-6 at 3; ECF No. 21-7 at 3. No one suggests that Ohio may forbid federal officers to make arrests on a Sunday or on the Fourth of July. Yet FCMC reads that same section to forbid them to make arrests at a courthouse. It cannot mean both. Section 2331.12 limits when private litigants may sue out civil process from Ohio courts. It does not limit when the United States may enforce federal law. Nor do the cases FCMC cites suggest that an Ohio court has any role in assessing arrests by the national government. They involved a civil summons served on a corporation's statutory agent, *Zumsteg v. Am. Food Club, Inc.*, 143 N.E.2d 701, 701–04 (Ohio 1957), and a traffic defendant arrested for municipal offenses, *Akron v. Mingo*, 160 N.E.2d 225, 230–31 (Ohio 1959).

how a privilege that operates as a defense allows a State to directly regulate federal officers, and several are on appeal. *See generally United States v. New York*, 810 F. Supp. 3d 329 (N.D.N.Y. 2025), *appeal docketed*, No. 26-104 (2d Cir. Jan. 16, 2026).

In any event, FCMC's argument that the INA incorporated the privilege founders at the threshold. A statute incorporates a common-law rule only if the rule "was long-established and familiar at the time of the statute's enactment," here 1952. *Ryan*, 974 F.3d at 23. And where the common law supplies little background on the question, a supposed common-law rule cannot displace broad statutory language. *See United States v. Craft*, 535 U.S. 274, 288 (2002) (declining to read a common-law rule into a federal statute where the common-law background was thin). Even assuming there was a privilege against civil arrests by private citizens in certain places, FCMC identifies no "clear historical precedent for extending the privilege to arrests on behalf of the sovereign" as of the INA's enactment in 1952. *Ryan*, 974 F.3d at 26.

FCMC invokes the presumption that statutes retain "long-established and familiar principles," PI Opp. at 20–21 (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)), but that assumes the answer to the question: whether the privilege as to arrests by the sovereign was such a principle in the first place. The First Circuit, the only court of appeals to decide the question, rejected the claim that "the INA implicitly incorporates a common law privilege against civil arrests for individuals attending court on official business." *Ryan*, 974 F.3d at 15.[12] It found "no

[12] *Ryan* did not specifically analyze Ohio's privilege, though it surveyed the privilege's origins and state-court decisions applying it. 974 F.3d at 21–22. But FCMC does not suggest that Ohio's privilege differs from the general common law in any relevant respect. *See* PI Opp. at 21. In any event, one State's practice could not show what Congress incorporated into a nationwide statute in 1952. Nor did *Ryan* turn on a "gap in the record." PI Opp. at 24 n.12. *Ryan* decided the historical question under federal common law and held that the plaintiffs were unlikely to succeed on it. 974 F.3d at 23–28; *id*. at 28 ("We conclude, therefore, that the plaintiffs are unlikely to succeed in demonstrating a long-established and familiar common law rule barring courthouse arrests that can be presumed to have been incorporated into the INA's civil arrest authority."). The "gap" concerned a separate federalism-canon argument, involving a claim by the plaintiff that ICE exceeded its statutory authority under the Administrative Procedure Act in conducting

clear historical precedent for extending the privilege to arrests on behalf of the sovereign." *Id.* at 26. English "cases and treatises indicate that certain litigation-related privileges protecting attorneys on account of their necessary attendance in court did not apply in the context of" suits by the sovereign. *Id.* at 24; *see, e.g.*, *Wheely v. Richam* (1734) 92 Eng. Rep. 882, 882 (K.B.) ("[C]ertainly no privilege is good against the King"). The history "tends to suggest that crown-initiated suits may well have been exempted." *Ryan*, 974 F.3d at 24. Civil immigration arrests, like criminal arrests, "are initiated by the sovereign in order to vindicate uniquely sovereign interests," *id.* at 26, so "one would think (for the same reason) that the privilege would not shield civil immigration arrests." *Id.* at 27.[13]

And FCMC concedes that "civil immigration arrests at courthouses were nearly non-existent prior to recent years." PI Opp. at 24 n.12. That concession dooms its privilege theory. "[T]he party seeking to read a common law rule into the statute can only do so if the factual circumstances are closely analogous to a case of which Congress would have been aware." *Ryan*,

---

civil courthouse arrests "because Congress has not made clear its intent to permit ICE to conduct arrests in violation of state law." *Id.* at 33. And FCMC's account of Ohio enactments from 1799 forward, PI Opp. at 3, 22, shows only that Ohio has long protected persons from civil process. Today those protections sit in a chapter titled "Execution Against the Person," the tool of private judgment creditors. Ohio Rev. Code §§ 2331.01–.14. FCMC does not contend that any of those enactments addressed an arrest by a sovereign to enforce public law.

[13] FCMC responds that the privilege "has for its primal object the protection of the court and not the immunity of the person," so it should bind any arrester. PI Opp. at 23 (quoting *Zumsteg*, 143 N.E.2d at 703). But the same could be said of criminal arrests, which also "risk deterring parties and witnesses from coming forward" and "risk disrupting ongoing proceedings." *Ryan*, 974 F.3d at 27. Yet "courts have refrained from extending the privilege to criminal arrests due to the overriding sovereign interests in enforcing the penal laws." *Id.* FCMC fails to show that the "traditional rationales" for the privilege "plainly suggest that it swept so broadly." *Pasquantino v. United States*, 544 U.S. 349, 360 (2005). FCMC's two English cases do not fill the gap. In *Ex parte Russell*, a bankrupt attending his examination was arrested "upon an extent, sued out by the Commissioners of Excise for a debt due by him to the Crown." ECF No. 21-16 at 1. The Crown's counsel did "not press" the point that the Crown's case differed, *id.*, and a Crown creditor stands in a private creditor's shoes, pursuing a "proprietary interest[]," not a "uniquely sovereign" one. *Ryan*, 974 F.3d at 26. In *Ex parte Helsby*, private creditors "sued out" the writ, and the court held that "in substance, it is civil process to enforce the payment of a debt." ECF No. 21-17 at 2, 8. Neither applies the privilege to a sovereign enforcing public law.

974 F.3d at 24. The relevant "case" is a judicial decision applying the privilege, not an arrest. *See id.* at 24 (faulting plaintiffs for failing to offer "any pre-1952 *case law* from an American court that directly addresses the applicability of the privilege either to civil immigration arrests or to fairly comparable forms of civil arrest") (emphasis added). FCMC identifies no such decision. What remains is an "attenuated" analogy: a privilege that shielded suitors and witnesses from private civil process, stretched to reach arrests a sovereign makes in the public interest. *Id.* at 24. That falls far short of "a long-established and familiar common law rule barring courthouse arrests that can be presumed to have been incorporated into the INA's civil arrest authority." *Id.* at 28. Indeed, the most recent court to look at this issue found that "plaintiffs have not shown that there was a common law privilege against arrest by the sovereign at courthouses that was incorporated into the INA." Op. & Order at 14, ECF No. 110, *African Cmtys. Together v. Lyons*, No. 1:25-cv-6366 (S.D.N.Y. Sept. 30, 2026).

Even if the INA incorporated the privilege, the Rule would exceed it. The privilege protected suitors and witnesses "necessarily attending" court, during attendance and necessary travel. PI Opp. at 21; *see Stewart*, 242 U.S. at 129 (describing the immunity of "suitors, as well as witnesses, coming from another State or jurisdiction . . . while in attendance upon court, and during a reasonable time in coming and going"). Ohio's statutes are narrower still. They cover listed participants going to, attending, or returning from court, and only while court sits. Ohio Rev. Code §§ 2331.11(A)(4), 2331.12. Yet the Rule covers every "individual" present for "any lawful court business," whether or not court is sitting, throughout every building FCMC uses and its curtilage. ECF No. 1-4. On its face, it protects a spectator who "attends" a hearing to avoid arrest, and a person paying a fine at a clerk's window on a day no court sits. Compl. ¶ 58. FCMC identifies no authority extending the privilege to every space a court uses or to the grounds around it. In short,

any privilege that might exist gives FCMC no right to regulate federal officers, and none of the cases FCMC cites suggests otherwise.

## IV. THE TENTH AMENDMENT DOES NOT HELP FCMC BECAUSE THE INJUNCTION WOULD REQUIRE IT TO DO NOTHING.

FCMC argues that an injunction would "conscript FCMC personnel and resources into acting as the security apparatus for the federal government's immigration enforcement efforts." PI Opp. at 31. It would not. The anti-commandeering doctrine bars Congress from "directly compelling" States "to enact and enforce a federal regulatory program," *Murphy v. NCAA*, 584 U.S. 453, 472 (2018) (quotation marks omitted), and from "conscripting the State's officers directly," *Printz v. United States*, 521 U.S. 898, 935 (1997). The requested injunction does neither. FCMC identifies no federal law that orders it to adopt or implement a federal program. The United States has said so from the start: it "does not seek to compel FCMC personnel to assist immigration enforcement or to perform federal functions." PI Br. at 13 n.8. A State may not escape that conclusion "just by framing" its regulation of federal officers as management of its own affairs. *Nat'l Meat*, 565 U.S. at 464. "It is doubtful that States have reserved power to adopt . . . immigration policies contrary to those preferred by the federal government," *New York v. Dep't of Justice*, 951 F.3d 84, 113 (2d Cir. 2020) (emphasis omitted), and the Tenth Amendment is not "a sword allowing states and localities to engage in passive resistance that frustrates federal programs." *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

Next, FCMC says an injunction would let federal officers "reap the benefits" of its screening entrants to the courthouse. PI Opp. at 29–30. That theory proves too much. No provision of federal law "compel[s]"—and the United States is not seeking here to compel—the State to perform such screenings. *Murphy*, 584 U.S. at 472 (quotation marks omitted). FCMC cites no authority finding a commandeering problem when the Federal Government incidentally benefits

from activities that states voluntarily choose to undertake. That happens all the time, federal vehicles drive on roads maintained by the states, state driver's licenses may be used to enter federal buildings or pass security screenings at airports, and the Federal Government benefits from the state's voluntary activities in myriad other ways. That is not commandeering, but cooperative federalism. *U.S. v. King Cnty., Washington*, 122 F.4th 740, 758 (9th Cir. 2024) ("We would not perceive a threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways.").

Any benefit ICE receives from FCMC's screening flows from FCMC's choice to run a screened courthouse, and the theory cannot explain the Rule's reach into the curtilage, where no screening occurs. FCMC also says it would face an "impossible choice" between "uncoordinated, public courthouse arrests" and enlisting its personnel in nonpublic arrests. PI Opp. at 29–30. An injunction creates no such choice. Nothing in ICE's operative 2021 guidance requires state court officers to expend state time and resources to grant ICE agents access to non-public spaces. Nor does it otherwise conscript state officers to assist ICE agents' immigration enforcement actions. FCMC offers no basis for its view that the Federal Government violates state sovereignty by conducting arrests in the safest and least disruptive way it can. And even if FCMC did have to spend some time and effort because federal officers make arrests at its courthouse, the Supreme Court has rejected the argument that the Tenth Amendment is violated whenever a federal law "will consume [state] employees' time and thus the State's resources." *Reno v. Condon*, 528 U.S. 141, 150 (2000); *see also King Cnty.,* 122 F.4th at 758 ("To the extent King County argues that it has expended resources ensuring the safety of [a local airport] in response to ICE charter flights, it identifies no case treating this degree of background support as rising to the level of unconstitutional commandeering.").

Finally, FCMC improperly invokes the three concerns underlying *Murphy*: cost-shifting, political accountability, and tyranny. PI Opp. at 30–31. The costs FCMC describes arise from federal enforcement generally, not from this injunction. And "responsibility for the benefits and burdens" of federal immigration enforcement remains with the Federal Government. *Murphy*, 584 U.S. at 473. And the tyranny the Framers feared was federal conscription of state machinery, as in *Murphy* (striking down a federal statute that dictated state legislative choices on sports gambling), *New York v. United States*, 505 U.S. 144 (1992) (striking down federal provisions requiring States to provide for radioactive-waste disposal), and *Printz* (striking down a federal requirement that local officers conduct background checks). Nothing of the kind is at issue.[14]

Preliminarily enjoining the Rule would not require FCMC to regulate in a particular area by enacting or repealing a particular law, as in *New York* and *Murphy*, or require it to enforce a federal regulatory scheme, as in *Printz*. Federal immigration agents would still perform the arrests, and no state official would have to participate in or assist them. An injunction against the Rule would only stop FCMC from obstructing the Federal Government's enforcement of the federal immigration laws. In any event, the Tenth Amendment is not implicated where, as here, federal law regulates private actors—removable aliens—rather than the State. *Murphy*, 584 U.S. at 476–77.

[14] FCMC argues that the United States must show the Rule invalid "in every respect." PI Opp. at 31 n.17. But the complaint pleads an as-applied challenge. It alleges that the Rule "is invalid *as to the Federal Government*," Compl. ¶¶ 90, 94 (emphasis added), and it seeks a declaration that the Rule is "unenforceable *as to the Federal Government*" and an injunction against enforcing it "against the Federal Government." *Id.*, Prayer ¶¶ A–B (emphasis added). FCMC's facial-challenge standard therefore does not apply.

## V. EVERY REMAINING INJUNCTION FACTOR FAVORS AN INJUNCTION.

### A. The Rule inflicts irreparable harm every day it stands, and the record documents it.

The United States has shown it is irreparably harmed by the Rule. *See New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 366–67 (1989) (noting that irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of . . . the express constitutional prescription of the Supremacy Clause") (citation omitted). FCMC repeats its standing argument: no harm, it says, because the Rule thwarted no arrest and conjuring one requires a "series of *ifs*." PI Opp. at 33. Again, ICE made repeated arrests before the Rule, FCMC adopted the Rule to stop them, and none has occurred since. Compl. ¶¶ 38, 79; Affholter Decl. ¶¶ 26–34, 38. Each day the Rule stands, officers must forgo arrests Congress authorized or risk contempt, and no damages remedy can repair that sovereign injury. "[T]he interest of preserving the Supremacy Clause is paramount." *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (quotation marks omitted), *rev'd in part on other grounds*, 567 U.S. 387 (2012). At-large arrests take four to six officers where a courthouse arrest takes two. They demand extended surveillance and overtime, they put officers in settings without courthouse screening, and they have already sent two Columbus officers to the hospital. Affholter Decl. ¶¶ 43–44, 46–47, 50–51.[15] *See* PI Br. at 15–17.

FCMC says the Sixth Circuit "does not permit" the "shortcut" of presuming irreparable harm from a Supremacy Clause violation. PI Opp. at 32. But the case FCMC cites, PI Opp. at 32, holds that "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed."

[15] FCMC says it is "difficult to understand" why courthouse arrests would limit doxing, because FCMC does not prohibit cellphones. PI Opp. at 30 n.16. Its declarant confirms that anyone may film agents in courthouse hallways. ECF No. 21-2 at 4, ¶¶ 24–28. That is why the 2021 guidance directs courthouse actions to nonpublic areas, "outside of public view." ECF No. 21-8 at 3. At-large arrests occur on streets, in front of bystanders and cameras. Compl. ¶ 75; Affholter Decl. ¶¶ 48, 52, 56.

*Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *accord Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 642 (6th Cir. 2025); PI Br. at 10. That makes sense. Indeed, "[i]t seems rather clear that being subjected to a [local rule] that regulates an activity that is constitutionally delegated to the federal government is an infringement of the Supremacy Clause that constitutes an irreparable injury." *U.S. v. Virginia*, 2026 WL 2411521, *12 (E.D.Va. Aug. 18, 2026); *see also California*, 173 F.4th at 1069 ("[I]rreparable harm necessarily results from allowing California to enforce a law invalid under the doctrine of intergovernmental immunity."). FCMC's reliance on *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–27 (2015), for the point that the Supremacy Clause "is not the 'source of any federal rights,'" PI Opp. at 32, does not help it. *Armstrong* concerned whether private parties may sue under the Supremacy Clause. It said nothing about the United States' sovereign injury, and it reaffirmed that courts may enjoin unconstitutional state action under their equitable powers. *Id.* at 327. It also recognized that "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Id*. at 326. The injury also compounds. If FCMC may condition federal arrests on a warrant of its own design, nothing stops the next municipal court from doing the same, and federal officers would face a patchwork of local rules. PI Br. at 17.[16]

Nor does the timing of this litigation undercut the irreparable nature of the injury. *Contra* PI Opp. at 33–32. The 2025 courthouse guidance was vacated in June of this year, and the 2021 guidance replaced it as the operative guidance. The United States assessed that framework, sought voluntary compliance on August 6, received FCMC's refusal on August 18, and sued on August

[16] FCMC calls the patchwork concern "a complaint about federalism and the INA, not LR 2.10." PI Opp. at 34 n.18. But it is a complaint about rules like Rule 2.10. If one court may regulate federal arrests, others may too.

25. ECF Nos. 1-5, 1-6; PI Br. at 8. And even longer delays than the one present here do not bar preliminary relief, particularly when the time was used—as here—to prepare a case or engage in negotiations. *Larweth v. Magellan Health, Inc.*, 841 F. App'x 146, 158–59 (11th Cir. 2021) ("[M]onths-long discussions" that included the "possibility of a settlement" did not "preclude a finding of irreparable injury"); *Times Mirror Mags., Inc. v. Las Vegas Sports News*, 212 F.3d 157, 169 (3d Cir. 2000) (affirming district court finding of irreparable harm even with 15-month delay "attributable to negotiations between the parties"). It would be odd for a party's good-faith attempt to get relief by avoiding litigation to be a factor undercutting the need for preliminary relief.

And FCMC's observation that the United States has not sued the Court of Common Pleas over its "nearly identical rule," PI Opp. at 34, is a complaint about litigation priorities, which belong to the Executive. *Texas*, 599 U.S. at 678–79. Nor is FCMC somehow a "lesser target." FCMC says its judges "hear traffic and misdemeanor cases," while individuals posing "serious risks to public safety" are "far more likely to be found" in Common Pleas. PI Opp. at 34. At the same time, FCMC describes itself as '"the busiest and largest' municipal court in Ohio,'" PI Opp. at 5, with roughly "5,200 domestic violence cases" prosecuted in 2025 alone on top of "an additional 500 to 750 aggravated menacing by stalking cases." ECF No. 21-1 ¶¶ 18–19. Indeed, the arrestee FCMC highlights was "scheduled to appear. . . for a bond revocation hearing arising out of domestic violence charges." PI Opp. at 7; ECF No. 21-12 at 2–6. The order in which the United States brings its suits thus says nothing about whether the Rule inflicts irreparable harm. The Rule does, every day it remains in force.

### B. The equities and the public interest favor relief because the harms FCMC describes flow from federal law, not from this injunction.

When the Federal Government is a party, the last two injunction factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); PI Br. at 8. FCMC describes how federal immigration

enforcement affects its docket, prosecutors, and public defenders. PI Opp. at 34–36. But those effects come from the laws Congress enacted and the Executive enforces, not from this injunction, which would allow no arrest that federal law forbids. FCMC cannot have it both ways: when it argues standing, it says the 2021 guidance makes courthouse arrests "vanishingly rare," *id.* at 12, and when it argues equities, it says an injunction will cause havoc, *id.* at 35–36. Most of the harms it describes date to 2025, when the guidance permitted courthouse arrests "seemingly without limit," *id.* at 3, and FCMC admits the 2021 guidance now in force is "far-more-restrictive." *Id.* at 8. FCMC reads the guidance's acknowledgment that courthouse arrests "may chill" court access as agreement that FCMC may regulate them. *Id.* at 35. But that is an accommodation the Federal Government chose as policy, in "management guidance" that "does not affect the statutory authority of ICE or CBP employees." ECF No. 21-8, at 3. FCMC's other declarations describe fear, not arrests: clients who pleaded in absentia to "non-jailable traffic offenses," ECF No. 21-4, at 2, and individuals who are "concerned." ECF No. 21-2, at 3, ¶ 15. That fear does not stem from this injunction. Rather, it flows from the laws Congress passed.[17]

The requested injunction is also narrow. It would bar FCMC from enforcing one rule against federal officers. It would not require FCMC to assist immigration enforcement, alter its screening, or change any rule governing its staff, litigants, or facilities, and FCMC's other rules would stay in place. Compl., Prayer ¶ B; PI Br. at 13 n.8, 19. And it would restore "the last peaceable uncontested status that existed before the dispute arose." *Montgomery v. Carr*, 848 F. Supp. 770, 779 (S.D. Ohio 1993) (quoting *Massachusetts Mut. v. Associated Dry Goods*, 786

[17] FCMC says that "varying state and local standards" are "a function of our federalist system." PI Opp. at 35 n.19. But federalism does not include state power to regulate federal officers. And FCMC's vague invocation of litigants' constitutional rights, *id.* at 36 n.21, does not explain how an order that leaves FCMC's lawful procedures untouched would impair any right.

F.Supp. 1403, 1427 (N.D.Ind.1992)); PI Br. at 9. As discussed, before FCMC adopted the Rule in April 2026, ICE made courthouse arrests in coordination with court security. Affholter Decl. ¶¶ 26–34, 37.

In the end, the public interest favors relief because the Rule makes dangerous arrests more dangerous. *See* PI Br. at 17–18. When ICE cannot take custody in a screened courthouse, individuals who pose serious risks are more likely to remain at large, and arrests move to homes, workplaces, and streets where the subject may be armed or violent. Affholter Decl. ¶¶ 41, 47; Compl. ¶¶ 72–73; PI Br. at 18. Beyond that, "there is no valid state interest in enforcing unconstitutional laws." *Brown v. Yost*, 133 F.4th 725, 738 (6th Cir. 2025). FCMC's declarations show, at most, that reasonable people disagree about the prudence of courthouse immigration arrests. But that policy judgment belongs to Congress in passing laws and to the Executive in faithfully executing them. It does not belong on a municipal court's rulemaking docket.

**CONCLUSION**

The Court should grant the motion and preliminarily enjoin Defendants from enforcing Rule 2.10 against the United States and its officers.

Dated: October 9, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

HILARY K. PERKINS
Director
Enforcement & Affirmative Litigation Branch

JACQUELINE COLEMAN SNEAD
Deputy Director, Affirmative Litigation Section

/s/*Garrett Greene*
Garrett Greene (TX Bar No. 24096217)
Senior Litigation Counsel
Enforcement & Affirmative Litigation Branch
Civil Division, U.S. Department of Justice
450 Fifth Street, N.W., Ste. 6400 South
Washington, D.C. 20001
Tel.:(202) 549-9429
Email: Garrett.greene@usdoj.gov

*Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I certify that on October 9, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Garrett Greene*
Garrett Greene